# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MICHAEL ROWE,**

      **Plaintiff,**

      **v.**

**PCHANGE, LLC,** *et al.***,**

      **Defendants.**

**Civil Action No. 22-3098 (JEB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Michael Rowe filed this action in October 2022, alleging that a group of Special Police Officers employed by Defendant PChange, LLC, to guard his mother's apartment building, assaulted him and employed excessive force as he attempted to exit the parking garage. He asserted a plethora of claims arising from those events against PChange, Vesta Management DC, LLC (the apartment building's management company), and a number of individual SPOs, seeking both monetary damages and injunctive relief. Defendants responded with a motion to dismiss his injunctive-relief claim for lack of standing, which the Court granted, leaving the many and varied damages counts remaining.

Now, believing it is neither vicariously nor directly liable for the SPOs' challenged conduct, Vesta moves for judgment on the pleadings; Plaintiff also seeks leave to file a Second Amended Complaint even though the amendment deadline has passed. Because Vesta cannot show that judgment in its favor is warranted without relying on materials outside of the pleadings, and because it would be premature to convert its Motion into one for summary judgment, the Court will deny that Motion. As for Rowe's Motion for Leave to Amend, the Court will grant it in part and deny in part: Plaintiff may not add new Vesta-related entities as

defendants because he was not diligent in pursuing such amendment.  Nor may he assert Fourth

and Fifth Amendment claims against PChange under 42 U.S.C. § 1983 because such causes of

action could not withstand a motion to dismiss.  He may, however, add a common-law

negligence claim and accompanying facts against PChange because he was proactive in pursuing

that claim, its addition would not unduly prejudice PChange, and it is not futile.

## I.     Background

### A.  Factual Background

An account of the factual background, drawn from Plaintiff's First Amended Complaint,

appears in the Court's prior Opinion in this case.  Rowe v. PChange Protective Servs., LLC,

2023 WL 2598683 (D.D.C. Mar. 22, 2023).  The Court will only briefly summarize those facts

here, focusing on the allegations most relevant to the Motions at issue and assuming them to be

true.  As the relevant facts for purposes of the two extant Motions do not diverge between the

FAC and the proposed Second Amended Complaint, Plaintiff is not prejudiced by such reliance.

On October 26, 2021, Rowe drove his mother, sister, and three children to an apartment

complex in Southeast Washington — the Park Southern — where his mother lives.  See ECF No.

19 (FAC), ¶ 28.  After dropping off the adults, Plaintiff headed toward the exit of the building's

parking garage.  Id., ¶ 29.  He noticed that it was blocked by several Special Police Officers —

privately hired security officers employed by PChange whom the city empowers to act as police

on an individual's or company's property.  Id., ¶¶ 15–18, 30–31.  Rowe honked twice before the

officers moved slightly out of the way so he could navigate past them.  Id., ¶ 32.  Displeased

with the officers' behavior, Plaintiff "shouted" at them "out of frustration" as he drove by.  Id.,

¶ 33.

Things escalated from there.  An SPO stopped him and demanded identification, which Rowe refused to provide.  Id., ¶¶ 33–34.  Several officers approached his car, forced the door open, and dragged Rowe from the vehicle, ripping his clothing and, at one point, causing him to choke.  Id., ¶¶ 35, 38–41.  One SPO handcuffed Plaintiff so tightly that his wrists and hands went numb; his back was then shoved against the car.  Id., ¶¶ 42–45.  While Plaintiff stood handcuffed, an officer pepper-sprayed him in the face.  Id., ¶¶ 49–50.  He continued to withhold his consent for the officers to search him, so they slammed him into a wooden fence and then onto the ground.  Id., ¶¶ 51, 52–54.  They threatened that his three young children, screaming in the back seat of the car, would be taken away.  Id., ¶ 56.

At that point, still handcuffed, Rowe asked a resident in the parking garage to inform his mother of the incident, which she did.  Id., ¶ 57.  Plaintiff's mother went to the Vesta property-management staff's office to seek their assistance but observed that they were already aware of what was happening thanks to their cameras monitoring the parking garage.  Id., ¶¶ 58–60.  She asked the property manager, Nicole Kindred, to assist, but Kindred "was hesitant to leave the office" and said something to the effect of "there's nothing I can do if the police have been called."  Id., ¶¶ 61–62.  Eventually, Kindred accompanied Rowe's mother to the garage and asked the SPOs whether the Metropolitan Police Department had in fact been called.  Id., ¶¶ 63–64.  After the SPOs confirmed as much, Kindred told Plaintiff's mother that the SPOs were exercising their police rights and reiterated that her hands were tied.  Id., ¶ 67.

Upon their arrival, MPD officers removed Rowe's handcuffs and determined that there was not probable cause to arrest him.  Id., ¶¶ 73–74.  The MPD Lieutenant told the SPOs that they lacked the authority to make traffic stops, could not detain individuals for failing to provide identification, and could use physical force only to defend themselves or others.  Id., ¶ 77; see

also id., ¶¶ 78–81 (citing several provisions prohibiting SPOs from using excessive force and barring them from threatening or using force to retaliate against others).

    B.  Procedural Background

    In October 2022, Rowe filed this lawsuit against PChange, Vesta Corporation, and seven individual SPOs.  See ECF No. 1 (Compl.), ¶¶ 5–13.  He subsequently filed a FAC, which substituted Vesta Management DC, LLC (the entity that the Court calls "Vesta" for present purposes) for Vesta Corporation and added another SPO, among other changes.  See FAC, ¶¶ 6–14.  That pleading, the operative one here, contains 19 counts under federal and District law.  Id. at 32; see id., ¶¶ 90–214.  Defendants thereafter moved to dismiss Rowe's request for injunctive relief, asserting that he lacked standing for such relief.  See ECF No. 36 (MTD) at 1.  The Court granted that motion in March 2023, leaving Rowe's multiple monetary-damages claims.  Rowe, 2023 WL 2598683.

    Later that month, the Court issued a Scheduling Order setting May 14, 2023 — a date the parties proposed — as the deadline for both sides to seek leave to amend their pleadings or add new parties.  See ECF No. 51 (Scheduling Order).  The Scheduling Order indicated that "motions to amend pleadings or join new parties after that date based on new information uncovered in discovery will be considered."  Id.

    In the months that followed, Rowe requested documents, deposed two non-party witnesses, and scheduled numerous party depositions.  The litigation began to lag in September 2023 when counsel for PChange and the SPO Defendants moved to withdraw because of a conflict.  See ECF No. 75 (Mot. to Withdraw).  The Court granted the motion in October, and discovery essentially stood still while PChange and the SPOs arranged for new counsel.  See ECF No. 95 (Joint Mot. for Extension), ¶ 4.  In light of that holdup, in December 2023, the Court

ordered the parties to propose a revised discovery timeline.  See Minute Entry of Dec. 20, 2023.

It approved their new timeline in early 2024.  See Minute Order of Jan. 4, 2024.  That one did

not modify the deadline to seek leave to amend pleadings or add parties, but it extended the other

discovery-related deadlines.  Id.

Vesta has now filed a Motion for Judgment on the Pleadings, asserting that judgment

should be entered in its favor on the counts against it — viz., Counts XV, XVI, XVII, XVIII, and

XIX.  See ECF No. 98-1 (MJP).  In addition to opposing Vesta's Motion, see ECF No. 99 (Pl.

Opp.), Rowe has filed a Motion for Leave to File a SAC.  See ECF No. 107 (Mot. to Amend).

Vesta opposes that amendment attempt, as do PChange and one of the individual SPO

Defendants, James Parker.  See ECF Nos. 109 (Vesta Opp.); 111 (PChange & Parker Opp.).

With both Motions ripe for resolution at this time, the Court will address them together.

## II.    Legal Standard

### A.    Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on

the pleadings at any time "[a]fter the pleadings are closed — but early enough not to delay trial."

A party seeking judgment on the pleadings must demonstrate "that no material fact is in dispute

and that it is entitled to judgment as a matter of law."  Dist. No. 1 v. Liberty Maritime Corp., 933

F.3d 751, 760 (D.C. Cir. 2019) (cleaned up).  When deciding such a motion, a court "accept[s] as

true the allegations in the opponent's pleading, and as false all controverted assertions of the

movant."  Id. at 761 (cleaned up).  "[A] judgment on the pleadings is not appropriate if there are

issues of fact which if proved would defeat recovery, even if the trial court is convinced that the

party opposing the motion is unlikely to prevail at trial."  Id. (quoting Wager v. Pro, 575 F.2d

882, 884 (D.C. Cir. 1976)); see also Tapp v. Washington Metro. Area Transit Auth., 306 F. Supp.

3d 383, 391 (D.D.C. 2016) ("Because a Rule 12(c) motion would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, the Court must treat such a motion with the greatest of care and deny it if there are allegations in the complaint which, if proved, would provide a basis for recovery.") (cleaned up).  The appropriate standard for reviewing a 12(c) motion is therefore similar but not identical to that applied to a motion to dismiss under Rule 12(b).  See Samuels v. Safeway, Inc., 391 F. Supp. 3d 1, 2 (D.D.C. 2019); see id (noting that "a Rule 12(b) motion may be based on procedural failures, including lack of subject-matter jurisdiction," while "a Rule 12(c) motion centers upon the substantive merits of the parties' dispute") (cleaned up).

B.  Amendment

A plaintiff may amend her complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading.  See Fed. R. Civ. P. 15(a)(1).  Otherwise, she must seek consent from the defendant or leave from the court.  See Fed. R. Civ. P. 15(a)(2).  When a plaintiff seeks leave to amend her complaint before any deadline for amendment set in a court's scheduling order, the familiar Rule 15(a)(2) standard applies.  "The court should freely give leave when justice so requires."  Id.  In this Circuit, "it is an abuse of discretion to deny leave to amend" under Rule 15 "unless there is sufficient reason."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  Leave is accordingly granted "[i]n the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  Foman, 371 U.S. at 182.  Furthermore, under Rule 15, "the non-movant

generally carries the burden in persuading the court to deny leave to amend." <u>Nwachukwu v.</u> <u>Karl</u>, 222 F.R.D. 208, 211 (D.D.C. 2004).

A plaintiff seeking to amend her complaint <u>after</u> the scheduling-order deadline for amendment has passed, however, must satisfy Rule 16's more stringent standard. <u>See</u> Fed. R. Civ. P. 16(b)(4); <u>see also</u> <u>Lurie v. Mid-Atl. Permanente Med. Grp., P.C.</u>, 589 F. Supp. 2d 21, 23 (D.D.C. 2008) ("[A]fter the deadlines provided by a scheduling order have passed, the [Rule 16] standard must be satisfied to justify leave to amend the pleadings.") (citation omitted); <u>A Love of</u> <u>Food I, LLC v. Maoz Vegetarian USA, Inc.</u>, 292 F.R.D. 142, 143–44 (D.D.C. 2013) (collecting cases applying Rule 16 in this circumstance). Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." The plaintiff bears the burden to show "good cause for [her] failure to amend before the deadline." <u>Valle v. Karagounis</u>, 2020 WL 5505299, at *2 n.1 (D.D.C. Sept. 11, 2020). To do so, she "must show both diligence and a lack of prejudice to the opposing part[y]." <u>In re Papst Licensing GmbH & Co. KG Litig.</u>, 762 F. Supp. 2d 56, 59 (D.D.C. 2011).

Only if the court finds good cause to modify its schedule under Rule 16 does it consider if leave to amend is also appropriate under Rule 15's "more liberal standard." <u>Premier Comp</u> <u>Sols., LLC v. UPMC</u>, 970 F.3d 316, 319 & n.1 (3d Cir. 2020); <u>see</u> 6A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1522.2 (3d ed. 2016) ("[T]he Rule 16(b) standard . . . must be satisfied before determining whether an amendment should be permitted under Rule 15.").

## III.    Analysis

The Court assesses the Motions in turn, beginning with Vesta's Motion for Judgment on the Pleadings and then turning to Rowe's Motion for Leave to Amend.

A.  Vesta's MJP

The FAC alleges that Vesta is vicariously liable for the SPOs' assault, battery, false imprisonment, and intentional infliction of emotional distress, see FAC, ¶¶ 184–207 (Counts XV–XVIII), and directly liable for negligent supervision of the SPOs.  Id., ¶¶ 208–14 (Count XIX).  In seeking judgment on the pleadings on those claims, Vesta contends that it cannot be vicariously liable for the SPOs' actions because it is neither their principal nor their employer.  See MJP at 5–9.  Nor has Rowe stated a claim that Vesta is directly liable for negligent supervision, it asserts, because Vesta had no right to control the SPOs' arrests.  Id. at 9–10.  To support those arguments, Vesta attaches two documents to its Motion, which it believes demonstrate the correctness of its position.  See ECF Nos. 98-2 at 2–8 (Property Record); 98-2 at 10–25 (800 Southern-PChange Contract).

Rowe, for his part, urges the Court to ignore those documents as improperly presented on this type of motion.  See Pl. Opp. at 1, 8–10.  He asserts, moreover, that judgment on the pleadings is precluded by disputes of material fact regarding, *inter alia*, the existence of an employer-employee relationship between Vesta and PChange and the degree of Vesta's authority over the SPOs.  Id. at 10–22.

The Court begins by explaining the scope of its review given the procedural posture here and proceeds to an analysis of the merits of Vesta's arguments.

1.  *Scope of Review*

"A motion brought under Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking at the substance of the pleadings and any judicially noted facts."  All. of Artists & Recording Cos., Inc. v. Gen. Motors Co., 162 F. Supp. 3d 8, 16 (D.D.C. 2016) (cleaned up).  The Court, accordingly, may rely

only on "the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice" in considering such a motion.  Tapp, 306 F. Supp. 3d at 392 (cleaned up); see Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec., 422 F. Supp. 3d 42, 46 (D.D.C. 2019), aff'd, 980 F.3d 109 (D.C. Cir. 2020).

Vesta nonetheless urges the Court to consider two materials that were not attached to the FAC: (1) a deed indicating that the owner of the Park Southern apartment complex is an entity called 800 Southern Avenue, LLC, see Park Southern Deed; and (2) a contract between 800 Southern and PChange, indicating that 800 Southern — not Vesta — hired PChange to provide security services at the complex.  See 800 Southern-PChange Contract.  As Vesta sees it, the Court may rely on such materials without converting its Motion into one for summary judgment because the deed is a judicially noticeable public record, and the contract is relied on by the FAC. See MJP at 2 n.1, 5 n.3.  Plaintiff retorts that both are outside the pleadings and are thus improper to consider on a Rule 12(c) Motion.  See Pl. Opp. at 1, 8–10.

The Court agrees with Vesta as to the deed.  It is well established that "judicial notice may be taken of public records and government documents available from reliable sources," and there can be no doubt that the deed is such a public record.  Johnson v. Comm'n on Presidential Debates, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), aff'd, 869 F.3d 976 (D.C. Cir. 2017); see also Herron v. Fannie Mae, 2012 WL 13042852, at *1 (D.D.C. Mar. 28, 2012) (similar).  It is recorded with the D.C. Recorder of Deeds and available from the District of Columbia's Office of Tax Revenue.  See George v. Bank of Am. N.A., 821 F. Supp. 2d 299, 301 n.5 (D.D.C. 2011) ("[T]he court may take judicial notice of the Deed of Trust because it is a public document recorded with D.C. Land Records.").  Although Plaintiff is correct that the deed is "[o]utside the

[p]leadings," that is plainly irrelevant to the judicial-notice inquiry.  See Pl. Opp. at 8.  The Court, accordingly, will consider the deed.

The contract, which is neither a public record nor a government document, is a different story.  Acknowledging as much, Vesta points to the incorporation-by-reference doctrine, under which "a defendant can submit — and the court can consider — a document that is not attached by the plaintiff, but is referred to in the complaint and integral to the plaintiff's claim."  Horton v. Espindola, 319 F. Supp. 3d 395, 400 (D.D.C. 2018) (cleaned up).  It offers two reasons to treat the 800 Southern-PChange contract as such.  Neither is convincing.

First, the management company asserts that the FAC "necessarily relies" on the 800 Southern-PChange contract "because [Rowe's] theories of liability against Vesta turn on its existence."  ECF No. 101 (Vesta Reply) at 3.  That assertion misses the mark.  To start, the fact that "Plaintiff did not have access to [the contract] and was not aware of its existence until receiving it in discovery five months after [the FAC was filed]" casts doubt on the notion that the FAC "necessarily relies" on it.  See Pl. Opp. at 8.  More crucially, Vesta mischaracterizes Plaintiff's theories of liability, which "rest on the allegations in the [FAC] that Vesta had and exercised actual control and supervisory authority over PChange and the SPO Defendants" — not on the contractual relationship between Vesta and PChange.  See Pl. Opp. at 8 (emphasis added); see Search v. Uber Techs. Inc., 128 F. Supp. 3d 222, 232 (D.D.C. 2015) (noting "the parties' actual relationship, in spite of contractual language, may be the conclusive factor" in assessing employer-employee relationship) (cleaned up); cf. Slaughter v. Catholic Univ., 2024 WL 1299373, at *3 (D.D.C. Mar. 27, 2024) (document that "does not appear to form the basis for any part of [plaintiff's] claims" is not necessarily relied on).  While the contract may prove integral to Vesta's defenses to those theories, it is not fair game on a Rule 12(c) Motion.

Second, Vesta argues that the contract is incorporated because the FAC "referenced" it. See MJP at 5. Not so. If anything, the FAC referenced a <u>different</u> contract — *viz.*, a contract between Vesta and PChange, which Vesta asserts does not exist. See FAC, ¶ 6 (alleging that, "[a]t the time of the incident at issue here, Vesta contracted PChange to provide security services at Park Southern"); <u>see also</u> MJP at 5 (explaining that there is no Vesta-PChange contract because "[t]he party that hired PChange is . . . 800 Southern"). Although a document need not always "be mentioned by name to be . . . incorporated by reference into the complaint," <u>Strumsky v. Wash. Post Co.</u>, 842 F. Supp. 2d 215, 218 (D.D.C. 2012) (cleaned up), that passing mention of a different contract does not do the trick, especially given that Plaintiff does not rely on it to establish Vesta's vicarious liability. <u>Cf.</u> <u>Horton</u>, 319 F. Supp. 3d at 401 (even "mentioning" contract in complaint not enough to make <u>that</u> contract "an integral part of the pleading" that is incorporated by reference into complaint) (cleaned up).

Vesta retorts that the Court could still consider the 800 Southern-PChange contract at this juncture by construing its Motion as one for summary judgment. Under Rule 12(d), if "matters outside the pleadings are presented to and not excluded by the court," then the Rule 12 "motion must be treated as one for summary judgment under Rule 56." <u>See also</u> <u>Yates v. Dist. of Columbia</u>, 324 F.3d 724, 725 (D.C. Cir. 2003). The Court therefore has discretion to either exclude the contract or convert the Rule 12(c) motion into a motion for summary judgment. <u>Gilliard v. Gruenberg</u>, 302 F. Supp. 3d 257, 274 (D.D.C. 2018) (such decision is "committed to the sound discretion of the trial court") (cleaned up); Wright & Miller § 1371 ("[I]t is well-settled that it is within the district court's discretion whether to accept extra-pleading matter on a motion for judgment on the pleadings and treat it as one for summary judgment or to reject it and maintain the character of the motion as one under Rule 12(c).").

Exercising that discretion, the Court declines Vesta's invitation to construe its Motion as one for summary judgment. Rowe has not yet had an opportunity to take discovery that might bear on contentions crucial to Vesta's Motion, including ability to control the SPOs and its formal relationship with them. See Pl. Opp. at 23–24. Nor has he deposed any of the parties. Id. at 24. Considering summary judgment at this juncture would therefore be premature and unfairly prejudice him. Cf. Yazzie v. Nat'l Org. for Women, 2021 WL 1209347, at *8 (D.D.C. Mar. 30, 2021). As a result, in considering Vesta's Motion under Rule 12(c), the Court will take judicial notice of the Park Southern deed but exclude the 800 Southern-PChange contract.

### 2. *Merits*

That brings us to the merits of the Motion, starting with the vicarious-liability counts.

#### a. Vicarious Liability (Counts XV–XVIII)

Rowe sets forth several theories under which Vesta is vicariously liable for the SPOs' actions on October 26, 2021. See Pl. Opp. at 10–13, 17–19; see also FAC, ¶¶ 184–207. Principal among them is *respondeat superior*. Under that doctrine, "an employer may be held liable for the acts of his employees committed within the scope of their employment." Search, 128 F. Supp. 3d at 231 (quoting Brown v. Argenbright Sec., Inc., 782 A.2d 752, 757 (D.C. 2001)); see Restatement (Third) of Torts § 3; Restatement (Third) of Agency § 7.07. To prevail on such a theory of liability here, Rowe would have to show both that: (1) there exists an employer-employee (or principal-agent) relationship between Vesta and PChange and between PChange and the SPOs, and (2) the SPOs committed their allegedly tortious acts within the scope of such employment. Search, 128 F. Supp. 3d at 231. Because Vesta does not contest Plaintiff's showing on the second prong, see MJP at 5–8, the only question is whether it has shown an

entitlement to judgment on the pleadings with respect to the first — specifically, whether there exists an employer-employee relationship between Vesta and PChange.

Insistent that such a relationship exists, Rowe alleges that "Vesta, which contracts with PChange to provide security services at the Park Southern property, has and exercises the power to control the conduct of the SPOs employed by PChange, placing the SPOs in an employee-employer or master-servant relationship with Vesta." FAC, ¶¶ 187, 193, 199, 205. Other allegations in the FAC bolster his claim that Vesta was the SPOs' employer (via PChange) insofar as it had the right to control their conduct. See, e.g., id., ¶ 24 (alleging that Vesta staff "actively direct the PChange SPOs assigned to the Park Southern property, including by directing them to certain locations on the property and directing them to address various security issues and incidents"; id., ¶¶ 25–27 (similar); see also Moorehead v. Dist. of Columbia, 747 A.2d 138, 143 (D.C. 2000) (under D.C. law, "the right to control an employee in the performance of a task and in its result" is "usually" the "determinative factor" in establishing whether employer-employee relationship exists) (citation omitted).

The management company nonetheless believes that this is insufficient for two reasons, both of which come up wanting. First, it contends that the FAC misstates the relationship between Vesta and PChange. 800 Southern — not Vesta — is PChange's employer. See MJP at 5–6; see also ECF No. 37 (Answer), ¶ 6 (Vesta denying that it contracted with PChange). Vesta and PChange are merely co-agents of the same principal, it says, rendering *respondeat superior* liability inapplicable. See MJP at 6; see Restatement (Second) of Agency § 358(1) ("The agent of a disclosed or partially disclosed principal is not subject to liability for the conduct of other agents unless he is at fault in appointing, supervising, or cooperating with them.").

The hurdle for Vesta at this stage is that it cannot establish this fact without relying on the excluded 800 Southern-PChange contract. Nor does it try, for that matter. See MJP at 5–6 (basing argument entirely on contract); Vesta Reply at 11 (same). Because the Court must accept the facts alleged in the FAC as true, the management company's protestations about their accuracy goes nowhere at this point. Assuming that it is correct about the legal relationships between these entities, that may be important at summary judgment, but not here.

Second, Vesta admits that the FAC alleged facts indicating its "general ability to control the SPOs on some issues" but submits that Rowe failed to allege facts "to support a conclusion that Vesta exercised control over the SPOs' arrests" specifically. See MJP at 6–7 (emphasis added). Nor could he so allege, Vesta posits, because it "has no right to interfere with an SPO's arrests, as a matter of law." Id. at 7 (citing D.C. Code § 22-405.01(b)). Indeed, the management company asserts that Plaintiff actually pled "himself out of a claim by including other allegations that negate his conclusion that Vesta could control the SPOs' arrests" — viz., his negligent-supervision claim based on the fact that Kindred "repeatedly stated that she had no ability to intervene in the SPOs' arrests." Id. (citing FAC, ¶¶ 62, 64, 67). According to Vesta, such claims are "[c]ontradictory," rendering his complaint "inherently implausible." Id. (quoting Yen Hoang v. Contextlogic, Inc., 2023 U.S. Dist. Lexis 182500, 30–31 (N.D. Cal. 2023)).

The Court finds no tension between Rowe's allegation that Vesta had the right to control the conduct of the SPOs and his claim that Kindred personally (and, in his view, negligently) disclaimed any ability to intervene. In any event, plaintiffs may generally plead contradictory theories of liability. See Administrators of the Tulane Educ. Fund v. Ipsen Pharma, S.A.S., 771 F. Supp. 2d 32, 41 (D.D.C. 2011). Nor does the Court believe that Plaintiff needed to specifically allege that Vesta has control over the SPOs' arrests — as distinct from other conduct

— in order to survive judgment on the pleadings.  See FAC, ¶¶ 24, 25, 27 (alleging that Vesta had power to control SPOs' conduct with respect to their work providing security at Park Southern).  Vesta, for its part, cites no authority for the proposition that Plaintiff's allegation was insufficiently specific to establish an employer-employee relationship.  As Rowe accurately observes, moreover, "[T]he arrest itself is not the only conduct raised in the Amended Complaint."  Pl. Opp. at 17.

While Vesta may succeed at the summary-judgment stage on its argument that it is not PChange's employer, Rowe's *respondeat superior* theory of vicarious liability persists at present. The Court, as a result, need not spill any ink on Plaintiff's alternative theories of vicarious liability and will instead turn to the issue of direct liability.

### b.  Direct Liability (Count XIX)

The FAC also advances a negligent-supervision claim against Vesta under D.C. common law.  "[L]iability for negligent supervision arises when an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." Moore v. Dist. of Columbia, 79 F. Supp. 3d 121, 142 (D.D.C. 2015) (citation omitted); see also Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985).  Here, Rowe alleges that Vesta "negligently supervised the Individual SPO Defendants because its property management staff knew or should have known that the Individual SPO Defendants were behaving dangerously regarding Mr. Rowe and failed to take any action, including adequately supervis[ing] the Individual SPO Defendants."  FAC, ¶ 210.  He supports that claim with allegations regarding Kindred's actions (or, more accurately, lack thereof) on October 26, 2021.  See, e.g., id., ¶¶ 211–13.

Rather than contending that the allegations as pled in the FAC are not up to snuff, Vesta devotes its Motion for Judgment on the Pleadings to prophesying that Rowe "will be unable to show" the elements of a negligent-supervision claim. <u>See</u> MJP at 10.  In particular, it submits that Plaintiff "will be unable to show that Vesta, which neither hired nor controlled PChange or its SPOs, owed him a duty of care"; that "Vesta had a right to control or supervise the SPOs in a manner that would impose liability for negligent supervision"; or "even if Vesta had a right to supervise the SPOs, that Vesta had adequate notice of an issue with the SPOs and an opportunity to exercise a right of supervision here, in his spur-of-the-moment arrest." <u>Id.</u>

The problem with those predictions is that they are exactly that — predictions.  As Rowe points out, "[T]he question on a Rule 12(c) motion is not what may be ultimately proven, but rather whether the allegations, if taken as true, make out a claim."  Pl. Opp. at 21; <u>see</u> <u>Kivanc v. Ramsey</u>, 407 F. Supp. 2d 270, 273 (D.D.C. 2006) ("Granting judgment on the pleadings under Rule 12(c) . . . is warranted only if it appears beyond doubt, based on the allegations contained in the complaint, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (cleaned up); <u>cf.</u> <u>Covad Commc'ns Co. v. Bell Atl. Corp.</u>, 398 F.3d 666, 671 (D.C. Cir. 2005) ("[T]he issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (citation omitted).  As long as the FAC adequately pled facts to support a negligent-supervision claim, whether or not Rowe can actually prove them is an issue for another day.

Perhaps recognizing that, Vesta refocuses its energy in its Reply on the adequacy of the pleadings.  It first re-ups its argument that the negligent-supervision claim fails because Vesta was not the SPOs' employer and did not have a right of control over their arrests.  <u>See</u> Vesta Reply at 9–10.  That argument is infirm at this stage for the same reasons discussed above —

namely, Vesta cannot undermine Rowe's employer-employee allegation without relying on the extraneous contract, and Plaintiff's general allegation that the management company had control over the SPOs' conduct suffices.  See Section III.A.2.a, *supra*.  The argument also seems to conflate theories of liability.  See Brown, 782 A.2d at 760 ("[Defendant's] duty to supervise is not merely to be judged by the concept of *respondeat superior*.") (cleaned up); see also Jackson v. Starbucks Corp., 2022 WL 888180, at *13 (D.D.C. Mar. 25, 2022) (explaining conflation).

Shifting gears, Vesta next submits that Rowe's allegations do not establish that Kindred had the "requisite knowledge" to support a theory of negligent supervision.  See Vesta Reply at 10.  In particular, the company observes that by the time she arrived in the garage, Rowe "was already sitting upright, cuffed," so she "could not have heard or known what happened inside the car."  Id.  That critique ignores the allegations in the FAC.  True, Kindred did not see the SPOs' conduct up close until she "accompanied Mr. Rowe's mother to the parking garage," at which point Rowe was in handcuffs.  See FAC, ¶ 63.  But, according to the allegations, Kindred was aware of the incident in real time both because her office had security cameras on and because Rowe's mother informed her of it.  Id., ¶ 59 ("Once Mr. Rowe's mother was in the management staff's office, . . . she observed that the staff appeared to already be aware of what had happened."); id., ¶ 60 ("On information and belief, the Vesta property management staff had access to cameras with views both inside and outside the garage where the incident occurred."); id., ¶¶ 61–63 (alleging that Rowe's mother informed Kindred of incident and "demanded" she come outside).  It strains credulity to contend that, notwithstanding those facts, Kindred lacked the requisite knowledge.

It is of no moment, moreover, that Kindred's knowledge of the incident was contemporaneous.  Although the archetypal negligent-supervision case involves a pattern of

employee wrongdoing preceding the incident in question, "the courts that have considered this issue uniformly concluded that such" a contemporaneous-knowledge claim "can proceed." Jackson v. Starbucks Corp., 2021 WL 1317883, at *5 (D.D.C. Apr. 8, 2021) (cleaned up); see also Spicer v. Dist. of Columbia, 916 F. Supp. 2d 1, 3 (D.D.C. 2013) (allegation that prison supervisor "was negligent in failing to adequately supervise the other officers [on] the night of the incident" such that "they attacked an inmate and broke his foot" was sufficient to show knowledge); Godfrey v. Iverson, 559 F.3d 569, 571 (D.C. Cir. 2009) (basketball player liable for negligently supervising bodyguard when he failed to "say or do anything to try to stop" bodyguard from fighting and injuring plaintiff in nightclub fight).

As a *pis aller*, Vesta proposes that Rowe is asserting "what is essentially a bystander liability claim" — *i.e.*, that "Vesta's employee should have intervened in his arrest" — but has failed to adequately plead as much. See Vesta Reply at 2; id. at 5–10; see also id. at 10 (citing bystander-liability case, Smith v. City of Atlanta, 2013 U.S. Dist. Lexis 38879 (N.D. Ga. 2013)). The Court agrees that Rowe has not alleged facts sufficient to make out a bystander-liability claim. That much is obvious: Kindred is not a police officer. See Wheeler v. Am. Univ., 619 F. Supp. 3d 1, 33 (D.D.C. 2022) (to establish bystander liability, plaintiff must show that a police officer "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act"). That is beside the point, however, because Plaintiff does not purport to allege bystander liability, and the Court rejects Vesta's attempt to rewrite Rowe's pleading for him.

*       *       *

In sum, Rowe's lawsuit against Vesta lives on — for now.  He may well face an uphill climb in parrying a future motion for summary judgment by Vesta that advances the same vicarious-liability arguments set forth in this Motion.

### B.  Rowe's Motion to Amend

Next up is Rowe's Motion for Leave to Amend, which seeks permission to file a SAC that would: (1) name five additional Vesta entities as Defendants; (2) add several claims against Defendant PChange; (3) revise the allegations concerning SPO Defendants Bryan Hunter and Stefan Williams to clarify which SPO engaged in which conduct; and (4) revise the negligent-supervision claim against Vesta so it alleges not only negligent supervision, but also negligent hiring and retention.  See Mot. to Amend at 5–6; see also ECF No. 107-2 (Proposed SAC). Because no Defendant seems to oppose the third or fourth category, the Court will permit those clarifying amendments and limit its substantive analysis to the first two categories.

#### 1.  *Addition of Vesta Entities as Defendants*

Recall that Rowe originally named Vesta Corporation as the sole Vesta-related Defendant in this action.  See Compl., ¶ 6.  His FAC then replaced Vesta Corporation with Vesta Management DC LLC (the entity that the Court refers to in this Opinion as "Vesta"), see FAC, ¶ 6, apparently based on "representations by Vesta's counsel that this was the 'proper Vesta entity.'"  Mot. to Amend at 6; see also ECF No. 103-2 (Declaration of David Last), ¶ 7.  Now, Plaintiff seeks to reinstate Vesta Corporation as a defendant and add four other Vesta entities: Vesta Equity Corporation, Vesta Management Corporation, Vesta PSRC, and 800 Southern (collectively, "Vesta Entities").  See Proposed SAC at 1–2; id., ¶¶ 7–10.

In opposing such additions, Vesta contends that Rowe cannot show good cause under Rule 16 because he has not been diligent in pursuing amendment, and his amendment would

prejudice the management company.  See Vesta Opp. at 10–16.  Nor can he establish that amendment would be warranted under Rule 15, says the company, because adding the Vesta Entities would be futile.  Id. at 6–10.  Because the Court agrees on diligence, it need not delve into prejudice or the Rule 15 considerations.

To evaluate whether a plaintiff has acted diligently for purposes of Rule 16, the court "focus[es] on the reasons the plaintiff has given for his delay instead of the substance of the proposed amendment."  Lurie, 589 F. Supp. 2d at 23.  Here, Plaintiff asserts that any delay in his proposed addition of the Vesta Entities is due to his recent receipt of "information that was not previously available to [him] through the exercise of diligence."  Mot. to Amend at 6.  In particular, he explains that he did not realize that he may have sued the wrong Vesta entity until Vesta filed its Motion for Judgment on the Pleadings in January 2024.  Id. at 6–7.

The problem for Plaintiff is that he "had all of the information on which his current request to add new parties is based" by March 31, 2023 — i.e., a month and a half before the Scheduling Order's amendment deadline of May 14, 2023.  See Vesta Opp. at 3.  Vesta's Motion for Judgment on the Pleadings may have catalyzed Rowe into realizing that he needed to sue additional entities.  But his reasons for adding such entities rely entirely on information included in Vesta's initial disclosures over a year ago — i.e., the 800 Southern-PChange Contract and a management agreement between Vesta and 800 Southern — and public records.  See Proposed SAC, ¶ 20 (citing public records); id., ¶ 22 (citing Vesta-800 Southern management agreement); id., ¶ 23 (citing public records); id., ¶ 24 (citing 800 Southern-PChange Contract); id., ¶ 25 (citing 800 Southern-PChange Contract); see also ECF Nos. 109-1 (Vesta Initial Disclosures); ECF No. 103 (Pl. Notice of Errata) at 1 (acknowledging that contract was provided at this time). There can be no doubt that waiting until nine months after the deadline to seek amendment based

on information learned 44 days before that deadline is not diligent.  See <u>Phillips v. Dist. of Columbia</u>, 2023 WL 5607449, at *5 (D.D.C. Aug. 30, 2023) (plaintiff not diligent where she had access to information before amendment deadline).  To this, Rowe offers three responses.

First, he requests that the Court disregard Rule 16 and apply only Rule 15's more lenient standard because the Scheduling Order specifically noted that "motions to amend pleadings or join new parties after [May 14, 2023,] based on new information uncovered in discovery will be considered."  Scheduling Order; <u>see</u> Mot. to Amend at 2, 4–5.  How that language helps Rowe is lost on the Court.  Even if the Scheduling Order created a special exception to the Rule 16 standard for amendments based on information uncovered in discovery after the May 14, 2023, deadline, his proposed amendment is based on information discovered <u>before</u> that deadline, as explained above.  Such a carveout, accordingly, would not apply.

Second, Rowe explains that the reason why he did not seek leave to amend between September 2023, when PChange and SPO Defendants' counsel withdrew, and February 2024, when he ultimately filed his Motion to Amend, was that "the majority of the parties were unrepresented and . . . the discovery process was suspended until PChange could ascertain counsel."  ECF No. 113 (Pl. Reply) at 4; <u>see also</u> Mot. to Amend at 7.  "Plaintiff had good cause to not seek to amend the FAC during that time," he says, "including during the time between the appearance for counsel for PChange and James Parker and the appearance of counsel for Stefan Williams on February 16, 2024."  Pl. Reply at 4.  The Court fully concurs that such time period should not be held against Plaintiff because the standstill was no fault of his.  But that does not alter the conclusion that Rowe was less than diligent — he never filed a motion to amend <u>before</u> September 2023.

Third, Plaintiff attempts to pass the buck for his lack of diligence to Vesta. Specifically, he emphasizes that he substituted Vesta for Vesta Corporation in the FAC in the first place "based on Vesta's counsel's representations that [it was] the 'proper Vesta entity' for this litigation" — a representation that he now believes was malarkey. See Mot. to Amend at 3 (quoting Last Decl., ¶ 7). To make matters worse, Rowe says, "Vesta then knowingly delayed revealing" that "800 Southern . . . was the proper defendant" in this case "for more than a year before filing its Motion for Judgment on the Pleadings. Pl. Reply at 5.

Vesta responds that it made no false representation to begin with: it represented only that Vesta "is the correct entity that managed Park Southern," which is true. See Vesta Opp. at 15; see also ECF No. 109-11 (Vesta-Rowe Email Exchange) at 3 (Vesta counsel stating that Vesta is the entity "that manages the property") (emphasis added); Last Decl., ¶ 7 ("Mr. Rowe agreed to this substitution after counsel for Vesta and 800 Southern confirmed that Vesta is the correct entity that managed Park Southern.") (emphasis added); cf. Vesta-Rowe Email Exchange at 3 (Vesta counsel explaining that "Vesta Corp is the member of the member of Vesta Management DC LLC (so Vesta Management DC ➔ member ➔ Vesta Corp)"). What is more, it gave Rowe both the contract and the management agreement in March 2023, as discussed, and those materials indicated that 800 Southern, not Vesta, was the owner of the apartment complex and had hired PChange. See Vesta Opp. at 13.

On this point, Vesta has the better of the arguments. The Court is not persuaded that it inveigled Rowe into naming the wrong Vesta entity. Even if it did initially make an incorrect representation, the management company certainly did not "knowingly delay[] revealing" information about the Vesta Entities as Plaintiff claims. Contra Pl. Reply at 5. It disclosed the documents containing such information as part of its initial disclosures, and Rowe offers no

reason why such documents were inadequate to provide him with a basis to make the amendment he seeks.  Nor could he, since all he cites to support the addition of parties in the proposed SAC is the contract, management agreement, and public records.  <u>See</u> Proposed SAC, ¶¶ 20, 22–25.

The Court therefore concludes that Rowe has not acted diligently with respect to adding the Vesta Entities, meaning there is no good cause under Rule 16.  <u>United States v. Kellogg Brown & Root Servs.</u>, Inc., 285 F.R.D. 133, 136 (D.D.C. 2012) ("If the party was not diligent, the inquiry should end.") (citation omitted).  He will, accordingly, not be permitted to add these entities.

### 2.  *Addition of Claims Against PChange*

That is not all.  Rowe seeks to augment his case against PChange, too.  Specifically, he wants to add PChange as a Defendant for Counts I and V, which currently name only the individual SPOs.  These two counts allege unlawful seizure in violation of the Fourth Amendment and excessive force in violation of the Fifth Amendment, respectively.  <u>See</u> Proposed SAC, ¶¶ 169–81 (Count I); <u>id.</u>, ¶¶ 203–18 (Count V).  Rowe believes that the security company is liable pursuant to 42 U.S.C. § 1983 "under the theory of liability for constitutional harms as against a municipality as outlined in" <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).  <u>See</u> Mot. to Amend at 1.  Specifically, he asserts deliberate indifference to misconduct by these and other SPOs that put PChange on notice of a need for better training.  <u>See</u> Proposed SAC, ¶¶ 179, 216.  He also seeks to add a count of negligent supervision, hiring, and retention against PChange under D.C. common law.  <u>See id.</u>, ¶¶ 308–15 (New Count XX).

In their joint Opposition, PChange and SPO Parker argue that Rowe has not shown good cause for amendment under Rule 16.  <u>See</u> PChange & Parker Opp. at 3–8.  Even if he had, they say, amendment is unwarranted because it would be futile.  <u>Id.</u> at 8–11.  (Well, technically,

thanks to a hapless typo, which the Court assumes was not a Freudian slip, their argument header says that "amendment would <u>not</u> be futile." <u>Id.</u> at 8 (emphasis added). The Court thus considers their position to be the opposite.) It begins with the Rule 16 inquiry and then turns to Rule 15.

        a. Rule 16: Diligence and Prejudice

Asking the Court to deem him diligent, Rowe explains that he could not have added his new claims against PChange before the May 14, 2023, deadline because he learned the factual basis for them only in August 2023 when he deposed non-party D.C. government witnesses — *i.e.*, representatives of MPD and the District of Columbia Department of Licensing and Consumer Protection (DLCP). <u>See</u> Mot. to Amend at 5, 12; <u>cf.</u> <u>Salomon v. Adderley Indus., Inc.</u>, 960 F. Supp. 2d 502, 507 (S.D.N.Y. 2013) ("Because Plaintiffs learned about the [facts supporting amendment] through discovery after the expiration of the scheduling order deadline, their inability to [make the amendment] prior to the expiration of the deadline does not constitute a failure of diligence."). Those witnesses "testified that several of the SPO Defendants did not have effective licenses on the date of the incident, and two of [theirs] had, in fact, been revoked as a result of their misconduct or were in expired status as of the date of the incident." Mot. to Amend at 5. It was only then that Plaintiff learned about "PChange's conduct in arming and permitting unlicensed individuals to patrol their property and conduct traffic stops." <u>Id.</u> at 6.

PChange and Parker believe that Rowe should have gleaned that information from MPD's and DLCP's document productions on May 22, 2023 (a date that the reader will note was still after the amendment deadline). <u>See</u> PChange & Parker Opp. at 4; <u>see also</u> ECF Nos. 111-2 (Report on SPOs Arrington and Hunter); 111-3 (Notice of Proposed Revocation of PChange License). Vesta apparently agrees. <u>See</u> Vesta Opp. at 13 ("While it is true Plaintiff asked the MPD deponent about those records, the questions-and-answers merely asked what was already

evident from the face of the documents themselves."). To that, Plaintiff replies that "the license status for these SPOs was not evident from the face of the materials produced by MPD and DLCP, which show only the initial date of receipt of the SPO license and an expiration date and then refer to an extension of time to renew licenses as a result of the COVID-19 pandemic." Pl. Reply at 3. A perusal of those productions reveals that Rowe is correct. Although they hinted that there was trouble in PChange paradise, they did not reveal the full basis of his new claims — *i.e.*, the fact that several SPO Defendants did not have effective licenses and that the security company had notice of that, or any other instances of misconduct.

Defendants next point out that other factual allegations Plaintiff seeks to add regarding prior misconduct by PChange SPOs rely on allegations in other lawsuits, which are matters of public record that Rowe could have accessed at any point. See Proposed SAC, ¶¶ 144–46; PChange & Parker Opp. at 5; see also ECF No. 111-4 (Docket Sheet & Complaint in Rivers v. PChange, LLC, 2017-CA-8080-B (D.C. Super. Ct. Dec. 6, 2017); Robinson v. Hardy, No. 19-3070, ECF No. 9 (D.D.C. Jan. 10, 2020) (Robinson Complaint). True, but those allegations alone did not give Rowe "a sufficient factual basis to assert" his new claims. Cf. Hudson v. Am. Fed'n of Gov't Emps., 2019 U.S. Dist. LEXIS 129137, at *11 (D.D.C. Aug. 2, 2019). Indeed, even PChange and Parker implicitly acknowledge as much. See PChange & Parker Opp. at 9–10 (pointing out that these lawsuits "do not involve the SPO defendants" and "were settled before trial with no finding of liability as to PChange").

Nonetheless insistent on Rowe's dilly dallying, PChange and Parker posit that even if he did not obtain the information he needed for his new claims against the security company until the August 2023 depositions, he "still fails to provide any further explanation as to why he waited almost seven months since the depositions to seek leave to file the proposed SAC."

PChange & Parker Opp. at 6. But the Court has already explained that it will not hold against Plaintiff the time period during which discovery was suspended in light of PChange's and SPO Defendants' counsel's withdrawal — *viz.*, from September 2023 to February 2024.

The question, then, is whether Rowe should have sought leave to file the proposed SAC in the seven weeks between the August 2023 depositions and the September 2023 withdrawal of counsel. PChange and Parker say yes, faulting Plaintiff for "provid[ing] no explanation for not seeking leave from the Court during this time period." Id. at 5. Yet they cite no case holding that a plaintiff must seek amendment in such a short time period to be deemed diligent under Rule 16, and the Court is aware of none. During those seven weeks, moreover, Plaintiff did not sit twiddling his thumbs. Instead, he "sought to obtain additional information relating to the new claims against PChange through party depositions that were scheduled in August, then rescheduled to September 2023 to accommodate opposing counsels' schedules." Pl. Reply at 4. The Court declines to conclude that Rowe was not diligent because he did not file his Motion in the cabined time period between the depositions and the withdrawal of counsel.

That brings us to prejudice. Defendants assert that amendment would prejudice them, emphasizing the (now-past) April 3, 2024, fact-discovery deadline. See PChange & Parker Opp. at 7; see also Vesta Opp. at 15–16. They believe that the proposed SAC would, moreover, "require the parties to this case to essentially litigate the merits of two other cases to see if the plaintiff's claims in those cases, which settled before trial, had sufficient merit such that they could be used as incidents that could have put [PChange] on notice of an issue with the SPOs (assuming, *arguendo*, that the conduct of PChange SPOs other than those involved in Rowe's alleged incident was relevant)." PChange & Parker Opp. at 7 (quoting Vesta Opp. at 16).

Not quite; Defendants hyperbolize the prejudice here.  For one, this suit is still in early stages — the fact-discovery period remained open when Plaintiff filed his Motion to Amend, expert discovery has only just begun, and "they have plenty of time to prepare any motions for summary judgment."  Pl. Reply at 9; see James Madison Project v. DOJ, 208 F. Supp. 3d 265, 277 (D.D.C. 2016) ("When amendment is sought shortly after discovery ends but before summary judgment briefing has commenced, the prejudice to a defendant if any, is minimal.") (cleaned up).  For another, any prejudice can be mitigated by a limited reopening of fact discovery.  Ellis v. Georgetown Univ. Hosp., 631 F. Supp. 2d 71, 79 (D.D.C. 2009) ("[A]ny potential prejudice would be ameliorated by supplemental discovery related to, what it characterizes as, [plaintiff's] 'new' claims.").

In addition, as Rowe points out, the new claims — and the factual basis for them — do not come out of thin air.  Defendants "have been aware of" the "prior complaints filed against PChange for the conduct of its SPOs in lawsuits that were settled out of court" and "complaints by Park Southern residents made to Vesta about PChange SPOs, which were then relayed to PChange," for "many months, and in most cases for much longer than Plaintiff, because Defendants themselves possess the evidence regarding most of the complaints."  Pl. Reply at 7 (emphasis omitted).  Plaintiff is also correct that "Vesta and PChange . . . learned that multiple SPOs did not have valid licenses at the time of the incident alleged in this case after testimony from MPD and DLCP" in August 2023 and have "thus had an adequate opportunity to take discovery on these allegations."  Id. at 8.  And "Vesta and PChange's awareness of misconduct by SPO Defendants and PChange SPOs was already a subject of discovery under the FAC."  Id. at 8; see FAC, ¶ 210.

27

In light of Rowe's diligence and minimal — if any — prejudice to Defendants, the Court concludes that he has shown good cause for his amendments under Rule 16.

### b.  Rule 15: Futility

That, however, is not the end of the story.  The question whether leave to amend is appropriate under Rule 15 remains.  PChange and Parker argue that it is not, invoking futility. See PChange & Parker Opp. at 8–11.  In their view, neither Rowe's Monell claims under 42 U.S.C. § 1983 nor his common-law negligence count could withstand a motion to dismiss.  Id. These will be addressed separately, starting with Monell.

### i.   Monell

A brief primer on municipality liability may prove useful.  Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of . . . the District of Columbia, subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable."  A municipality may be sued as a person under that section.  Monell, 436 U.S. at 690; see also Dorman v. Dist. of Columbia, 888 F.2d 159, 162 (D.C. Cir. 1989).

The statute, however, imposes liability on a municipality only for its own illegal actions — i.e., "'action [taken] pursuant to official municipal policy'" — that "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such a deprivation."  Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Monell, 436 U.S. at 691–92).  In other words, "[a] municipality may not be held liable under § 1983 for the acts of its employees on a theory of respondeat superior."  Grissom v. Dist. of Columbia, 853 F. Supp. 2d 118, 122 (D.D.C. 2012).  A plaintiff may state a claim that a municipal policy exists by showing, inter alia, that "the municipality knew or should have known of a risk of constitutional violations, but showed

'deliberate indifference' to that risk by failing to act." Hurd v. Dist. of Columbia, 997 F.3d 332,

337 (D.C. Cir. 2021) (cleaned up); see also Daskalea v. Dist. of Columbia, 227 F.3d 433, 441

(D.C. Cir. 2000) (a municipality's "inaction, including its failure to train or supervise its

employees adequately, constitutes a policy or custom under Monell when it can be said that the

failure amounts to deliberate indifference towards the constitutional rights of persons in its

domain") (cleaned up).

      Municipal liability under Monell also demands a showing of causation — specifically, a

§ 1983 plaintiff must plead facts to support an inference that the official municipal policy

"'cause[d]' an employee to violate another's constitutional rights." Monell, 436 U.S. at 692

(citing Rizzo v. Goode, 423 U.S. 362, 370–71 (1976)).  That is, "a municipality can be liable

under § 1983 only where its policies [or customs] are the 'moving force [behind] the

constitutional violation.'" City of Canton v. Harris, 489 U.S. 378, 388–389 (1989) (cleaned up).

      Here, Rowe alleges that PChange had "actual notice of a pattern" of employee

misconduct — including false arrests and excessive force — yet was "deliberately indifferent" in

"its failure to adequately supervise and/or discipline its SPOs," and that its indifference was "the

direct cause" of his injuries.  See Proposed SAC, ¶¶ 178–81, 215–18.  In other words, his theory

seems to be that PChange was deliberately indifferent to the risk that, if it did not better train its

employees on the "legality of stops, seizures, searches, and use of force," id., ¶ 127, and

discipline them for misconduct, they would inevitably commit constitutional violations.

      At this point in the analysis, the Court would not fault a reader for wondering how Rowe

could possibly assert a Monell claim against PChange, which is not a governmental entity but a

private business.  See FAC, ¶ 5.  The answer is that a private corporation acting under color of

state law is treated as a municipal entity under § 1983.  See Smith v. Corr. Corp. of Am., 674 F.

Supp. 2d 201, 205 (D.D.C. 2009) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)); see also

Jackson v. Ill. Medi-Car, Inc., 300 F.3d 760, 766 n.6 (7th Cir. 2002); Rodriguez v. Smithfield

Packing Co., 338 F.3d 348, 355 (4th Cir. 2003).  Rowe claims that, like its SPOs, PChange was

"at all times relevant to the actions alleged herein[] a state actor."  Proposed SAC, ¶¶ 177, 214;

cf. Maniaci v. Georgetown Univ., 510 F. Supp. 2d 50, 69 (D.D.C. 2007) (special police officers

are state actors under § 1983 "when they undertake to arrest an individual or perform actions

related thereto") (cleaned up); see also Woodward & Lothrop v. Hillary, 598 A.2d 1142, 1146

(D.C. 1991) (similar).  Defendants do not contest that.

Instead, PChange and Parker maintain that Rowe's efforts to add PChange to Counts I

and V on a Monell theory of liability are futile because the proposed SAC fails to establish the

security company's deliberate indifference.  See PChange & Parker Opp. at 10.  The Court

agrees.  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action."  Connick, 563 U.S.

at 61 (cleaned up).  Plaintiffs like Rowe whose deliberate-indifference theories rest on an alleged

failure to train or discipline must show that the defendant entity was "on actual or constructive

notice that a particular omission in their training program causes [their] employees to violate

citizens' constitutional rights."  Id.  Put differently: to press his claim, Rowe needs to establish

that "the need for more or different training [was] so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that [PChange] can reasonably be said to have been

deliberately indifferent to the need."  City of Canton, 489 U.S. at 390.

To make this showing, plaintiffs must ordinarily demonstrate "[a] pattern of similar

constitutional violations by untrained employees."  Connick, 563 U.S. at 62.  Whether a pattern

of constitutional torts bears a sufficient relationship to the alleged violation to place a defendant

municipality on notice hinges on whether the violations "have materially similar legal implications." Hurd, 997 F.3d at 340; see also Buie v. Dist. of Columbia, 2021 WL 4061142, at *17 (D.D.C. Sept. 7, 2021) ("[A] plaintiff who presents 'scattered' and generalized examples of inadequate training or discipline will not succeed in showing a municipal policy of deliberate indifference.") (cleaned up).

Attempting to identify such a pattern of misconduct, Rowe relies on three sets of allegations, none of which fits the bill. First, he alleges that at the time of the incident involving Rowe, PChange "knew or should have known" that three of the SPOs' licenses had been revoked, and three were not effective. See Proposed SAC, ¶¶ 120–21. But PChange's knowledge that a subset of its employees had ineffective licenses does not equate with knowledge that they "will probably violate constitutional rights." Warren v. Dist. of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004); contra Proposed SAC, ¶ 126 (PChange "should have foreseen that deploying unlicensed SPOs to provide armed security services would result" in constitutional violations). And nothing in the proposed SAC supports an inference that PChange had the latter sort of knowledge.

Nor do the details of these revocations do the job. Plaintiff cites an incident involving Defendant SPOs Arrington, Hunter, and Williams in September 2020. See Proposed SAC, ¶¶ 133–34. He alleges that "Arrington negligently discharged his firearm in the breakroom of a residential apartment building while on duty" at an apartment complex next to Park Southern; "Hunter, Williams, and several other PChange SPOs were present." Id., ¶ 133. As a result, MPD apparently issued a "notice of revocation of PChange's Security Agency license," finding that its "failure to adequately train and supervise [its] employees . . . created a substantial public safety risk." Id., ¶ 134. It also allegedly found that Hunter and Williams had lied to MPD officers

about the incident, and Arrington, Hunter, and Williams had failed to notify MPD of the incident as they were required to.  Consequently, MPD revoked the SPOs' licenses.  Id., ¶¶ 134, 136.

Unfortunately for Plaintiff, while such negligent firearm discharge, lying to officers, and failing to notify officers of such discharge may certainly constitute misconduct, such acts do not amount to <u>constitutional</u> violations.  Nor can they be said to have put PChange on notice that, absent better training or discipline, its SPOs were likely to violate the constitutional rights of individuals through unlawful seizures or excessive force.  Cf. Robinson v. Pezzat, 818 F.3d 1, 13 (D.C. Cir. 2016) (pattern of lawful shootings by MPD officers of dogs did not place District on notice as to risk of unconstitutional canine killings); Johnson v. Dist. of Columbia, 2023 WL 2770392, at *3 (D.D.C. Apr. 4, 2023) ("Allegations about prior incidents of excessive force are insufficient to establish . . . the likelihood that MPD officers would use unjustified deadly force.") (cleaned up); Leach v. Dist. of Columbia, 2022 WL 1316436, at *12 (D.D.C. May 3, 2022) (denying plaintiff's municipal-liability claim because he did not plead facts "specific to lethal uses of force by MPD officers").

Second, Rowe describes a slew of incidents involving other SPOs who are not parties to this litigation.  One, in which an on-duty SPO — who had an expired license at the time — "unlawfully struck a handcuffed, seated, intoxicated individual across the face" resulted in MPD's issuing a second notice of revocation of PChange's Security Agency license for its failure to make a timely report.  See Proposed SAC, ¶ 137.  The others involved SPOs assaulting residents and barging into a resident's apartment without a warrant; those resulted in lawsuits against PChange.  Id., ¶¶ 144–46; see also Rivers Complaint; Robinson Complaint.

Such incidents at least involved (allegedly) unlawful seizure and excessive force, similar to the alleged conduct in this case.  But they involved entirely different groups of SPOs who

have nothing to do with the incident at issue here.  See Spiller v. Dist. of Columbia, 302 F. Supp. 3d 240, 255 (D.D.C. 2018) ("Plaintiffs have not alleged that these officers were previously involved in similar incidents, or that other aspects of their behavior known to their supervisors would have or should have put their superiors on notice that the officers required additional supervision or training."); cf. Singh v. Dist. of Columbia, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (letting claim proceed where plaintiff alleged that he was harassed by same group of officers "on five separate occasions" and "nothing was done to stop, discipline, or investigate the defendant officers").  While a series of incidents involving other SPOs could conceivably show a need for greater training, that is not the case here.  These incidents do not bear enough similarity to reveal inadequate instruction on the particular policing tactics and protocols that were used here.  They thus do not indicate a systemic likelihood of constitutional violations going forward.  See Pollard v. Dist. of Columbia, 698 F. App'x 616, 621 (D.C. Cir. 2017) ("[E]ven 'adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.'") (quoting City of Canton, 489 U.S. at 391).

Third, Plaintiff cites a string of incidents post-dating October 26, 2021, apparently believing PChange to be clairvoyant.  Allegations of failures to train "after the incident in question do not give rise to a reasonable inference that [PChange was] on constructive notice of dangerous or incompetent behavior by the officers in question prior to" their encounter with Rowe.  Spiller, 302 F. Supp. 3d at 255; see Mitchell v. Yates, 402 F. Supp. 2d 222, 233–34 (D.D.C. 2005) ("[A]llegations of actual or constructive notice to [the municipality] and inaction after the alleged incident . . . simply fail to meet the standard for demonstrating municipal responsibility and support only respondeat superior liability, which was rejected in Monell.").

As a last resort, Rowe tries his hand at a single-incident theory: he claims that "[t]he inadequacy of Defendant PChange's training of its SPOs is demonstrated" by their conduct on October 26, 2021.  See Proposed SAC, ¶¶ 129–130.  In those "rare" instances when the "unconstitutional consequences of failing to train" were "patently obvious," municipalities indeed may be held liable on such a deliberate-indifference theory "without proof of a pre-existing pattern of violations."  Connick, 563 U.S. at 64.  But this is not "an exceptional instance where such a theory would be successful."  Johnson, 2023 WL 2770392, at *6.  That is because "[t]he facts of this case, by themselves, do not raise such a clear constitutional concern as to make it patently obvious that [PChange] could be liable under § 1983 without proof of a pre-existing pattern of violations."  Pollard, 698 F. App'x at 621 (cleaned up).  Rowe has, "at most, . . . allege[d] that [he] encountered several poorly trained officers" who violated MPD's policies.  Xingru Lin v. Dist. of Columbia, 268 F. Supp. 3d 91, 101 (D.D.C. 2017).  That is not good enough.  So much, then, for his attempt to add § 1983 claims.

          ii.  Common-law negligence

The analysis is different, however, for his proposed common-law negligence claim.  That is because the standard for common-law negligent supervision, hiring, and retention is "much lower" than the standard for § 1983 municipality liability.  Johnson, 2023 WL 2770392, at *7; cf. id. at *4–8 (granting motion to dismiss as to § 1983 claim while denying motion as to common-law negligence claim in similar case).  "To state a claim for negligent hiring, supervision, or retention, a plaintiff must allege facts showing that the employer knew or should have known that the employee was incompetent, and that the employer, despite this actual or constructive knowledge, hired or failed to adequately supervise the employee."  Pinkett v. Dr. Leonard's Healthcare Corp., 2018 WL 4682022, at *3 (D.D.C. Sept. 28, 2018) (cleaned up); see also

Section III.A.2.b, *supra* (discussing elements of negligent supervision).  In other words, to escape futility on this proposed claim, Rowe must merely link (1) a showing of prior "dangerous or otherwise incompetent" behavior to (2) a decision to hire or retain or a "fail[ure] to adequately supervise."  Moore, 79 F. Supp. 3d at 142.

His proposed SAC does just that.  It sufficiently alleges facts supporting the inference that PChange had actual or constructive knowledge of its SPOs' past dangerous or incompetent behavior.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Proposed SAC, ¶¶ 133–34, 137–42, 153, 160–61, 163, 300–15.  Specifically, Rowe claims that "PChange knew or should have known that the SPO licenses of Defendants Williams, Hunter, and Arrington had been revoked" and that "the SPO licenses of Defendants Parker, Philson, and Phillips were not effective," given a DLCP representative's testimony that it would have been so informed.  Id., ¶¶ 118–21. PChange also knew that several of those SPOs had "intentionally covered up the negligent discharge of a firearm," "been intentionally untruthful with MPD officers about the negligent discharge," and "failed to notify MPD of the use-of-force incident, despite being required to do so."  Id., ¶ 134.  Those factual allegations suggest that at least some of the SPOs involved in the incident at issue had acted incompetently and violated MPD policy in the past, and that PChange was aware of such conduct.  See Xingru Lin v. Dist. of Columbia, 2019 WL 1597876, at *12 (D.D.C. Apr. 15, 2019) (plaintiff "pled at least minimal factual allegations in support of the District of Columbia's actual or constructive knowledge" of dangerous or incompetent behavior by listing prior incidents); Johnson, 2023 WL 2770392, at *7 (similar).

Rowe's proposed SAC also links PChange's knowledge of prior dangerous behavior or incompetence with a failure to adequately supervise.  For instance, MPD's incident report following the 2021 incident involving a subset of the Defendant SPOs found that PChange's

"failure to adequately train and supervise [its] employees . . . created a substantial public safety risk."  Proposed SAC, ¶ 134; <u>see also id.</u>, ¶ 125 ("Despite having notice of the status of its SPOs' licenses, defendant PChange negligently and/or recklessly failed to adequately supervise its SPOs by failing to ensure the SPOs it deployed held or maintained valid and effective SPO licenses and by arming unlicensed SPOs with firearms."); <u>id.</u>, ¶ 147 (alleging that pattern of SPO misconduct is result of PChange "repeatedly deploying and arming unlicensed employees to serve as SPOs," "failing to adequately supervise the SPOs it deploys to provide armed security services throughout the District of Columbia, including at Park Southern," "failing to ensure its SPOs are properly and adequately trained on how to lawfully carry out their SPO duties," and "failing to take appropriate disciplinary action in response to such misconduct").  Such allegations suffice to survive a motion to dismiss with respect to common-law negligence.

Nonetheless convinced that Rowe's claim would fall on such a motion, Defendants quibble with the factual premise that some SPOs had ineffective licenses, contending that it is "implausible to suggest that the very agency [MPD] that licenses the SPOs and disciplines them would review this incident and find no wrongdoing" if Plaintiff's allegations were true.  See PChange & Parker Opp. at 11 (quoting Vesta Opp. at 8); <u>see</u> Vesta Opp. at 8 (noting that MPD deponent "testified that the SPOs' conduct at issue here was subjected to an internal disciplinary review by MPD's Internal Affairs Division," which "determined there was no wrongdoing"). Vesta also posits that "despite Plaintiff's frequent references in the proposed amended complaint to proposed notices of revocation of PChange's own license, that never happened either — an Administrative Hearings judge determined PChange should keep its license."  Vesta Opp. at 8–9. But, as Rowe notes, "[P]ointing to purported facts outside the amendment and claiming that Defendants' proof will ultimately be more persuasive does not mean that the allegations are

legally insufficient nor that the proposed amendment would be futile." Pl. Reply at 10. Although it remains to be seen whether Plaintiff's negligence claim against PChange can ultimately carry the day, the Court agrees with Rowe that amending the FAC to add it is not a futile enterprise.

*      *      *

One final note. It is not obvious that Rowe has alleged facts adequate to support a negligent-<u>hiring</u> claim, as distinct from negligent supervision and retention, against Vesta or PChange. But because neither Defendant attacks this facet of his claim on such grounds, the Court will not probe the issue here but will only note that elaborating on it may prove fruitful at summary judgment.

## IV.   Conclusion

For the foregoing reasons, the Court will deny Vesta's Motion for Judgment on the Pleadings and grant in part and deny in part Rowe's Motion for Leave to Amend. A separate Order so stating will issue this day.

/s/ <u><i>James E. Boasberg</i></u>
JAMES E. BOASBERG
Chief Judge

Date: <u>April 17, 2024</u>