UNITED STATES DISTRICT COURT DISTRICT
OF THE DISTRICT OF COLUMBIA

MICHAEL ROWE

                Plaintiff,

     v.

PCHANGE LLC, *et al.*

                Defendants.

Civil Action No.: 1:22-cv-03098-JEB

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO VESTA'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................. 1

BACKGROUND..................................................................................... 2

LEGAL STANDARD .............................................................................. 4

ARGUMENT ........................................................................................... 5

I. GENUINELY DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON MR. ROWE'S VICARIOUS LIABILITY CLAIMS..................................... 5

   A. Summary Judgment Is Precluded On *Respondeat Superior*.............................. 5

     i. The actual relationship between Vesta and PChange is determinative. ......................... 6

     ii. The record establishes Vesta's power to control PChange's conduct............................ 7

     iii. The record also establishes Vesta's power to discharge and that PChange's work was part of Vesta's regular business.......................................................... 12

   B. Summary Judgment Is Also Precluded On The Alternative Vicarious Liability Theories.12

     i. Vesta can be held liable even if it also acted as PChange's co-agent. ......................... 12

     ii. Vesta can be held liable because it had a nondelegable duty to protect visitors........... 13

     iii. Vesta can be held liable because it cannot contract away its liability for the inherently dangerous activity of armed policing. .................................................. 13

II. GENUINELY DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE NEGLIGENT SUPERVISION CLAIM.............................................. 14

   A. There Is A Genuine Dispute As To Whether, And To What Extent, Vesta (Through Ms. Kindred) Had Knowledge Of The SPO Defendants' Dangerous And Incompetent Behavior Towards Mr. Rowe During The Incident.......................................... 15

   B. There Is Also A Genuine Dispute As To Whether Vesta Had Knowledge Of SPOs' Dangerous And Incompetent Conduct Prior To The Incident............................. 16

III. VESTA IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON ITS ASSERTION OF QUALIFIED PRIVILEGE BECAUSE THAT DEFENSE IS NOT AVAILABLE TO IT AND GENUINE DISPUTES OF MATERIAL FACT PRECLUDE A FINDING OF QUALIFIED PRIVILEGE.............................................................. 20

   A. Legal Standard................................................................. 20

   B. The SPO Defendants May Not Assert Qualified Privilege Based On The Capacity In Which They Were Operating............................................................ 21

   C. Vesta May Not Rely On Any Qualified Privilege Afforded To The SPO Defendants..... 24

   D. Factual Disputes Preclude Finding The SPO Defendants Are Entitled To Qualified Privilege. ......................................................................... 25

i.   A Reasonable Jury Could Conclude the SPOs Lacked Probable Cause to Arrest Mr. Rowe for Assault...............................................................................................26

ii.   A Reasonable Jury Could Find the SPOs Lacked Reasonable Suspicion to Perform a Terry Stop...........................................................................................................31

iii.   A Reasonable Jury Could Find the SPOs Lacked Probable Cause to Arrest Mr. Rowe for Resisting Arrest..................................................................................................36

iv.   A Reasonable Jury Could Find the SPOs Used Excessive Force on Mr. Rowe, Even if They Had Probable Cause or Reasonable Suspicion.......................................................38

v.   The SPOs Lacked Any Legal Authority for their Conduct.........................................41

CONCLUSION...............................................................................................42

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Amili v. City of Tukwila*,
   31 F. Supp 1274 (W.D. Wash. 2014)....................................................... 32

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................. 25

*Arrington v. United States*,
   473 F.3d 329 (D.C. Cir. 2006).............................................................. 24

*Burney v. Suggs*,
   630 F. Supp. 3d 20 (D.D.C. 2022)......................................................... 20

*Campbell v. District of Columbia*,
   245 F. Supp. 3d 78 (D.D.C. 2017)......................................................... 31

*City of Houston v. Hill*,
   482 U.S. 451 (1987).............................................................................. 32

*Corrigan v. District of Columbia*,
   841 F.3d 1022 (D.C. Cir. 2016)............................................................ 24

*District of Columbia v. Tulin*,
   994 A.2d 788 (D.C. 2010)..................................................................... 24

*District of Columbia v. Wesby*,
   583 U.S. 577 (2018).............................................................................. 25

*Dormu v. District of Columbia*,
   795 F. Supp. 2d 7 (D.D.C. 2011)........................................................... 41

*Givens-Nyarko v. Crothall Healthcare, Inc.*,
   2023 WL 6388950 (D.D.C. Sept. 29, 2023) .......................................... 10

*Godfrey v. Iverson*,
   559 F.3d 569 (D.C. Cir. 2009)............................................................... 19

*Henderson v. Munn*,
   439 F.3d 497 (8th Cir. 2006) ................................................................ 39

*Hunter v. Sprint Corp.*,
  453 F. Supp. 2d 44 (D.D.C. 2006) ........................................................ 4

*Jackson v. Starbucks Corp.*,
  2022 WL 888180 (D.D.C. Mar. 25, 2022) .......................................... 15

*Johnson v. District of Columbia*,
  528 F.3d 969 (D.C. Cir. 2008) ...................................................... 37, 39

*LaLonde v. Cnty. of Riverside*,
  204 F.3d 947 (9th Cir. 2000) ............................................................ 40

*Maddux v. District of Columbia*,
  144 F. Supp. 3d 131 (D.D.C. 2015) .................................................. 31

*Matiella v. Murdock St. LLC*,
  2023 WL 4684854 (D.D.C. July 21, 2023) ........................................ 13

*Paavola v. United States*,
  459 F. Supp. 3d 21 (D.D.C. 2020) .................................................... 17

*\*Richardson v. McKnight*,
  521 U.S. 399. (1997) ................................................................... 22-23

*Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*,
  413 F.3d 1163 (10th Cir. 2005) ........................................................ 23

*\*Rowe v. PChange, LLC*,
  2024 WL 1655348 (D.D.C. Apr. 17, 2024) ................................*passim*

*Rudder v. Williams*,
  666 F.3d 790 (D.C. Cir. 2012) .......................................................... 39

*\*Sacchetti v. Gallaudet Univ.*,
  344 F. Supp. 3d 233 (D.D.C. 2018) .................................................. 25

*\*Search v. Uber Techs., Inc.*,
  128 F. Supp. 3d 222 (D.D.C. 2015) ............................................... 6, 11

*Smith v. United States*,
  843 F.3d 509 (D.C. Cir. 2016) ...................................................... 26-27

*Stehn v. Cody*,
  74 F.Supp. 3d 140 (D.D.C. 2014) .................................................... 30

*Terry v. Ohio*,
392 U.S. 1 (1968)......................................................................... 31

*Tracy v. Freshwater*,
623 F.3d 90 (2d Cir. 2010)........................................................... 39

*United States v. Castle*,
825 F.3d 625 (D.C. Cir. 2016)...................................................31-33

*Wasserman v. Rodacker*,
557 F.3d 635 (D.C. Cir. 2009)...................................................... 38

*Wesby v. District of Columbia*,
765 F.3d 13 (D.C. Cir. 2014)........................................................ 25

*Wheeler v. Am. Univ.*,
619 F. Supp. 3d 1 (D.D.C. 2022)............................................. 21, 23

*Wilson v. Good Humor Corp.*,
757 F.2d 1293 (D.C. Cir. 1985) .................................................... 13

*Xingru Lin v. District of Columbia*,
2019 WL 1597876 (D.D.C. Apr. 15, 2019) .................................... 14

**State Cases**

*Beegle v. Rest. Mgmt., Inc.*,
679 A.2d 480 (D.C. 1996)............................................................... 6

*Coghill v. United States*,
982 A.2d 802 (D.C. 2009)............................................................. 35

*Dolson v. United States*,
948 A.2d 1193 (D.C. 2008)........................................................... 36

*Gordon v. District of Columbia*,
309 A.3d 543 (D.C. 2024)............................................................. 20

*Graham v. M & J Corp.*,
424 A.2d 103 (D.C. 1980)............................................................. 12

*Howard v. United States*,
966 A.2d 854 (D.C. 2009)............................................................. 35

*In re C.L.D.*,
  739 A.2d 353 (D.C. App. 1999) ........................................................ 35

*Jackson v. United States*,
  56 A.3d 1206 (D.C. App. 2012) ...................................................... 34

*Jenkins v. District of Columbia*,
  223 A.3d 884 (D.C. 2020) ............................................................. 20

*Ruffin v. United States*,
  76 A.3d 845 (D.C. 2013) ............................................................... 36

*\*Safeway Stores, Inc. v. Kelly*,
  448 A.2d 856 (D.C. 1982) ..................................................... 6, 8, 10

*Scales v. District of Columbia*,
  973 A.2d 722 (D.C. 2009) ............................................................. 20

*Schecter v. Merchs. Home Delivery, Inc.*,
  892 A.2d 415 (D.C. 2006) ............................................................... 6

**Federal Statutes**

Fed. R. Civ. P. 56(a) ........................................................................ 4

Fed. R. Civ. P. 56(c)(1)(A)-(B) ........................................................ 5

**State Statutes**

D.C. Code § 22-405.01(b) ............................................................... 35

**Other Authorities**

Restatement of Agency (Second) of Agency § 358 (Am. Inst. 1981) ............................................. 12

## PRELIMINARY STATEMENT

Defendant Vesta Management DC, LLC ("Vesta") was responsible for managing the Park Southern Apartment building, including the responsibilities and conduct of the special police officers ("SPOs") hired to provide security services at the apartment building. Despite routinely exercising control over the SPOs' conduct, Vesta failed to appropriately supervise the SPOs' behavior to ensure the safety of residents and visitors to Park Southern. Their failure to supervise the SPOs culminated in the incident that is the subject of this lawsuit, where Plaintiff Michael Rowe was unlawfully stopped, arrested, searched, assaulted, and maced, without justification, all in front of his three young children. Even after the Vesta property manager had notice of the harm being done to Mr. Rowe, she still did *nothing* to alleviate the harm caused to Mr. Rowe, despite the fact that, as the client, the SPOs would have listened to her directives.

Now, on a motion for summary judgment, Vesta seeks refuge from liability for its own negligent supervision of these SPOs as well as its vicarious liability for the actions of the SPOs in its employ. Vesta argues first that *respondeat superior* liability does not attach because the actual contract for security services was between the owner of Park Southern and the SPO security agency, Defendant PChange, LLC ("PChange"). It also argues that it could not possibly have been negligent in its supervision of the SPOs because it did not actually control the relevant conduct. Both of these theories fall flat in light of the extensive record showing Vesta—not the property owner—possessed and exercised authority over PChange and its SPOs. On this record, a reasonable jury could find that Vesta was in an employer-employee relationship with PChange and that it had the requisite control to render it liable for negligent supervision of the PChange SPOs.

As an alternative argument, Vesta argues it should get the benefit of the common law qualified privilege afforded to police officers charged with false arrest or assault. But Vesta has not established

that the SPOs are themselves entitled to such a privilege, much less Vesta itself. Even if Vesta could somehow benefit from the qualified privilege being afforded to the SPOs, it has failed to demonstrate that the undisputed facts support such a finding on a motion for summary judgment.

## BACKGROUND

On October 26, 2021, Plaintiff Michael Rowe dropped his mother and sister off at their home, the Park Southern apartment building at 800 Southern Avenue in Southeast Washington, D.C ("Park Southern"). Plaintiff Michael Rowe's Statement of Disputed Material Facts and Statement of Additional Material Facts ("Pl.'s SOF") ¶¶ 39–40. Mr. Rowe's three children, then aged one, five, and eight, were in the backseat of his car as he drove through the parking garage to leave the property. Pl.'s SOF ¶¶ 41, 92. When Mr. Rowe tried to exit the parking garage, he found his way blocked by a group of special police officers ("SPOs") employed by PChange LLC ("PChange"), who had a contract to provide security services at Park Southern under the direction and supervision of Park Southern property manager Vesta. *Id.* ¶ 5. The SPOs and their vehicles almost completely blocked the exit to the parking garage, so Mr. Rowe stopped 50 to 75 feet from where they were standing and chatting and honked his horn twice. *Id.* ¶¶ 51, 190. Vesta was aware of complaints that the SPOs would loiter on the property and block traffic, but had done nothing to prevent them from doing so, on this day or on any other. *Id.* ¶¶ 143, 151.

The SPOs turned to look at Mr. Rowe but did not move out of the roadway, so Mr. Rowe rolled forward and stopped about 25 to 50 feet from them and honked again. *Id.* ¶¶ 191–92. Again, the SPOs looked at Mr. Rowe but did not move. *Id.* ¶ 193. Mr. Rowe took his foot off the brake and lightly tapped the accelerator so he could inch toward the SPOs, who did eventually move out of the way to allow Mr. Rowe to pass by. *Id.* ¶¶ 193–95 Frustrated by the SPOs, Mr. Rowe cussed at them out of the window as he navigated around them. *Id.* ¶¶ 61, 196.

That set off one of the SPOs, Defendant Stefan Williams, who yelled back at Mr. Rowe,

causing him to stop. *Id.* ¶¶ 62, 197. Williams and Defendants Bryan Hunter, Damion Philson, Shamar Phillips, Tyauna Perry, Tyrell Arrington, and at least two other SPOs approached Mr. Rowe's vehicle and surrounded it. *Id.* ¶ 199. Williams demanded Mr. Rowe's identification, supposedly so he could bar him from the property, purportedly for speeding. *Id.* ¶¶ 200–01. Mr. Rowe told Williams to call the police if he wanted to see his identification. *Id.* ¶ 205. Mr. Rowe was in the right here because, under District of Columbia law, he was under no obligation to provide the SPOs his identification, as SPOs do not have authority to enforce traffic laws and, as Williams himself admitted, Mr. Rowe had not committed any crime. *Id.* ¶¶ 14, 201. Williams refused to call the police, telling Mr. Rowe, "I am the police." *Id.* ¶ 205.

His authority challenged, Williams began violently yanking on the handle to Mr. Rowe's door, telling him he was under arrest for "failure to identify." *Id.* ¶¶ 75, 208–10. Mr. Rowe opened the car door, placed his car in park, and attempted to turn off the ignition. *Id.* ¶¶ 208–12. Williams grabbed Mr. Rowe by the neck, arm, hair, and shirt, yanking him around and breaking the key in the process. *Id.* ¶¶ 78, 214. Williams' apparent attempt to get Mr. Rowe out of the car was thwarted, not by anything Mr. Rowe was doing, but by the fact that Mr. Rowe was still buckled into the car by his seatbelt. *Id.* ¶¶ 77, 84, 215–17. In fear for his life, Mr. Rowe unbuckled his seatbelt, reflexively grabbed the steering wheel, then released it and stepped out of the car with Williams still manhandling him the entire way. *Id.* ¶¶ 216–21. At this point, other SPOs, including Hunter, were involved in in the arrest and using physical force against Mr. Rowe. *Id.* ¶ 218. While Mr. Rowe was handcuffed, complying with the arrest, and telling Williams to call the 911, Hunter sprayed Mr. Rowe directly in the face with OC spray, on Williams' orders. *Id.* ¶¶ 218–23. The SPOs then slammed Mr. Rowe against a nearby fence, lifted him in the air and slammed him on the ground on his back. *Id.* ¶¶ 224–28. They also searched Mr. Rowe's pockets. *Id.* ¶¶ 225–28.

At this point, a bystander witnessing called 911 for the District of Columbia Metropolitan Police Department ("MPD"). *Id.* ¶ 228. Vesta property manager Nichole Kindred arrived on the scene before officers MPD, after Mr. Rowe's mother pleaded with her to come out and put a stop to the SPOs' unlawful assault and battery of Mr. Rowe. *Id.* ¶¶ 231–37. Mr. Rowe repeatedly complained about his handcuffs being too tight, and he had just been sprayed in the face with OC spray, but Kindred did nothing to alleviate Mr. Rowe's pain or stop the unlawful behavior, despite knowing the SPOs viewed Kindred and Vesta as their client and would follow her orders. *Id.* MPD arrived on the scene, changed out Mr. Rowe's handcuffs, and, after assessing the situation, released Mr. Rowe because there was no probable cause to arrest him. *Id.* ¶¶ 238–46. Mr. Rowe was later treated for shoulder, wrist, and neck pain sustained during the assault. *Id.* ¶¶ 247. He was diagnosed with PTSD stemming from the incident, and continues to suffer symptoms. *Id.* ¶¶ 135–36, 249–52.

This was not the first instance of PChange SPO misconduct at a Vesta property. In fact, just a few months earlier, Arrington had negligently fired his firearm inside the apartment building next door to Park Southern, a building Vesta also managed. Pl.'s SOF ¶ 153–55. In the fallout of that investigation, three of the SPOs who assaulted Mr. Rowe—Williams, Hunter, and Arrington—had their SPO licenses revoked by MPD. *Id.* ¶¶ 163–69. Williams and Hunter's licenses were revoked after MPD concluded both of them had lied to MPD about the negligent discharge during the investigation. *Id.* Separately, Philson's SPO license was in expired status, and Phillips did not even have an SPO license as of October 26, 2021. *Id.* ¶¶ 174, 176. As a result, most of the defendants who assaulted Mr. Rowe were not licensed as SPOs on the date of the incident.

## LEGAL STANDARD

Summary judgment may be granted only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of demonstrating the absence

of a genuine dispute of material fact." *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 49 (D.D.C. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In determining whether there is a genuine issue of material fact, "the court must regard the non-movant's statements as true, and accept all evidence and make all inferences in the non-movant's favor." *Hunter*, 453 F. Supp. 2d at 49 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The non-moving party can oppose summary judgment by either (a) relying on admissible evidence to support its opposition, or (b) demonstrating "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

## ARGUMENT

### I. GENUINELY DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON MR. ROWE'S VICARIOUS LIABILITY CLAIMS.

The Court should reject Vesta's request for summary judgment on Mr. Rowe's vicarious liability claims. First, Vesta is not entitled to summary judgment on the principal vicarious liability theory, *respondeat superior*, because there are genuine factual disputes regarding its power to control the conduct of the SPOs. Second, Vesta is not entitled to summary judgment on the alternative vicarious liability theories.

#### A. Summary Judgment Is Precluded On *Respondeat Superior*.

Vesta argues that summary judgment on *respondeat superior* is warranted because (1) a different entity, 800 Southern Avenue, LLC, contracted with PChange; and (2) Vesta lacked control over the PChange SPOs' exercise of police powers. Vesta's Memorandum of Points and Authorities in support of its Motion for Summary Judgment, ECF No. 144-1 (hereinafter "MSJ") at 3-4. Under the doctrine of *respondeat superior*, Vesta may be held liable for the acts of PChange SPOs if the evidence establishes: "(1) there exists an employer-employee (or principal-

agent) relationship between Vesta and PChange and between PChange and the SPOs, and (2) the SPOs committed their allegedly tortious acts within the scope of such employment." *Rowe v. PChange, LLC*, 2024 WL 1655348, at *6 (D.D.C. Apr. 17, 2024). Vesta only challenges the first prong. *See* MSJ at 2-5.

To determine whether an employer-employee (or principal-agent) relationship exists, courts look to the following factors: "(1) involvement in the selection and engagement of the employee; (2) payment of wages; (3) power to discharge; (4) power to control the employee's conduct; and (5) whether the employee's work is part of the regular business of the employer." *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 231 (D.D.C. 2015). Here, contrary to Vesta's assertion, PChange's actual relationship with Vesta is what matters, not the legal entity whom it contracted with. With that context in mind, there is substantial evidence establishing Vesta's control over the PChange SPOs' conduct and multiple other *Search* factors.

### i. The actual relationship between Vesta and PChange is determinative.

The absence of a formal contract between Vesta and PChange is not determinative. *See Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C. 1996) (reversing trial court's finding of no principal-agent relationship because its decision was "focused only on" which entity formally employed restaurant worker). Similarly, that the PChange-800 Southern Contract states that PChange is an independent contractor of 800 Southern is not determinative of its status under the law. *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 420, 423 (D.C. 2006) (contract specifying that deliveryman "was an independent contractor and not an employee" was not "conclusive" on vicarious liability). Instead, it is "the parties' *actual* relationship, in spite of contractual language, [which] may be the conclusive factor." *Search,* 128 F. Supp. 3d at 232. As described below, the actual relationship between PChange and Vesta establishes that, at

minimum, there are disputed issues of material fact that preclude summary judgment on *respondeat superior*.

### ii. The record establishes Vesta's power to control PChange's conduct.

"[T]he right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision" is usually the "determinative factor" in deciding whether an employer-employee relationship exists. *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860-61 (D.C. 1982); *see also Rowe*, 2024 WL 1655348, at \*6.

Discovery has revealed many facts establishing that Vesta, through Ms. Kindred, enjoyed the right to control the SPOs' conduct. Deposition testimony from Ms. Kindred, PChange, and its SPOs establishes that Ms. Kindred had the authority to, and did, direct the SPOs to perform a variety of security related tasks; investigate specific issues such as propped doors, alarms, or "anything on the property"; conduct inspections of units; investigate potential lease infractions; deliver eviction notices to tenants; staff the concierge desk; patrol specific areas; avoid standing or loitering in certain areas; and issue parking tickets. Pl.'s SOF ¶¶ 123-134.

For instance, PChange affirmed that Ms. Kindred could "direct the SPOs at Park Southern to patrol a particular area" on the premises. *Id*. ¶ 129. A PChange supervisor, SPO Defendant Stefan Williams, regularly communicated with Ms. Kindred. *Id*. ¶ 123. When Ms. Kindred made requests – such as to patrol "hot zone[s]" – he would "generally" do what she asked. *Id*. ¶¶ 130, 134. Another SPO Defendant, Damion Philson, testified: "Pretty much every day [Ms. Kindred] would let us know if – what she needed. Could be anything from, hey, I'm doing . . . unit inspections, so we would escort her and we stayed in contact." *Id*. ¶ 123. When Philson received directions from Ms. Kindred, he would follow them. *Id*. ¶ 134. Indeed, the SPOs considered Vesta their "client." *Id*. ¶ 136.

Contemporaneous emails further evidence Ms. Kindred's right to control the PChange SPOs' day-to-day tasks. For example, in July 2021 – three months before the incident with Mr. Rowe – Ms. Kindred had a meeting with Williams and PChange supervisors in which she "express[ed] all the issues and concerns with Park Southern." *Id*. ¶ 143. An email from Williams the following day contained a heading called "Concerns & Solutions," and stated that "[p]atrolling of the floors throughout the interior of the property needs improvement," that "[t]icketing and [t]owing needs to be consistent, effective, and fair always," and it further indicates that SPOs were "loitering in the roundabout on and off duty" which was "prohibited." *Id*. In another instance, Ms. Kindred raised a number of issues about SPOs' conduct to PChange supervisors in September 2022, which they agreed to work "diligently" to address. *Id*. ¶ 145.

The D.C. Court of Appeals has found an employer-employee relationship between Safeway and a security guard employed by an agency based on the same type of facts. *See Safeway Stores,* 448 A.2d at 860-62. In affirming the trial court's ruling on *respondeat superior*, the court explained that, "[m]ost importantly, Safeway enjoyed the right to control the guards' conduct," for instance because "the store manager had operational control over the guards, who worked under his general direction." *Id.* at 861. In addition, a guard's testimony "provided some specific instances of control: on occasion he would lock the doors at the manager's request or would act under the manager's general direction if he were having a problem with a customer," while "[t]he store manager's testimony added further examples: the manager instructed the guards to keep juveniles out of the doorway and to watch for shoplifters," and "the Safeway manager identified specific problems requiring the guard's assistance and directed the guard to those problems." *Id.* To the court, "[t]hese specific instances of actual control [we]re

evidence of the general right of Safeway to control the guard in the performance of his duties." *Id*.

In fact, there is even *more* evidence of control here than in *Safeway Stores*. In addition to the specific examples described above of Ms. Kindred's exercise of her right to control day-to-day SPO conduct, she also enjoyed more general authority over the performance of their tasks and the results, as described below.

**Vesta had authority over PChange's Post Orders**. Vesta approved and provided input on Park Southern Post Orders, a set of "post specific operational instructions" for SPOs, before they went into effect. Pl.'s SOF ¶ 147. The Post Orders from 2019 specified how many SPOs would be staffed at Park Southern and what their shifts and uniforms would be and listed "specific special police duties for Park Southern." *Id*. ¶ 148. Ms. Kindred also requested new Post Orders and updates to existing ones. *Id*. ¶¶ 149-50.

**Vesta had authority to assess PChange's adherence to performance standards**. The PChange-800 Southern Contract required PChange to provide its services with respect to Park Southern "to the satisfaction of the Owner's Agent," which was Vesta. *Id*. ¶ 117. The Contract gave Vesta discretion over any amendments, including regarding "extra work" and "substitutions in the work." *Id*. ¶ 118. Vesta enjoyed *sole discretion* to terminate the agreement if PChange failed "in any respect to perform work as specified in this Contract." *Id*. ¶ 120. The Contract also required the PChange SPOs to have valid SPO licenses. *Id*. ¶ 7. Vesta points to a provision stating that "neither [800 Southern] nor . . . [Vesta] will have any direction or control of [PChange] except in the results to be obtained." MSJ at 3; Pl.'s SOF ¶ 12. But the Contract clearly vests considerable control in Vesta over "the results to be obtained." Moreover, 800

Southern's "Management Plan" for Vesta instructs Vesta to "supervise[] contract services and vendors," which includes PChange. Pl.'s SOF ¶ 122.

Contemporaneous emails show Ms. Kindred exercising her authority to set and enforce performance standards and to ensure that PChange provided services to Vesta's "satisfaction" per the Contract. *Id.* ¶¶ 117, 143-46. For instance, in the July 2021 email described above, PChange agreed to Ms. Kindred's request to address various "issues and concerns with Park Southern" that needed to be dealt with in order to "stay in compliance with . . . Vesta management." *Id.* ¶¶ 143-44. A PChange supervisor, Williams, agreed that the email exchange meant that "***PChange needed to do what Vesta was asking it to do***." *Id.* ¶ 144. A right to control can be based on evidence such as this, showing that an alleged agent was "following [the alleged principal's] policy and procedure at the time of the incident." *Givens-Nyarko v. Crothall Healthcare, Inc.*, 2023 WL 6388950, at *5 (D.D.C. Sept. 29, 2023).

***Vesta had authority to remove SPOs.*** Ms. Kindred also had authority to request that PChange SPOs be removed from Park Southern. Pl.'s SOF ¶¶ 138-42. Ms. Kindred exercised this authority multiple times, resulting in the removal of multiple PChange SPOs from Park Southern at her direction. *Id.* ¶ 139. In one instance less than two weeks before the incident with Mr. Rowe, Ms. Kindred told a PChange supervisor that an SPO nicknamed "Rambo" should be removed from Park Southern in light of "tenant complaints" about his conduct. *Id.* ¶ 141. PChange agreed to remove him. *Id.* When he later resurfaced, Ms. Kindred repeated to a PChange supervisor that Rambo "cannot work here." *Id.* ¶ 142. Multiple cases have found an employer-employee relationship in circumstances like this based on the employer's "right to discharge an individual guard," *Safeway Stores*, 448 A.2d at 861, or the employer's "authority to

discipline" a contractor's "employees under its supervision."  *Givens-Nyarko*, 2023 WL 6388950, at *5.

The record demonstrates that, at minimum, there are disputed issues of material fact as to whether Vesta had the authority to control PChange SPOs in the performance of their work and the results.  Rather than address this substantial evidence, Vesta argues that "Vesta could <u>not</u> control the SPOs' police powers."  MSJ at 5.  But the record shows that Ms. Kindred did have the power to direct the SPOs in their performance of work at Park Southern, such as investigating and patrolling specific areas.  For example, Ms. Kindred had the authority to prevent PChange SPOs from congregating in the parking garage and blocking traffic at the time of the incident with Mr. Rowe, which in part led to the initiation of the incident.  *See, e.g.*, Pl.'s SOF ¶¶ 181-82.  Additionally, while PChange testified that Ms. Kindred could not direct the SPOs to release someone whom they arrested or to loosen the handcuffs on a detainee, these facts are disputed.  *See id*. ¶¶ 21-27.  Williams, Philson, and other SPOs generally followed Ms. Kindred's instructions.  *Id*. ¶¶ 134-35.  A jury could reasonably infer that had Ms. Kindred directed the SPOs to release Mr. Rowe, loosen his handcuffs, or attend to his injuries, they would have followed her instructions.

The Court rejected the same argument presented by Vesta here in its prior order, explaining that Mr. Rowe did not "need[] to specifically allege that Vesta has control over the SPOs' arrests – as distinct from other conduct."  *Rowe*, 2024 WL 1655348, at *7 ("As Rowe accurately observes, moreover, '[T]he arrest itself is not the only conduct raised in the Amended Complaint.'").  The Court instead looked to allegations that "Vesta had power to control SPOs' conduct with respect to their work providing security at Park Southern," including "by directing them to certain locations on the property and directing them to address various security issues

and incidents." *Id.* at \*6-7. Discovery has now substantiated these allegations, and the Court's holding accordingly remains equally applicable on summary judgment.

### iii. The record also establishes Vesta's power to discharge and that PChange's work was part of Vesta's regular business.

The "termination of employees" can be an important factor in establishing an employer-employee relationship, *Search*, 128 F. Supp. 3d at 232, and Vesta had the power to discharge both PChange itself and individual PChange SPOs. Pl.'s SOF ¶¶ 120-21, 138-41. Further, managing PChange's work was "part of the regular business of" Vesta. *Search*, 128 F. Supp. 3d at 231. Vesta's business is property management. Pl.'s SOF ¶¶ 3, 116. As demonstrated above, PChange provided security for the property Vesta managed, and performed a variety of tasks as part of, and to facilitate, Vesta's property management.

### B. Summary Judgment Is Also Precluded On The Alternative Vicarious Liability Theories.

### i. Vesta can be held liable even if it also acted as PChange's co-agent.

Vesta has previously argued that the PChange-800 Southern Contract makes Vesta an agent of 800 Southern and a co-agent of PChange, and that therefore Vesta cannot as a matter of law be considered PChange's principal. *See* ECF No. 101 at 15-19. While unclear, Vesta appears to make that same argument here. *See* MSJ at 4. Vesta is wrong because, even if it is a co-agent of PChange, one co-agent can be found liable as the principal or master of another co-agent if there are sufficient indicia of control. Vesta cites to notes from the Restatement of Agency which confirm that "the doctrine of *respondeat superior* does not apply to agents **who are not masters**." RESTATEMENT (SECOND) OF AGENCY § 358 (emphasis added); MSJ at 4. Thus, Vesta can be both a co-agent and principal of PChange. Additionally, as Vesta concedes, even in the absence of a principal-agent relationship, agents can be vicariously liable for the tortious conduct of a co-agent when they are "at fault in appointing, supervising, or cooperating

with" the co-agent.  RESTATEMENT (SECOND) OF AGENCY § 358(1); MSJ at 4, n.1.  Here, there are genuine issues of material fact as to whether Vesta was negligent in its supervision of PChange.  *See infra* Section II.

### ii. Vesta can be held liable because it had a nondelegable duty to protect visitors.

Alternatively, a reasonable jury could conclude that Vesta is vicariously liable by virtue of the non-delegable duties it owes to residents and guests at Park Southern.  "It is established in the District of Columbia that a landlord has a duty to use reasonable care to keep safe those common areas of the building retained under his control."  *Graham v. M & J Corp.*, 424 A.2d 103, 105 (D.C. 1980).  Here, a reasonable jury could find liability based on Vesta's failure to prevent unlicensed armed guards from patrolling the property, failure to prevent PChange SPOs from loitering in the parking garage before the incident, and failure to protect Mr. Rowe against their foreseeable assault.  *See, e.g.*, Pl.'s SOF ¶¶ 180-237.  Vesta asserts that "a landowner's duty does not extend to protecting visitors from third persons until he knows or has reason to know that the acts of third persons are occurring or are about to occur."  MSJ at 7.  But it is disputed whether and to what extent Vesta had knowledge of the incident.  *See infra* Section II.A.  At minimum, Ms. Kindred indisputably knew that the SPOs were attempting to arrest Mr. Rowe, and a jury could conclude that she had a duty to protect him at that point.  *See id*.

### iii. Vesta can be held liable because it cannot contract away its liability for the inherently dangerous activity of armed policing.

"Under D.C. law, 'the general rule' is that 'an employer of an independent contractor is not liable for physical harm caused by the acts or omissions of the contractor.'"  *Matiella v. Murdock St. LLC*, 2023 WL 4684854, at *11 (D.D.C. July 21, 2023) (quoting *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1301 (D.C. Cir. 1985)).  However, there is an exception that "applies both to 'generically hazardous activities—work that, regardless of the skill with which it

is undertaken, poses a danger to others,' as well as situations where the employer 'has reason to know that his independent contractor is likely, under particular circumstances, to endanger others absent reasonable precautions' and 'depending on the entire situation under examination.'" *Id.* at *12 (quoting *Wilson*, 757 F.2d at 1303). Here, a reasonable jury could conclude that providing armed security services is "generally hazardous," permitting vicarious liability even if PChange is an independent contractor. *Wilson*, 757 F.2d at 1303. There is record evidence of a negligent discharge of a firearm and other use of force incidents involving SPOs. *See infra* Section II.B. A jury could also find that Vesta had "reason to know" that PChange SPOs were "likely, under particular circumstances, to endanger others absent reasonable precautions," *Wilson*, 757 F.2d at 1303, based on the same set of facts that preclude summary judgment on Mr. Rowe's negligent supervision claim. *See infra* Section II.

## II.   GENUINELY DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE NEGLIGENT SUPERVISION CLAIM.

"Liability for negligent supervision arises when an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Rowe*, 2024 WL 1655348, at *8 (cleaned up); *see also Xingru Lin v. Dist. of Columbia*, 2019 WL 1597876, at *12 (D.D.C. Apr. 15, 2019) (denying motion to dismiss negligent supervision claim based on "allegations that the District of Columbia knew or should have known about the risk posed by its officers"). Contrary to Vesta's assertion (MSJ at 9), there is substantial evidence establishing that Vesta was PChange's employer. *See supra* Section I.A. Summary judgment is also precluded because there are genuine issues regarding Vesta's knowledge of PChange's dangerous and incompetent conduct and failure to adequately supervise.

**A. There Is A Genuine Dispute As To Whether, And To What Extent, Vesta (Through Ms. Kindred) Had Knowledge Of The SPO Defendants' Dangerous And Incompetent Behavior Towards Mr. Rowe During The Incident.**

As the Court recognized, this claim can be based on Vesta's "contemporaneous" knowledge of the incident. *Rowe*, 2024 WL 1655348, at *9. At minimum, there are disputed issues as to Vesta's contemporaneous actual or constructive knowledge. A reasonable jury could conclude that Ms. Kindred knew or should have known of the incident from the start. Ms. Kindred had a monitor in her office that linked to cameras in the parking garage and outside the garage, which would have shown the incident as it was first unfolding. Pl.'s SOF ¶¶ 232-33. It was her practice to "periodically" look at her monitor. *Id*. ¶ 233. And she was in her office while at least some of the initial parts of the incident occurred. *Id*. ¶ 232. These facts permit an inference that she should have seen at least parts of the drawn out incident as it was occurring. While Vesta argues Ms. Kindred did not become aware of the incident until Ms. Rowe came to her office, MSJ at 8, a reasonable jury could infer that she had constructive knowledge based on her clear access to a live stream of the places where the incident occurred.

Further, Ms. Rowe informed Ms. Kindred of the incident as it was unfolding. Pl.'s SOF ¶ 231. Although Vesta asserts that Ms. Kindred "did not learn of [Mr. Rowe's arrest] until MPD was on scene" (MSJ at 8), that is disputed. It is reasonable to infer that Ms. Kindred had (or should have had) knowledge before MPD's arrival based on (1) Ms. Rowe's testimony that she pleaded with Ms. Kindred to ask the SPOs to release Mr. Rowe, Pl.'s SOF ¶ 231; (2) Ms. Rowe's testimony that MPD "may have come a minute or two" after she arrived with Ms. Kindred, *id*. ¶ 234; (3) Mr. Rowe's testimony that Ms. Kindred arrived before MPD did. *Id*.

Finally, when Ms. Kindred arrived on the scene, she indisputably observed Mr. Rowe in handcuffs and spoke briefly with the SPOs. *Id*. ¶¶ 235-36. Rather than do anything to help Mr.

Rowe, she rebuffed his request to have the SPOs loosen his handcuffs, told Ms. Rowe that there was nothing she could do to help him, and then left within minutes. *Id*. ¶¶ 235-37.

A reasonable jury could conclude that Ms. Kindred's failure to take any action during any stage of the incident constituted negligence. From the start, Ms. Kindred could have tried to exercise her supervisory authority to prevent the SPOs' tortious conduct. There is evidence that the SPOs followed her instructions and that she directed SPOs in their performance of a variety of tasks. *See supra* Section I.A. In similar circumstances, a court in this District has denied a manager's request for summary judgment on a negligent supervision claim, as "[a] reasonable jury could infer from [his] position that [he] had the authority to intervene and stop" assault of a customer. *Jackson v. Starbucks Corp.*, 2022 WL 888180, at *13 (D.D.C. Mar. 25, 2022). Further, when Ms. Kindred arrived on the scene and saw the aftermath of the incident, she could have instructed the SPOs to loosen Mr. Rowe's handcuffs or to determine if he needed medical attention. Instead, she left within minutes without taking any action. Her failure to pay closer attention to the situation in response to Mr. Rowe's and Ms. Rowe's pleas for help indicates negligence. Vesta asserts that Mr. Rowe's claim "necessarily requires" a showing that Vesta "possess[ed] supervisory authority over PChange's exercise of its police powers." MSJ at 9. That is wrong, as described above. *See supra* Section I.A.

### B. There Is Also A Genuine Dispute As To Whether Vesta Had Knowledge Of SPOs' Dangerous And Incompetent Conduct Prior To The Incident.

*First*, a reasonable jury could conclude that Vesta had actual or constructive knowledge of two prior incidents involving PChange SPOs that led to findings of misconduct by MPD. The first incident, which occurred on September 3, 2020, involved a negligent firearm discharge by Defendant Arrington in an apartment building close to Park Southern. Pl.'s SOF ¶ 153. The building was also managed by Vesta. *Id.* Defendants Williams and Hunter were present during

the incident, then tried to cover it up during MPD's investigation. *Id.* ¶¶ 154, 157. In September 2021, MPD issued a notice of revocation of PChange's Security Agency license as a result. *Id.* ¶ 155. MPD found that PChange's "failure to adequately train and supervise the employees of [its] security agency created a substantial public safety risk." *Id.* ¶ 156. The Vesta property manager was interviewed in connection with MPD's investigation, permitting an inference that Vesta knew about it. *Id.* ¶ 153. The second prior incident occurred on September 26, 2021, where a PChange SPO unlawfully assaulted a handcuffed individual in the presence of other SPOs. *Id.* ¶ 158. MPD then issued another notice of revocation to PChange in May 2022. *Id.* ¶ 159.

*Second*, the record establishes that Vesta had actual or constructive knowledge of prior dangerous and incompetent conduct by SPOs at Park Southern:

- Ms. Kindred had "concern[]" that SPOs were "loitering" on the premises. *Id.* ¶ 143. Ms. Kindred also received complaints from residents about "officers standing around and talking to each other on the property." *Id.* ¶ 151. Yet she testified that she did not direct the SPOs not to do this. *Id.*

- Vesta, through Ms. Kindred, knew about tenant complaints regarding PChange SPOs. For instance, in August 2021, she received a complaint about incompetent conduct by Rambo and former Defendant Parker. *Id.* ¶ 152.

- Vesta knew or should have known that Arrington's, Williams' and Hunter's SPO licenses were in revoked status as of October 26, 2021, and that Philson's license was in expired status, as their license status would have been posted on the publicly available DLCP website. *Id.* ¶¶ 162-64, 166-67, 169, 174. Further, Vesta should have at least known to inquire about the status of Arrington's, Williams' and Hunter's SPO licenses based on the report of their misconduct in the public September 2021 revocation proceeding against PChange that involved a Vesta-managed property. *Id.* ¶¶ 153-55. Because Defendant SPOs Williams, Hunter and Philson were not validly licensed, it was illegal for them to carry firearms as they were on October 26, 2021, which a property manager should be aware of. *Id.* ¶¶ 165, 168, 175.

A reasonable jury could conclude that, armed with this actual or constructive prior knowledge, Vesta was negligent by not providing more supervision; by allowing SPOs who engaged in prior dangerous and incompetent conduct to continue working at Park Southern; by allowing armed, unlicensed SPOs to continue working at Park Southern; by allowing unlicensed

PChange SPOs to have uncontrolled access to firearms at Park Southern, through their access to an armory located at the property, *id*. ¶ 160; and by not adequately preventing the SPOs from "loitering" and "standing around" on the premises, risking the type of altercation that occurred with Mr. Rowe. Vesta's actual or constructive knowledge of such "serial lapses" at its property and failure to take "steps to prevent repetition of those errors" evidences negligent supervision. *See Paavola v. United States*, 459 F. Supp. 3d 21, 41 (D.D.C. 2020).

Vesta argues that there is no "evidence to establish a pattern of excessive force or other misconduct relevant to [Mr. Rowe's] claims by the SPOs involved in his arrest." MSJ at 9. But this ignores all the evidence described above. For instance, the September 2021 incident involved an assault on a handcuffed individual, the same thing that happened to Mr. Rowe. Pl.'s SOF ¶¶ 158, 222. And the SPOs here were loitering by the exit to the parking garage, just as they had loitered in the past. *Id*. ¶¶ 143, 181-82. Regardless, the point is that a jury could find that this past conduct was "dangerous or otherwise incompetent." *Rowe*, 2024 WL 1655348, at *8.

Vesta argues that there is no evidence it "knew or should have known of such acts." MSJ at 9. This is disputed, as described above. And the only evidence Vesta addresses is a snippet of Ms. Kindred's testimony and a provision of the PChange-800 Southern Contract in which PChange warranted it would provide licensed SPOs. *See* MSJ at 10. Vesta asserts that Ms. Kindred testified "that she believed all of the SPOs were, in fact, licensed." MSJ at 10. But Ms. Kindred also testified that she did not actually know this to be true. Pl.'s SOF ¶ 8. And a jury could find that a contractual representation did not relieve Vesta of its responsibility to ensure that there were not unlicensed, armed, and illegally-operating SPOs on its property.

Vesta next argues that there is no evidence that its knowledge of the SPOs' licensing status "would have been a substantial factor in causing Rowe's injury." MSJ at 9. But the two primary actors in the assault of Mr. Rowe – Williams and Hunter – should not have been at Park Southern on October 26, 2021 in the first place because their licenses were revoked. Pl.'s SOF ¶¶ 163–64, 166–67. Nor should they have been carrying firearms—and in the case of Hunter, threatening Mr. Rowe with a firearm—nor should they have been able to access and use OC spray, as Hunter did at Williams's direction. Pl.'s SOF ¶¶ 165, 168, 186, 207, 219, 222. It is reasonable to infer that if Ms. Kindred had adequately supervised the SPOs, Williams and Hunter would not have been at Park Southern and the incident would not have occurred. In any event, the negligent supervision claim is not only based on the SPOs' licensing status. And Vesta does not contest the substantial factor element as to the other facts evidencing negligent supervision. For instance, it is reasonable to infer that had Ms. Kindred exercised her authority to prevent the SPOs from congregating by the parking garage exit (an issue for which she and Vesta were clearly on notice), the incident likewise would not have occurred.

Finally, Vesta argues that Mr. Rowe "lacks an expert to establish what Vesta supposedly should have known." MSJ at 9. But the D.C. Circuit has rejected the "proposition that expert testimony is always required to establish the standard of care in cases involving supervision of security personnel." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009). And the record here is full of evidence establishing a standard of care. This includes laws applicable to SPOs; testimony from MPD that it is illegal for an SPO to carry a firearm without being licensed; the PChange-800 Southern Contract, which requires PChange SPOs to be licensed; and Vesta performance standards such as Posting Orders. The jury here would not need expert evidence to grasp that a property manager should not permit unlicensed SPOs – who have no more authority

to exercise police powers than an average citizen – to work as armed guards at its property.  And a jury could readily grasp that the other facts described above establish negligence (*e.g.*, that Ms. Kindred knew that SPO loitering was a problem and did not provide adequate supervision to address the risk it presented).  Moreover, the *Godfrey* court rejected that "expert assistance [was] needed to establish the standard of care for an individual who is present" during an alleged assault by his bodyguard.  559 F.3d at 573.  Likewise, Vesta's contemporaneous knowledge of the incident is genuinely disputed.

III.    **VESTA IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON ITS ASSERTION OF QUALIFIED PRIVILEGE BECAUSE THAT DEFENSE IS NOT AVAILABLE TO IT AND GENUINE DISPUTES OF MATERIAL FACT PRECLUDE A FINDING OF QUALIFIED PRIVILEGE.**

Vesta asserts that it can be shielded from liability for all of Mr. Rowe's claims against it because undisputed facts show the SPO Defendants are entitled to qualified privilege.  But this argument presupposes: (1) that the qualified privilege should extend to the privately contracted and unlicensed SPO Defendants, and (2) that Vesta can avail itself of the benefits of that defense.  As discussed below, the Court should not extend the doctrine of qualified privilege to the SPO Defendants.  And, even if it did, that doctrine cannot protect Vesta from liability, particularly for the negligent supervision claim.  Even if both Vesta and the SPO Defendants could assert qualified immunity, genuine disputes of material fact preclude granting it summary judgment on that basis.  Vesta's argument for qualified privilege is based on disputed facts.

### A.  Legal Standard

Vesta argues it cannot be held secondarily liable for tort claims brought under District of Columbia law against the SPO Defendants because the SPO Defendants are immune from suit for them under the doctrine of qualified privilege under District of Columbia common law.  The qualified privilege analysis "largely mirrors § 1983 qualified immunity analysis."  *Burney v. Suggs*, 630 F.

Supp. 3d 20, 36 (D.D.C. 2022) (*citing Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 29–30. (D.D.C. 2021)).  Under D.C. law, to benefit from qualified privilege for the tort law claims against the SPOs, a police officer must show either that his conduct was constitutional or that he believed in good faith that his conduct was lawful, and that this belief was reasonable.  *Jenkins v. District of Columbia*, 223 A.3d 884, 900 (D.C. 2020).  Thus, unlike the objective qualified immunity analysis, the analysis for qualified privilege contains both objective and subjective elements.  *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009); *see also Gordon v. District of Columbia*, 309 A.3d 543, 560 n.12 (D.C. 2024) (noting objective and subjective elements of qualified privilege analysis).

### B.  The SPO Defendants May Not Assert Qualified Privilege Based On The Capacity In Which They Were Operating.

The SPO Defendants—and therefore Vesta—are not entitled to assert qualified privilege as a defense in this matter because of the nature of their private employment.  Vesta has cited to no authority establishing that unlicensed SPOs who themselves claimed to be enforcing private property rules while acting under the color of state law but well beyond their authority should be afforded qualified privilege.  The policy underpinnings of qualified privilege and qualified immunity are similar and, as a threshold matter, courts only permit private actors to raise qualified immunity in a § 1983 suit if (1) a firmly rooted tradition of immunity exists for similarly situated parties at common law, and (2) granting immunity is consistent with the reasons protection from suit under § 1983 is typically afforded.  *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 23 (D.D.C. 2022).  Neither prong supports affording qualified privilege or qualified immunity to the SPO Defendants.

The SPOs' conduct at issue here is not part of a "firmly rooted tradition" for qualified immunity because, by their own telling, the entire incident is predicated on their attempt to enforce the rules of Park Southern, not public laws.  In *Wheeler*, the court afforded qualified immunity to SPOs employed by American University in part because there was an unclear line there between their

enforcement of public laws and the university's rules while they policed the entire campus community. *Id.* at 23–24. But here, as discussed further below, the SPOs themselves cited property rules for their stop and arrest of Mr. Rowe, not public laws. Pl.'s SOF ¶ 28. In addition, the campus SPOs at issue in *Wheeler* are subject to a different set of D.C. regulations than SPOs like the SPO Defendants, who are commissioned to protect a single private property. *Compare* D.C.M.R. 1201 *et seq.* (regulating campus SPOs); *with* D.C.M.R. 1101 *et seq.* (regulating SPOs who protect private property). Unlike the PChange SPOs, DC regulations for campus SPOs further blur the private/public line by listing among their duties "integrating the principals [sic] of private and public policing and adapting them to the academic community." D.C.M.R. 1201.2. Further sharpening the public/private distinction is the fact that several of the SPO Defendants lacked effective SPO licenses at the time of the incident, Pl.'s SOF ¶¶ 163–64, 166–67, 169, 174—meaning the only *actual* authority they had is that of a private citizen plus the authority conferred on them by Vesta to enforce Park Southern's rules. There is no evidence of a "firmly rooted tradition" of affording qualified privilege or qualified immunity to privately contracted, unlicensed SPOs who violated constitutional rights while seeking to enforce private property rules.

On the second prong, granting qualified privilege to the SPO Defendants is not consistent with the purpose of the privilege. The Supreme Court has developed several policy justifications for the doctrine of qualified immunity, most importantly to avoid "unwarranted timidity" in the exercise of police authority, but also "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service," and to avoid "distract[ing] these employees from their duties." *Richardson v. McKnight*, 521 U.S. 399, 408–12. (1997) (internal citations and quotation marks omitted). In *Richardson*, the Court found that these justifications were not present in the context of a private company contracted to provide prison guard services. *Id.* The Court found that "competitive

market pressures" dispelled the concern about unwarranted timidity because those pressures will punish both overly aggressive and overly timid contractors by replacing them. *Id.* at 409-10. The Court also found that the availability of insurance coverage and employee indemnification allows private companies, unlike the government, to limit employees' exposure to damages suits and to "offset any increased employee liability risk with higher pay or extra benefits." *Id.* at 411. In light of these mitigations and the concern about deterring constitutional violations, the Court did not view any concern over distraction to employees as sufficient to justify applying qualified immunity to private prison guards. *Id.* at 411-12.

The facts here present the same bases to reject extension of qualified privilege to the SPO Defendants as existed in *Richardson*. PChange is a private firm that seeks to provide its services to a number of properties in the District of Columbia. If there are too many complaints from residents about aggressive or, on the other hand, timid policing by PChange SPOs, the property can replace them. In fact, that is exactly what has happened to PChange since this litigation was filed. Pl.'s SOF ¶ 121. As with the private firm in *Richardson*, PChange is organized to provide security services and was required to carry liability insurance by its contract with 800 Southern. Pl.'s SOF ¶ 119. It had the "strong incentives" of market pressure to calibrate its employees' conduct through reward or discipline. *Richardson*, 521 U.S. at 410; *see also Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1169 (10th Cir. 2005) (finding that the threat of replacement was sufficient to overcome unwarranted timidity concerns even when regulations make it "burdensome" to replace a private company). The same would not be true in *Wheeler*, where the university employed the SPOs directly and thus faced no threat of being replaced in its provision of security services on its own campus. 619 F. Supp. 3d at 23. Here, just as in *Richardson*, the "most important" policy reason justifying qualified immunity—avoiding unwarranted timidity—is not a concern. 521 U.S. at 409.

The remaining policy reasons also weigh against the SPO Defendants being permitted to assert qualified immunity. As in *Richardson*, there is less concern about liability risks deterring talented candidates because potential PChange hires have less reason to be concerned with damages suits in circumstances like this because PChange was required to carry liability insurance. Pl.'s SOF ¶ . In addition, unlike a government employer, PChange could "offset any increased employee liability risk with higher pay or extra benefits." *Richardson*, 521 U.S. at 411. As noted in *Richardson*, any concern about "distraction" of SPOs by lawsuits is insufficient on its own to justify applying qualified immunity or qualified privilege. *Id.*

### C. Vesta May Not Rely On Any Qualified Privilege Afforded To The SPO Defendants.

Even if qualified privilege is available to the SPO Defendants, it does not shield Vesta from vicarious liability for the claims against the SPOs or from liability for the negligent supervision claim lodged directly against Vesta. Vesta cites to no authority for the proposition that affording the SPO Defendants qualified privilege for the District of Columbia tort law claims against them means Vesta cannot be held secondarily liable for those torts, nor does it even attempt to explain why such a finding would extinguish Mr. Rowe's direct claim of negligent supervision against Vesta. To the contrary, case law demonstrates that Vesta could still be found liable at least for negligent supervision even if the SPOs' were privileged with respect to the assault, battery, and false imprisonment claims against them. In *District of Columbia v. Tulin*, for example, the District of Columbia Court of Appeals found no inconsistency between a jury verdict dismissing a claim for unlawful arrest against a junior police officer based on his good faith belief in the lawfulness of the arrest and finding the sergeants who authorized that officer's arrest liable for negligent supervision. 994 A.2d 788, 799-800 (D.C. 2010). Further, even assuming *arguendo* that qualified privilege exists as to the SPOs, there is no policy justification for extending it to the private property management company that supervises them.

**D. Factual Disputes Preclude Finding The SPO Defendants Are Entitled To Qualified Privilege.**

Even if qualified privilege were available to shield Vesta from any liability, genuine disputes of material fact exist as to each of the factual premises Vesta offers as a justification for the SPO Defendants' conduct.

Qualified privilege cannot be granted on summary judgment if there is a genuine issue as to a material issue of fact. *Arrington v. United States*, 473 F.3d 329, 339 (D.C. Cir. 2006). Analysis of a claim of qualified privilege calls first for the determination of "whether the facts in the record show the officers' conduct violated a constitutional right." *Corrigan v. District of Columbia*, 841 F.3d 1022, 1029 (D.C. Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Vesta asserts the SPOs are entitled to qualified privilege because they had the requisite reasonable suspicion or probable cause to detain, arrest, search, and use force on Mr. Rowe. MSJ at 16-27. "The detention of a plaintiff by a defendant police officer is lawful if the officer effected the detention constitutionally—that is, with probable cause if the detention was an arrest, or upon reasonable suspicion if the detention amounted only to a *Terry* stop." *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 256 (D.D.C. 2018) (internal citation and quotation marks omitted). To have probable cause, the information available to the SPOs, the information available to them at the time of the arrest must be "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id.* (internal citation and quotation marks omitted). Probable cause requires "at least *some* evidence supporting the elements of a particular offense, including the requisite mental state." *Wesby v. District of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014) (citing *Carr v. District of Columbia*, 587 F.3d 401, 410-11 (D.C. Cir. 2009)) *rev'd on other grounds, District of Columbia v. Wesby*, 583 U.S. 577 (2018).

There is a genuine dispute of fact as to the basis for the SPOs stopping and arresting Mr.

Rowe. At the time, the SPOs only said that he was being arrested for failing to provide identification. Pl.'s SOF ¶ 28. That fact is under dispute because the SPOs later offered an ever-evolving and conflicting list of pretexts in an attempt to justify the arrest, claiming in to MPD that he was stopped for speeding, Pl.'s SOF ¶ 241, and in another set of paperwork that he was arrested for "resisting arrest," Pl.'s SOF ¶¶ 28, 240, with different SPOs offering additional purported rationales for the arrests later on. Pl.'s SOF ¶ 200. Vesta notes additional purported bases for the arrest which no SPO Defendant ever articulated—that Rowe was arrested for attempting to assault the SPOs with his car or for unlawful entry. MSJ at 15, 25. But as discussed below, each of these theories is premised on mischaracterized or disputed facts. Drawing all inferences in Mr. Rowe's favor, as the Court must, *Liberty Lobby, Inc.*, 477 U.S. at 255, and considering these disputed facts, the Court cannot rule on summary judgment that the SPO Defendants did not violate Mr. Rowe's constitutional rights.

  **i. A Reasonable Jury Could Conclude the SPOs Lacked Probable Cause to Arrest Mr. Rowe for Assault.**

  Mr. Rowe disputes the facts Vesta relies on to argue the SPOs had probable cause to arrest him for assault on a police officer or assault with a deadly weapon due to the manner in which he drove through the parking garage. Vesta claims that Mr. Rowe used his vehicle as a weapon by driving it directly at the SPOs, narrowly avoiding them and putting them in fear for their lives. MSJ at 1, 16–18. But ample evidence contradicts that narrative, putting these facts in dispute.

  The facts as asserted by Mr. Rowe do not support an objective finding that a reasonable officer in the position of the SPO Defendants would have probable cause to arrest him for assault with a deadly weapon. Mr. Rowe was not speeding through the parking garage when he approached the SPOs, who were standing next to their PChange vehicles and blocking the exit to the parking garage. Pl.'s SOF at ¶¶ 180–90. Mr. Rowe stopped multiple times at different distances and honked his horn at the SPOs to get them to move, but the SPOs only looked at him without getting out of the way. *Id.*

at ¶ 190–93. Mr. Rowe then took his foot off the brake, tapped the accelerator to get the vehicle rolling forward, and it was only then that the SPOs got out of the way. *Id.* at ¶ 194. As he slowly went past the SPOs, Mr. Rowe held his foot over the brake pedal. *Id.* at ¶ 42. Mr. Rowe drove by the SPOs slow enough for them to hear Mr. Rowe shouting at them for blocking the way. *Id.* at ¶¶ 195–96.

The facts presented here are distinguishable from those in *Smith v. United States*, 843 F.3d 509 (D.C. Cir. 2016), the case Vesta principally relies on in making its argument. There, video evidence "indisputably" showed that after a heated argument between the plaintiff and police officer, the plaintiff "swiftly approached dangerously close" to the police officer when he "quickly pulled forward and to the left, passing very close to the officer" as he did a speedy U-turn. *Id.* at 513–14. This video evidence contradicted the plaintiff's version of events. *Id.* Vesta argues that *Smith* stands for the proposition that speed is an irrelevant consideration in analyzing probable cause in this context. MSJ at 15. However, in *Smith*, the court found only that the exact "miles per hour the car was traveling or whether the car actually touched the officer's leg" is not dispositive as to whether there was probable cause to arrest him for assault with a deadly weapon and assault on a police officer *Id.* In assessing the video evidence, the court noted the totality of the facts—including how quickly the plaintiff pulled his U-turn, how close the video showed his car getting to the police officer, and the fact that he "did not adjust for the safety of the officer attending on foot by, for example, . . . edging his car very slowly around until it was clear of the confined area," as confirmed by the video. *Id.* The video showed all of these circumstances plainly. *Id.*

Here, by contrast, there is no video evidence showing how Mr. Rowe was driving through the parking garage on the day of the incident, only competing testimony and statements about it. These disputes go to the core of whether a reasonable officer, seeing Mr. Rowe driving through the parking

garage, would form a reasonable belief that Mr. Rowe had the ability and intent to assault them with his vehicle, *see Smith*, 843 F3d at 512 (listing elements of the crime of assault on a police officer). Based on the facts in dispute, a jury could find that no reasonable officer would believe Mr. Rowe intended to assault them with his vehicle while driving at a slow speed and making efforts to safely navigate through the garage.

     ***The SPOs Did Not Subjectively Believe They Were Arresting Mr. Rowe for Assault.*** Vesta does not argue that they SPOs had a subjective belief they were arresting Mr. Rowe for assault because the SPOs' own actions during and immediately after the incident proves they had no such belief. To begin with, the SPOs approached and formed a perimeter around Mr. Rowe's vehicle immediately after he drove by them, Pl.'s SOF ¶ 199, an action inconsistent with any belief that he had tried to hit them. Williams testified that Mr. Rowe had not committed any crime whatsoever by the time Mr. Rowe had driven past the SPOs and stopped his vehicle outside the parking garage. *Id.* at 201; Pl.'s Ex. 24, Williams Dep. at 157:2-16 (agreeing that Mr. Rowe had not committed a crime at this point and only that he "violated a [Park Southern] rule by speeding through the parking lot"). During his deposition, Williams also admitted telling MPD that Mr. Rowe slowed down as he approached. Pl.'s SOF ¶ 201. Williams also told MPD at the scene that no one was assaulted, and did not think he had a basis to charge Mr. Rowe in connection with his driving toward him. *Id.* at ¶¶ 42, 190. Furthermore, Williams' written report, which he submitted to Vesta and to MPD the day after the incident, does not mention that he or any other SPOs feared for their safety. *Id.* at 203. Written statements provided by Hunter to MPD and by Phillips to Mr. Rowe's counsel after the filing of this lawsuit make no mention of being in fear for their safety or viewing Mr. Rowe as intending to hit them. *Id.* This evidence disputes the claim that the SPO Defendants had a subjective belief that Mr. Rowe committed assault, which is material to the qualified privilege analysis. In addition, the fact that

none of the SPOs believed they were arresting Mr. Rowe for assault supports the inference that the objective indicators of probable cause for that crime were absent.

***No Reasonable Officer Would Have Probable Cause to Arrest Rowe for Assault.*** Other disputed facts could allow a jury to find that no reasonable officer could have perceived Mr. Rowe as intending to cause harm as he drove through the garage. Mr. Rowe first stopped his car 50 to 75 feet away from the SPOs—not 20 feet, as Vesta claims, MSJ at 16—and honked his horn twice before rolling forward, stopping again, and honking his horn twice again when he was 25 to 50 feet away from them. Pl.'s SOF ¶¶ 190, 192. A key fact Vesta ignores is that the SPOs turned and looked at Mr. Rowe when he first honked at them. *Id.* ¶ 193. At this point, any reasonable observer would have seen that Mr. Rowe's intention in repeatedly honking his horn at them while at a full stop was to get their attention so he could safely pass through the exit of the parking garage that was blocked by the SPOs. *Id.* ¶ 190, 192.

The record supports that, in contrast to the situation in *Smith*, Mr. Rowe did not drive "swiftly" by the SPOs or in dangerously close proximity to them. Despite Mr. Rowe repeatedly honking his horn at them, the SPOs did not move. *Id.* ¶ 194. At that point, while 25 to 50 feet away from the SPOs, Mr. Rowe took his foot off the brake and "lightly tapped" on his accelerator. *Id.* ¶ 194. Mr. Rowe's vehicle moved forward slowly, driving past Phillips first then past the group of SPOs, who had plenty of time to move out of the way and did so without issue. *Id.* ¶ 194–95. Vesta relies heavily on Phillips' testimony, but ignores that he contradicted himself on this point, at one point saying Mr. Rowe was "not that fast." *Id.* ¶ 42. As he drove past, Mr. Rowe yelled at the SPOs and here again, there is a dispute on exactly what Mr. Rowe said—with Vesta relying on Williams' testimony that Mr. Rowe also purportedly said he would have run them over and that he said, "I see y'all moved when I sped up." MSJ at 17; Pl.'s SOF ¶ 55. Mr. Rowe said he yelled, "y'all blocking

the way like some ignorant [expletives]," and Williams testified that he heard him say either "I would have ranned over or sped up and run you over" or "if you didn't move out of the way you would have got ran over." *Id.* at ¶¶ 60–61 This is a material dispute, as Mr. Rowe's words are material as to a reasonable officer's perception of Mr. Rowe's intent. There is, however, no dispute that the SPOs claim to have heard Mr. Rowe clearly as he drove by, which shows he was not driving past them so quickly that his words were indecipherable. *Id.*

Similarly, the record gives rise to the inference that, in light of his low rate of speed, Mr. Rowe did not come so close to the SPOs as to give rise to a reasonable belief that he intended to hit them with his vehicle. Mr. Rowe came within five feet of Mr. Phillips and between a step and a half and two steps from the other SPOs because he had to navigate through the group that was blocking the road. Pl.'s SOF ¶ 58. Vesta's reliance on speculative testimony in response to a hypothetical question (over Plaintiff's objection) as to what would have happened if he had been speeding and the SPOs had not moved is unavailing, inadmissible, and proves nothing. MSJ at 17; Pl.'s SOF ¶ 55. One could make the same argument any time someone slows their vehicle down to allow a pedestrian to cross the street—that does not mean the pedestrian would be reasonable to think that the car intended to hit them or that they were placed in "grave risk of serious bodily harm." MSJ at 18. At most, the SPOs were inconvenienced because they had to momentarily stop their conversation and move out of the way so a car could pass through the driveway to exit the property.

Vesta also relies heavily on an MPD report that was drafted based on statements from Williams, Philson, and Hunter. MSJ at 17. The narrative section of that report is inadmissible hearsay evidence with numerous indicia of unreliability.[1] *See Stehn v. Cody*, 74 F.Supp. 3d 140, 149–50

---

[1]     Among other indicia of the report's unreliability, it incorrectly states that Philson was present in the garage when Mr. Rowe drove through it and that the SPOs, not Mr. Rowe, opened Mr. Rowe's car door. The report also acknowledges that the body worn camera footage did not

(D.D.C. 2014) (finding narrative in police report not based on personal knowledge was inadmissible hearsay). In any event, Vesta grossly mischaracterizes the findings of that report, which does not conclude that "Rowe's actions in driving his SUV at them amounted to a use of deadly force against the SPOs." MSJ at 17. To the contrary, the report makes no mention of assault of any kind and correctly points out that Mr. Rowe was "released without charge," and its only express finding as to the SPOs' conduct was that "this event was properly documented" and "proper notifications to the MPD were made by the PChange officers." ECF 144-13, at 4. The Court should not consider the MPD Internal Affairs report, much less Vesta's mischaracterizations of its contents.

Given the conflicting and disputed facts concerning the manner, speed, and circumstances in which Mr. Rowe was driving and purported bases for his arrest, a reasonable jury could find that the SPO Defendants lacked probable cause to arrest Mr. Rowe for assault.

### ii. A Reasonable Jury Could Find the SPOs Lacked Reasonable Suspicion to Perform a Terry Stop.

Vesta, accounting for the fact that the SPOs did *not* arrest Mr. Rowe for assault, next argues that that the SPO Defendants were justified in detaining Mr. Rowe and using force on him by the doctrine established in *Terry v. Ohio*, 392 U.S. 1 (1968). Qualified immunity is unavailable when a defendant makes a *Terry* stop without reasonable suspicion. *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 87 (D.D.C. 2017) (denying qualified immunity because "[i]t is well-established that investigatory stops must be supported by reasonable suspicion"); *Maddux v. District of Columbia*, 144 F. Supp. 3d 131, 144 (D.D.C. 2015) (denying qualified immunity because *Terry* "plainly requires an officer to have a reasonable, articulable suspicion of wrongdoing before stopping a person to

---

capture the use of force but still claims it "corroborates" the accounts of Williams, Hunter, and Philson, ignoring the statements Mr. Rowe made in that footage about what actually happened to him. In addition, the report failed to review the status of the SPO Defendants' SPO licenses, many of which were revoked or expired on the date of the incident. Pl.'s SOF ¶ 163–76.

investigate him or her"). Based on the facts in the record, a reasonable jury could find that the SPO Defendants lacked reasonable suspicion to conduct a *Terry* stop of Mr. Rowe.

There is a dispute as to when the *Terry* stop began. Vesta asserts that Williams asking for Mr. Rowe's identification "was a consensual police-citizen encounter," MSJ at 25, but that assertion is belied by the record. Under the Fourth Amendment, a seizure occurs "when physical force is used to restrain movement or when a person submits to an officer's show of authority." *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (internal citation and quotation marks omitted). A police action is a "show of authority" where a reasonable person would "not have believed that he was free to leave." *Id.* (internal citation and quotation marks omitted). In considering this question, courts review the totality of the circumstances, including "whether the officer displayed a weapon, wore a uniform . . . and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *Id.* at 632–33.

Here, the SPOs wore uniforms and displayed weapons, and the facts show that Mr. Rowe was stopped for Fourth Amendment purposes by the time Williams had approached his window and the other officers formed a "perimeter" around his vehicle. Pl.'s SOF ¶¶ 187, 199. According to SPO Phillips, at this point, Williams "basically conducted a traffic stop." *Id.* ¶ 200. With SPOs surrounding him, Williams yelling at him for his identification and proclaiming, "I am the police," and Hunter placing his hand on his gun and letting Mr. Rowe know he would use it if he had to, no reasonable person in Mr. Rowe's position would feel free to leave. *Id.* at ¶¶ 199 – 200, 202, 205, 207.

The question then turns to whether the SPO Defendants had a reasonable, articulable basis to conduct a *Terry* stop of Mr. Rowe when they formed a perimeter around his vehicle. Here, Vesta does not point to anything that would have provided such a basis at that point in time. *See* MSJ at 21. As discussed above, a reasonable jury could find that Mr. Rowe navigated safely around the SPOs and

that he did not reach for his gearshift, ignition, or seat belt buckle until after Williams had stopped him, meaning the fact that Park Southern sits in a high crime area is only undisputed fact Vesta could point to as justification for the stop.[2] MSJ at 21; Pl.'s SOF at ¶¶ 29-32. The high crime nature of a neighborhood is "only a 'contextual consideration[]' and, as such, cannot provide the information . . . necessary to demonstrate reasonable suspicion." *Castle*, 825 F.3d at 636 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Indeed, the Defendant SPOs have never articulated a factual basis for suspecting, at that point in time, that Mr. Rowe was committing or about to commit any crime associated with that neighborhood's status as a "high-crime" area.

Other facts in the record cut against the finding that any reasonable officer would have a reasonable suspicion that Mr. Rowe was committing or about to commit a crime. When Williams approached Mr. Rowe's window, he told Williams to call the police—the opposite of what a reasonable SPO would expect a criminal to request. Pl.'s SOF ¶ 205–06. Other facts further cut against any finding that the SPOs had reasonable suspicion that crime was afoot in Mr. Rowe's vehicle, including that his children were in the car (which Williams, Hunter, and Philson saw) that the stop occurred in the middle of the day, and that Mr. Rowe was known at least to Hunter. *Id.* ¶¶ 41, 70, 92, 199.

Muddying the waters, Vesta suggests that reasonable suspicion arose *after* Williams was asking for Mr. Rowe's identification and *after* Mr. Rowe had asked Williams to call the police. MSJ at 21. As evidence, Vesta cites Williams' unsupported testimony that he, "due to that being a high

---

[2] That Mr. Rowe was yelling at the SPOs is irrelevant to the reasonable suspicion analysis because that activity is protected by the First Amendment and cannot be the basis of a valid *Terry* stop. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Amili v. City of Tukwila*, 31 F. Supp 1274, 1279 (W.D. Wash. 2014) ("The use of expletives does not transform an otherwise-legal refusal to answer questions into the basis for a legitimate *Terry* stop).

crime area, felt as though it would be safer to detain [Mr. Rowe] at that moment just in case he had a weapon in his vehicle." MSJ at 21; Pl.'s SOF at ¶¶ 85. Vesta also seems to suggest that the fact that Williams saw Mr. Rowe's children in the backseat meant he "was concerned that Rowe was dangerous to Williams himself, and to others," although Williams offered no such testimony and Vesta points to no evidence in the record that supports that assertion. MSJ at 21. This is the epitome of a "suspicion" that does not pass muster under *Terry* because it is not articulable: the context of a high-crime area or the presence of children are not themselves articulable suspicions, but are only context that may inform whether an officer's articulated suspicion is reasonable. *Castle*, 825 F.3d at 636. Indeed, the fact that Mr. Rowe's children were in the backseat gives rise to the reasonable inference that Mr. Rowe did *not* wish to escalate the situation. Neither Vesta nor Williams pointed to any fact that would give rise to any reasonable suspicion that Mr. Rowe had a weapon, such that would justify a detention and search of Mr. Rowe's person or vehicle. If Vesta's argument were to prevail, all citizens in the vicinity of the high-crime Park Southern area—at least those in the company of children—would be subject to *Terry* stops. That is patently not the law.

The timing, nature, and purpose of Mr. Rowe reaching with his right hand is a fact in dispute. Pl.'s SOF at ¶¶ 211–216. Notably, Vesta does not point to Williams' testimony that he saw Mr. Rowe reach "like underneath his seat" to support the detention. *Compare* Pl.'s SOF at ¶ 85 *with* MSJ at 21. Regardless of when it occurred, the "reaching" at issue was not the type of "furtive gesture" that would justify a *Terry* stop or subsequent arrest. While asking Williams to call the police in response to his request for Mr. Rowe's identification, Mr. Rowe reached with his right hand to the gear shift, which was situated in front of the radio console in full view from the passenger window, so that he could put the vehicle in park. Pl.'s SOF ¶ 211. Mr. Rowe then reached to turn off the ignition, making the situation *safer*. *Id.* ¶ 212. Williams was standing at the driver's side door frame, with a

clear view of Mr. Rowe's hands at all times. *Id.* ¶ 200. Courts have found that such gestures do not provide a basis for a Fourth Amendment seizure. *See Jackson v. United States,* 56 A.3d 1206, 1210 (D.C. App. 2012) ("Notwithstanding the officer's testimony, the movement he described—'hands moving in the dash area'—did not give him particularized objective grounds for reasonably believing Mr. Jackson was moving his hands on the dashboard to retrieve a gun."). Vesta disputes that the gearshift would have been in view, but does not offer any evidence that supports that other than a reference to Mr. Rowe's mother's testimony saying the gearshift is "in the middle of the car" and agreeing with Vesta's counsel that you would have to "reach down to grab it." Pl.'s SOF at ¶¶ 81–82. Vesta also implies that, at this time, Mr. Rowe reached down to unbuckle his seatbelt, but that did not happen until *after* Williams reached in and started trying to wrench Mr. Rowe out of the vehicle. Pl.'s SOF at ¶¶ 81-82.

The manner in which Williams approached Mr. Rowe and initiated the arrest also contradicts any inference that he—or any reasonable officer in his shoes—had reason to believe Mr. Rowe had a weapon or posed a threat to the SPOs. As law enforcement expert Dr. Theron Bowman, former longtime chief of the Arlington, Texas police department, has opined, if Williams believed that Mr. Rowe may have had a weapon and posed a danger to him, then a reasonable officer would have ordered the driver to stop moving and show their hands, and would have drawn their weapon and pointed it at the suspect to gain control and ensure compliance. Pl.'s SOF 253. A reasonable officer also would not have engaged the individual in close quarters inside their vehicle, and would have taken cover and called the individual to them. *Id.*

Williams did not take any of these steps. Instead, irate that Mr. Rowe had mouthed off at him and understood, correctly, that he had no obligation to provide his identification, Williams began to use unjustified force on Mr. Rowe to effectuate an arrest unsupported by probable cause, violating Mr.

Rowe's clearly established constitutional rights.

### iii. A Reasonable Jury Could Find the SPOs Lacked Probable Cause to Arrest Mr. Rowe for Resisting Arrest.

Although a reasonable jury could find that Williams and the SPO Defendants lacked probable cause to arrest Mr. Rowe at the time they initiated his arrest, Vesta argues they developed probable cause in the course of his otherwise unlawful arrest because Mr. Rowe resisted arrest. Factual disputes preclude a finding that a reasonable officer would have found probable cause for resisting arrest.

Under D.C. Code § 22-405.01(b), a person is guilty of a misdemeanor when he "without justifiable and excusable cause intentionally resists an arrest by an individual who he or she has reason to believe is a law enforcement officer." This statute "does not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties." *Coghill v. United States*, 982 A.2d 802, 807 (D.C. 2009). A person's conduct "must go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action." *In re C.L.D.*, 739 A.2d 353, 357 (D.C. App. 1999). For example, refusing to identify oneself to the police, cursing at them, and walking away despite an order to remain does not constitute active resistance, nor does defying an instruction to remove hands from a pocket. *Id.*; *see also Howard v. United States*, 966 A.2d 854, 856 (D.C. 2009) (holding that failure to remove hands from pockets when ordered to do so was not resisting). "[T]he statute was intended to deescalate the potential for violence which exists whenever a police officer encounters an individual in the line of duty, ... the key to establishing any violation of the APO statute is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties." *Ruffin v. United States*, 76 A.3d 845, 850 (D.C. 2013) (internal citations and quotation marks omitted).

Vesta argues that Mr. Rowe resisted arrest when Williams first reached into the vehicle to

grab Mr. Rowe—after Mr. Rowe had himself opened the door to prevent Williams from damaging it. MSJ at 21. Here, Vesta ignores that Mr. Rowe testified that he was still buckled into his seat when Williams initiated the arrest, and grabbed his hair, neck, and shirt in an attempt to get him out of the vehicle. Pl.'s SOF ¶ 215. At this point, Mr. Rowe was not himself resisting arrest so much as his seatbelt was. Mr. Rowe cannot be said to have resisted arrest by the passive act of *not* removing his seatbelt. *See Dolson v. United States*, 948 A.2d 1193, 1202 (D.C. 2008) ("[T]he key to establishing any violation of the APO statute is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties.") (internal citation and quotation marks omitted).

At this point, Mr. Rowe—who had been threatened with a firearm, choked and yanked around by his hair and shirt for no justifiable reason by someone who refused to call the police despite Mr. Rowe's repeated requests—was in fear for his life. Pl.'s SOF ¶ 217. At *this point*, while Williams was *choking, yanking, and grabbing Mr. Rowe's hair*, Mr. Rowe reached down and unbuckled his seatbelt. *Id.* ¶ 216. Mr. Rowe then grabbed hold of the steering wheel in what was essentially a reflexive action—much like pulling away from an officer who grabs an arm. *Id.* ¶ 217; *see Ruffin*, 76 A.3d at 850. The reflexive nature of this act is supported by Mr. Rowe's testimony that he released the steering wheel once he realized that the reflexive grab of the steering wheel was putting him and his children at risk. Pl.'s SOF ¶ 221. Indeed, under the circumstances, Mr. Rowe's reflex to continue to keep his hands where the SPOs could see them was understandable in light of the conduct of the officers. Mr. Rowe then complied with the arrest, stepping himself out of his own vehicle. *Id.* .

Rowe's behavior in grabbing the steering wheel was also justified given the excessive nature of the force Williams was using against him. Where, as here, excessive force is used, the misdemeanor resisting statute allows arrestees to "defend against the excessive force, using only the

amount of force that appears reasonably necessary for protection." 1 Criminal Jury Instructions for DC Instruction 4.116.

Vesta also argues that Mr. Rowe resisted arrest by moving his legs as the SPOs searched him. MSJ at 23. That fact is in dispute. Mr. Rowe testified that he did not resist the search but tensed up because of the violence the SPOs perpetrated against him. Pl.'s SOF ¶ 94. Importantly, that search occurred after the SPOs had arrested him, handcuffed him, OC sprayed him, slammed him against a fence, then lifted him up and slammed him on the ground. *Id.* Mr. Rowe tensing as they continued to touch him is an understandable reflex, not resisting that rises to the level of a criminal offense.

### iv. A Reasonable Jury Could Find the SPOs Used Excessive Force on Mr. Rowe, Even if They Had Probable Cause or Reasonable Suspicion.

Even if, as Vesta asserts, the SPOs were justified in the stop and arrest of Mr. Rowe, the force used against Mr. Rowe—both before and after he grabbed the steering wheel—was excessive in violation of Mr. Rowe's constitutional rights. Assessing the reasonableness of police use of force is a fact-based inquiry, and involves analyzing factors including "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (*citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In this circuit, courts consider "(1) the facts and circumstances of the particular case, (2) the severity of the crime, (3) whether the plaintiff posed an immediate threat to the safety of the officers or other individuals, and (4) whether the plaintiff was actively resisting arrest or attempting to flee." *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Even before Mr. Rowe grabbed the steering wheel, Williams was using excessive force against him by choking him, grabbing his shirt, and yanking on his hair, all while Mr. Rowe was buckled into his seat. Pl.'s SOF ¶ 214–15. For the reasons discussed above, at this point, Williams

had *no* basis—reasonable suspicion or probable cause—to effectuate an arrest, much less use force, much less force including choking. Mr. Rowe did not pose an immediate threat to Williams' safety or the safety of the other officers, nor was he attempting to drive away when Williams grabbed him—he was asking him to call the police. *Id.* ¶ 205. To the contrary, it was Williams who chose to escalate the situation and introduce dangerous physical violence without justification.

The force used against Mr. Rowe continued even after he let go of the steering wheel and stepped out of the vehicle. At that point, Mr. Rowe had both hands cuffed behind his back. Pl.'s SOF ¶ 222. Mr. Rowe told Williams he did not want to hear what he had to say, so Williams ordered Hunter to deploy OC spray right into Mr. Rowe's face, despite being handcuffed and offering no physical resistance. *Id.* The SPOs and Vesta dispute this order of events, saying instead that Mr. Rowe was sprayed while he was still in the vehicle and holding onto the steering wheel, with only one hand cuffed. MSJ at 22. But that is not accurate according to Mr. Rowe's testimony, nor is it consistent with the fact that none of Mr. Rowe's children, who were in the backseat, were exposed to the OC spray, which they would have been if it had been deployed into the vehicle, as opposed to being deployed when Mr. Rowe was outside the vehicle. Pl.'s SOF ¶ 223. Williams' own written statement submitted to Vesta and MPD about the incident indicates that he had been able to get Mr. Rowe "fully detained in handcuffs" at the point he ordered Hunter to use OC spray on Mr. Rowe. Pl.'s SOF ¶ 222. Even if Mr. Rowe had been inside the vehicle, which he disputes, a reasonable jury could conclude that it was unreasonable and excessive to OC spray him in the face for the purpose of removing him from the vehicle only so that the SPOs could identify and bar him from the property.

The excessive force continued even after Mr. Rowe was sprayed with OC spray. The SPOs tried to search Mr. Rowe, threw him against a nearby fence, and then, as corroborated by an eyewitness, the SPOs then lifted Mr. Rowe up in the air and slammed him to the ground on his back,

on top of his cuffed hands. Pl.'s SOF ¶ 228. The SPOs then proceeded to engage in an unlawful search of Mr. Rowe. Pl.'s SOF ¶ 227. Mr. Rowe's expert witness, Dr. Bowman, opined that this use of force was excessive as the SPOs had no lawful basis to detain or use force against Mr. Rowe. *Id.* ¶ 229.

Under these facts, even if the SPOs subjectively believed this use of force was warranted, such a belief is not reasonable. It is clearly established that officers may not continue using force on a person who has either been subdued or is in compliance with officer's demands. *See, e.g. Johnson*, 528 F.3d at 974-75 (holding it was excessive force for an officer to kick the groin of an individual who had submitted himself to arrest by lying face down with his hands up); *Rudder v. Williams*, 666 F.3d 790, 795-96 (D.C. Cir. 2012) (holding it was excessive force when an officer used a baton on children and an adult who had complied with a request to leave the sidewalk); *see also Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010) ("[W]e presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee."); *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (use of pepper spray on detainee who was handcuffed and under control on the ground was excessive force and a "[g]ratuitous and completely unnecessary act[ ] of violence"). PChange's own use of force policies, which Williams and Hunter both acknowledged, say that use of OC spray is warranted only where a "suspect is violent or threatening" and that OC spray is meant to be used as a "defensive weapon." Pl.'s SOF ¶ 179; Pl.'s Ex. 47, PChange Use of Force Policy. It is perhaps because the use of OC spray was so unnecessary and violent that Williams later changed his story from the account he wrote a day after the incident and submitted to MPD and Vesta—which says Mr. Rowe was "fully detained in handcuffs" before he ordered Hunter to use OC Spray on Mr. Rowe. Pl.'s SOF at ¶ 222. Even later, after Mr. Rowe was sitting on the ground, waiting for police to arrive, the SPOs did not do anything to flush the OC spray

out of his eyes, as required by MPD general orders.  Pl.'s SOF at ¶ 230; *see LaLonde v. Cnty. of Riverside,* 204 F.3d 947, 960 (9th Cir. 2000) (finding "refusal without cause to alleviate [OC spray's] harmful effects constitutes excessive force").  All of this force was excessive and unnecessary considering the fact that, as discussed above, the SPOs lacked reasonable suspicion or probable cause. Even if the SPOs had developed probable cause to arrest Mr. Rowe for resisting arrest, by this point, he had ceased resisting, so the use of force was unnecessary and excessive.

### v.    The SPOs Lacked Any Legal Authority for their Conduct.

All of the foregoing arguments presuppose that the SPOs could have made a lawful arrest of Mr. Rowe if there had been probable cause.  But as Vesta alludes to in its brief, the SPO Defendants, specifically Williams, Hunter, Philson, Arrington, and Phillips, did not have *any* lawful authority to act as SPOs because their licenses were ineffective as of the date of the incident.  Pl.'s SOF ¶¶ 161– 76.  Phillips had not yet received his SPO license, and Philson's license was expired because he failed to submit a complete renewal application on time.  *Id.* ¶ 176.  Williams' and Hunter's licenses were revoked in September 2021 at the latest after they lied to the MPD in connection with an investigation into a negligent discharge by Arrington, the basis for the revocation of Arrington's license.  *Id.*  ¶¶ 164, 166.  Absent an effective SPO license, everything these unlicensed SPOs did that day, including wearing uniforms, carrying firearms, the stop, the arrest, the use of force, and the search, was not just illegal but criminal.  *Id.* ¶¶ 165, 167.  It was also in violation of clearly established D.C. law prohibiting anyone without a valid SPO license from presenting themselves as an SPO.  D.C.M.R. 6A § 1103–04.

Vesta attempts to get around the lack of a license by asserting that the SPOs somehow—after stopping Mr. Rowe—had reasonable suspicion or even probable cause to arrest Mr. Rowe for unlawful entry because D.C. law allows for "citizen's arrest" for that offense.  MSJ at 25.  But Mr. Rowe was not—and never has been—barred from Park Southern, and he remained on the property

after driving by the SPOs only because they yelled at them and then stopped him without legal justification. Pl.'s SOF ¶ 197–99 .

Vesta also attempts to make arguments similar to those considered above—that the SPOs could make a citizen's arrest for assault based on his alleged reaching and resistance. But, as noted above, there are numerous factual disputes as to whether there was probable cause for arrest on those grounds, *see supra at* III.D.i. Moreover, because the SPOs lacked licenses and therefore had no lawful authority to conduct a *Terry* stop, Mr. Rowe would have been justified in using reasonable force to resist their attempt to detain and batter him. After all, the SPOs were no more than private citizens with illegal firearms, and Mr. Rowe was justified in using force to defend himself. A private person cannot arrest Mr. Rowe for misdemeanor resisting arrest, and, as discussed above, a reasonable jury could find there was no probable cause to arrest Mr. Rowe for assault of any form.

Vesta's attempt to argue that the announcement that Mr. Rowe was arrested for failure to identify—not a crime—affords the officers qualified immunity is misplaced. *See* MSJ. at 26. Mr. Rowe was arrested with *no* probable cause, violating his "well established" right "to be free from arrest without probable cause." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 21 (D.D.C. 2011).

The fact of the matter is, whether licensed or not—and they were not—a reasonable jury could find that the SPOs had no legal authority to stop, arrest, use force on, and search Mr. Rowe. Thus, the SPOs are not entitled to qualified immunity or qualified privilege.

## CONCLUSION

For the reasons above, the Court should deny Vesta's motion for summary judgment. The Court should also reject Vesta's specious request for an order requiring Vest and Mr. Rowe to meet and confer on an award of costs to Vesta under LCvR 54.2.

Dated: August 5, 2024           Respectfully Submitted,

 /s/  Thomas A. Bednar
Thomas A. Bednar (D.C. Bar No. 493640)
David A. Last (D.C. Bar No. 476335)
Jessica Hollis (D.C. Bar No. 1618781)
Caleb J. Robertson (D.C. Bar No. 1720614)
Michael Schulman (D.C. Bar No. 1617228)
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Phone: (202) 974-1836 (Bednar)
Fax: (202) 974-1999
*dlast@cgsh.com*
*tbednar@cgsh.com*
*jhollis@cgsh.com*
*cjrobertson@cgsh.com*
*mschulman@cgsh.com*

 /s/ Dennis. A. Corkery
Dennis A. Corkery (D.C. Bar No. 1016991)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th St., NW
Ste. 400
Washington, D.C. 20005
(202) 319-1000
dennis_corkery@washlaw.org

*Attorneys for Plaintiff*

MICHAEL ROWE

        Plaintiff,

    v.

PCHANGE LLC, *et al.*

        Defendants.

Civil Action No.: 1:22-cv-03098-JEB

## PLAINTIFF MICHAEL ROWE'S STATEMENT OF DISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

## STAMENT OF DISPUTED MATERIAL FACTS

Plaintiff Michael Rowe submits the following statement of disputed material facts in response to Vesta Management DC, LLC's ("Vesta") statement of material facts. (ECF No. 144-2). The text of each numbered paragraph that Vesta asserts to be a material, undisputed fact is set forth below, with Plaintiffs' response following it. Unless otherwise specified, all citations to "Plaintiff's Exhibits" or "Pl.'s Ex." are to the Exhibits to the Declaration of Michael Schulman ("Schulman Decl.").

1. A true and correct copy of the Management Agreement between 800 Southern Avenue, LLC ("800 Southern") and Vesta is attached as Exhibit A to the Declaration of Nichole Kindred. *See* Decl. of Nichole Kindred, **Exhibit 1** hereto, ¶ 9.

    **Response:** Undisputed.

2. 800 Southern owns the Park Southern apartment complex located at 800 Southern Avenue SE, Washington, DC ("Park Southern"). *See* **Exhibit 1**, ¶ 9.

**Response:** Undisputed.

3. 800 Southern hired Vesta to be the property manager of the Park Southern apartment complex. *See* **Exhibit 1**, ¶ 11.

**Response:** Undisputed that Vesta and 800 Southern entered into an agreement by which Vesta would serve as the property manager of Park Southern.

4. A true and correct copy of the PChange Contract between 800 Southern and PChange is attached as Exhibit B to the Declaration of Nichole Kindred. *See* Decl. of Nichole Kindred, **Exhibit 1** hereto, ¶ 7 ("the Contract").

**Response:** Undisputed.

5. 800 Southern hired PChange, LLC ("PChange") to provide security services at the apartment complex. *See* Decl. of Nichole Kindred, **Exhibit 1** hereto, ¶ 7.

**Response:** Undisputed that 800 Southern contracted with PChange to provide security services under the direction of Vesta. Exhibit B to Decl. of Nichole Kindred at VESTA 001, 006, ECF No. 144-3 at 21, 26.

6. The Contract states that PChange's duties include having its SPOs "provid[e] a visible deterrent for…crime[]…" **Exhibit B** to Decl. of Nichole Kindred at VESTA008, § 3.2(i).

**Response:** Mr. Rowe disputes Vesta's characterization of the enumerated duty of PChange as described in the Contract, which in full context provides the duties of PChange "will consist of *reasonably*: (i) providing a visible deterrent for *property* crimes and crime against only [800 Southern]. . . provided however, that these crimes, as is consistent with this Agreement consist of crimes against only the property of only [800 Southern] such that said property is within

[Park Southern]." Exhibit B to Decl. of Nichole Kindred at VESTA 008, ECF No. 144-3 at 28 (emphasis added).

7. The Contract requires that all PChange SPOs be "licensed by the state of Maryland, Washington DC, and/or Virginia." **Exhibit B** to Decl. of Nichole Kindred at VESTA011, § 6.1.

**Response:** Undisputed.

8. Vesta's property manager, Nichole Kindred, was asked at her deposition: "Q: . . . [W]hen PChange was providing the SPOs, was it your impression that all of the SPOs they were providing at Park Southern were validly licensed?" Kindred answered: "[t]he SPOs, yes." **Exhibit 2**, Kindred Dep. at 69:16-22.

**Response:** Mr. Rowe disputes Vesta's characterization of, and any inference purportedly drawn from, this testimony, including the inference that Kindred knew the PChange SPOs were validly licensed as of October 26, 2021. When Kindred was asked whether she knew if the SPOs employed by PChange at Park Southern were validly licensed, she responded "No." *See* Pl.'s Ex. 26, Kindred Dep. at 68:9-12.

9. The Contract with PChange identifies 800 Southern Avenue, LLC as the "Owner" of the apartment complex. **Exhibit B** to Decl. of Nichole Kindred at VESTA001

**Response:** Undisputed.

10. The Contract with PChange identifies Vesta as the "Owner's Agent." **Exhibit B** to Decl. of Nichole Kindred at VESTA001

**Response:** Undisputed.

11. The Contract also identifies PChange as an independent contractor of 800 Southern Avenue, LLC. **Exhibit B** to Decl. of Nichole Kindred at VESTA011, §6.2.

**Response:** Undisputed.

12. The Contract provides that "neither [800 Southern] nor . . . [Vesta] will have any direction or control of [PChange] except in the results to be obtained." **Exhibit B** to Decl. of Nichole Kindred at VESTA011, §6.2.

     **Response:** Mr. Rowe disputes the inferences purportedly drawn from this language that Vesta could not control or direct the activities of PChange or its SPOs. To the contrary, evidence in the record demonstrates that Vesta, and Ms. Kindred specifically, could and did direct the activities of PChange and its SPOs, as noted in the Statement of Additional Material Facts, ¶¶ 117–152, below.

13. The Director of Operations and Business Development at PChange, Kevin Polistin, testified as PChange's Fed. R. Civ. P. 30(b)(6) witness in response to Plaintiff's Rule 30(b)(6) deposition notice. **Exhibit 3**, Polistin Dep. at 12:8-14:20.

     **Response:** Undisputed.

14. Polistin testified as follows concerning SPOs' "police powers":

     So SPOs in the District of Columbia are somewhat equivalent to the Metropolitan Police Department. The difference that you have as an SPO in the District of Columbia, you have police power only on the contracted property. Outside of that property, you don't have police authority.

     **Exhibit 3**, Polistin Dep. at 245:17-246:2.

     **Response:** Mr. Rowe disputes the characterization that SPOs' authority is "somewhat equivalent" to the District of Columbia Metropolitan Police Department ("MPD"), because, for instance, SPOs in D.C. do not have authority to conduct traffic stops. *See* Ex. 25, Polistin Dep. at 205:11-15, 244:19-245:2. The rights and responsibilities of SPOs in the District of Columbia are set forth in the D.C. Code, D.C. Municipal Regulations, MPD General Orders,

and MPD website. *See generally* Pl.'s Ex. 41, D.C. Code §§ 5–125.02, 5–129.02, 23–582; Pl.'s

Ex. 37, D.C.M.R. 6–A §§1100, 1101, 1102; Pl.'s Ex. 38, MPD General Order-OPS-308.07.

15. Polistin testified as following concerning SPOs' "police powers':

    Q: Is detaining a suspect part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 246:11-13.

<u>**Response:**</u>  Undisputed that Polistin offered the quoted testimony.

16. Polistin testified as follows concerning SPOs' "police powers":

    Q: Is arresting a suspect part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 246:14-16.

<u>**Response:**</u>  Undisputed that Polistin offered the quoted testimony.

17. Polistin testified as follows concerning SPOs' "police powers":

    Q: Is handcuffing a suspect part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 246:17-19.

<u>**Response:**</u>  Undisputed that Polistin offered the quoted testimony.

18. Polistin testified as follows concerning SPOs' "police powers":

    Q: Is handcuffing a detainee part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 246:20-22.

<u>**Response:**</u>  Disputed to the extent the testimony elicited by Vesta implies SPOs have unlimited

authority to handcuff a detainee. In addition to complying with all requirements of MPD

General Orders, SPOs must have at least reasonable suspicion that a detainee poses a threat to

place them in handcuffs. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 87 (D.D.C. 2017) (denying qualified immunity because "[i]t is well-established that investigatory stops must be supported by reasonable suspicion"); *Maddux v. District of Columbia*, 144 F. Supp. 3d 131, 144 (D.D.C. 2015) (denying qualified immunity because *Terry* "plainly requires an officer to have a reasonable, articulable suspicion of wrongdoing before stopping a person to investigate him or her").

19. Polistin testified as follows concerning SPOs' "police powers":

    Q: Is using OC spray during a detention part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 247:1-3.

**Response:** Disputed to the extent the testimony elicited by Vesta implies SPOs have an unlimited authority to use OC Spray on a detainee. In addition to complying with all requirements of MPD General Orders, use of force by an SPO, including the use of OC spray, is guided by the constitutional limitations barring excessive force, including, for example, using OC spray on a handcuffed, compliant detainee. *See* Pl.'s Br. in Opp. to Def.'s MSJ ("Pl.'s Br.") at 42-43 (citing cases).

20. Polistin testified as follows concerning SPOs' "police powers":

    Q: Is detaining a suspect part of an SPO's police powers?

    A: Yes.

**Exhibit 3**, Polistin Dep. at 246:11-13.

**Response:** Disputed to the extent the testimony elicited by Vesta implies SPOs have unlimited authority to detain any person. In addition to complying with all requirements of MPD General Orders, SPOs must have at least reasonable suspicion that person has committed a crime before they can initiate a detention. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Campbell v. District of*

*Columbia*, 245 F. Supp. 3d 78, 87 (D.D.C. 2017) (denying qualified immunity because "[i]t is

well-established that investigatory stops must be supported by reasonable suspicion"); *Maddux*

*v. District of Columbia*, 144 F. Supp. 3d 131, 144 (D.D.C. 2015) (denying qualified immunity

because *Terry* "plainly requires an officer to have a reasonable, articulable suspicion of

wrongdoing before stopping a person to investigate him or her").

21. Polistin testified as follows:

> Q: Does the Vesta Management D.C. property manager have any authority to direct the
> SPOs regarding the exercise of their police powers?
>
> A: No.

**Exhibit 3**, Polistin Dep. at 247:13-16.

**<u>Response:</u>** Disputed. Vesta had broad authority to direct the conduct of PChange SPOs.

PChange and its SPOs viewed Vesta and the property manager as their "client." Pl.'s Ex. 24,

Williams Dep. at 86:16-21. Under the contract between PChange and 800 Southern, PChange

was required to provide its services to Vesta's satisfaction, and 800 Southern's "Management

Plan" instructed Vesta to "supervise[] contract services and vendors" which includes

PChange." Exhibit B to Kindred Decl., VESTA 001 at 001-002; Pl.'s Ex. 20, VESTA 137 at

140; Pl.'s Ex. 26, Kindred Dep. at 60:15-21 (describing PChange as a "vendor"). Kindred

would direct PChange's work. *See* Pl.'s Ex. 25, Polistin Dep. at 108:15-20; Pl.'s Ex. 24,

Williams Dep. at 94:1-15 (Williams estimating that between five and ten PChange SPOs were

removed from Park Southern at Vesta's request during his tenure); Pl.'s Ex. 24, Williams Dep.

at 83:6-16 (Kindred directing PChange SPOs to patrol specific areas at Park Southern,

including "hot zone[s]"); Pl.'s Ex. 22, Philson Dep., at 50:1-52:15 (Kindred directing PChange

SPOs to investigate specific security issues on the Park Southern premises such as propped

doors, alarms, or "anything on the property"). Additional facts establishing a genuine factual

dispute as to the level of control Vesta exercised over the PChange SPOs are set forth below in the Statement of Additional Material Facts. Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including those regarding the exercise of their police powers.

22. Polistin testified as follows:

> Q: Does the Vesta Management D.C. property manager direct PChange SPOs to let a detainee go?
>
> A: No.

**Exhibit 3**, Polistin Dep. at 247:17-19.

**Response:** Disputed. Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts. Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions.

23. Polistin testified as follows:

> Q: Can the Vesta Management D.C. property manager direct PChange SPOs to let someone who they've arrested go?
>
> A: Who they've arrested?
>
> Q: No.
>
> A: No. I mean, if you're arrested, you're arrested. That's where it's going to go at that point.

**Exhibit 3**, Polistin Dep. at 247:21-248:6.

**Response:** Disputed. Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts. Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to

the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including ordering the PChange SPOs to let someone go whom they have arrested.

24. Polistin testified as follows:

> Q: Can the Vesta Management D.C. property manager direct PChange SPOs to handcuff a detainee?
>
> A: No.

**Exhibit 3**, Polistin Dep. at 248:7-10.

**Response:**  Disputed.  Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts.  Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including handcuffing a detainee.

25. Polistin testified as follows:

> Q: Can the Vesta Management D.C. property manager direct the PChange SPOs on how tight to handcuff a detainee?
>
> A: No.

**Exhibit 3**, Polistin Dep. at 248:11-14.

**Response:**  Disputed. Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts.  Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including directing how tightly a detainee should be handcuffed.

26. Polistin testified as follows:

Q: Can the Vesta Management D.C. property manager direct the PChange SPOs to loosen the handcuffs on a detainee?

A: No.

**Exhibit 3**, Polistin Dep. at 248:15-18.

**Response:** Disputed. Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts. Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including ordering the PChange SPOs to loosen Mr. Rowe's handcuffs.

27. Polistin testified that a Vesta property manager could report an incident to an SPO like any other civilian in which case the SPO could make an independent investigation. **Exhibit 3**, Polistin Dep. at 248:18-249:19.

**Response:** Disputed. Vesta had broad authority to direct the conduct of PChange SPOs, as noted in Mr. Rowe's response to ¶ 21 of Vesta's Statement of Material Facts. Mr. Rowe thus disputes Vesta's characterization of, and inferences purportedly drawn from, this testimony to the extent it implies Vesta could not control the behavior of the PChange SPOs or direct them to take certain actions, including detaining individuals. Mr. Rowe also disputes the characterization that a report by Vesta, including Ms. Kindred, would have been treated like a report from "any other civilian" given PChange SPO testimony that she was their "client."

28. On October 26, 2021, Michael Rowe was arrested by the SPOs for resisting arrest. **Exhibit 4** (Advice to Arrestee); **Exhibit 5**, ROWE-TP-0589.mp4 at 0:28.

**Response:** Disputed. The SPOs arrested Mr. Rowe because he would not provide them his identification, telling him that he was "under arrest for failure to identify." *See* Pl.'s Ex. 27, M. Rowe Dep. at 103:9-12; *see also* Pl.'s Ex. 5, ROWE-TP-0645 at 7:00-7:40, 9:44-10:00 (Williams

telling MPD he ordered Mr. Rowe to exit his vehicle after he "failed to identify" and citing property rules for "100% identity check" as providing the authority to issue that order). Mr. Rowe did not resist arrest. Pl.'s Ex. 27, M. Rowe Dep. at 112:20-113:5 (Mr. Rowe testifying that he did not resist the SPOs attempts to search him after he was told he was under arrest, assaulted, and grounded). When the responding MPD officers were told that Mr. Rowe had been arrested for failing to provide identification, they informed the SPOs that failure to provide identification is not a lawful basis for an arrest Pl.'s Ex. 6, ROWE-TP-0628 at 00:55-2:20. The exhibit relied on by Defendant, an Advice to Arrestee form, is a form document that was filled out by MPD officers who did not themselves witness the stop and arrest of Mr. Rowe, based on statements made by the SPOs, and as such is inadmissible hearsay. *See Stehn v. Cody*, 74 F.Supp. 3d 140, 149–50 (D.D.C. 2014) (finding narrative in police report not based on personal knowledge was inadmissible hearsay). The Advice to Arrestee form also records the MPD officers' conclusion that there was not probable cause for an arrest for any reason. Ex. 4 to Vesta MSJ at ROWE-00000041, ECF No. 144-6 (Advice to Arrestee).

29. Rowe testified that Park Southern is "a high crime area." **Exhibit 6**, Michael Rowe Dep. at 33:18-20.

    **Response:** Undisputed that Mr. Rowe offered the quoted testimony.

30. Polistin also testified that Park Southern is considered a high crime area. **Exhibit 3**, Polistin Dep. at 66:19-67:2.

    **Response:** Undisputed as to the content of the testimony.

31. SPO Philson testified that Park Southern is a high crime area. **Exhibit 7**, Philson Dep. at 179:9-13.

**Response:** Undisputed as to the content of the testimony.

32. SPO Williams testified that Park Southern was "a high crime area." **Exhibit 8**, Williams Dep. at 160:12-19.

**Response:** Undisputed as to the content of the testimony.

33. SPO Williams testified that, around October 2021, "carjackings, murders and a lot of robberies," occurred around Park Southern. **Exhibit 8**, Williams Dep. at 198:21-199:7

**Response:** Undisputed that Williams offered the quoted testimony.

34. Michael Rowe has lived at Park Southern his "whole life." **Exhibit 6**, Michael Rowe Dep. at 10:5-13.

**Response:** Undisputed as to the content of the testimony.

35. Rowe testified that shootings happen at Park Southern. **Exhibit 6**, Michael Rowe Dep. at 33:21-22.

**Response:** Undisputed as to the content of the testimony.

36. On the day of the incident, the SPOs were having a shift change briefing in the parking lot at Park Southern. **Exhibit 9**, Phillips Dep. at 22:10-23:5.

**Response:** Mr. Rowe disputes the characterization of the gathering of the SPOs on October 26, 2021 as a "shift change briefing." The gathering should instead should be considered "hanging around." Pl.'s Ex. 23 Phillips Dep. at 54:8-55:7. Mr. Rowe also disputes that all the SPOs were in the parking lot. *See* Pl.'s Ex. 22, Philson Dep. at 81:15-20 (Philson testifying that he was inside the building at this time).

37. SPOs met at Park Southern for shift change briefings because PChange's command center was located there. **Exhibit 3**, Polistin Dep. at 84:20-85:15.

**Response:** Mr. Rowe disputes the characterization of the gathering of SPOs on October 26, 2021 as a "shift change briefing." The gathering should instead be considered "hanging around." Pl.'s Ex. 23 Phillips Dep. at 54:8-55:7.

38. SPOs met in the parking lot on the date of the incident due to COVID distancing requirements. **Exhibit 3**, Polistin Dep. at 250:13-18.

**Response:** Mr. Rowe disputes Vesta's characterization, and any inferences purportedly drawn from, the implication that its COVID distancing requirements required the SPOs to hold a meeting in the roadway of an active parking lot.

39. On the day of the incident, Michael Rowe was driving through the Park Southern parking garage. **Exhibit 6**, Michael Rowe Dep. at 80:1-20.

**Response:** Undisputed. Mr. Rowe had driven to the property, had dropped off his mother and sister at the parking garage entrance, and was exiting the parking garage to take his children to their mother's apartment. Pl.'s Ex. 1, ROWE-TP-0623 at 0:15-0:30; Pl.'s Ex. 27, M. Rowe Dep. at 80:6-9; Pl.'s Ex. 28, C. Rowe Dep. at 79:6-17.

40. Rowe was driving his mother's GMC Acadia. **Exhibit 6**, Michael Rowe Dep. at 102:22-104:20.

**Response:** Undisputed.

41. Rowe had three of his children in the vehicle with him ages one, five and eight years old. **Exhibit 6**, Michael Rowe Dep. at 80:4-7.

**Response:** Undisputed.

42. One SPO, Shamar Phillips, was standing at the garage exit when he "[saw] Michael Rowe speeding in the garage… He was going fast to a point where you could hear the RPMs go up. So he was flying through that garage to the point where it got the other officer's attention." **Exhibit 9**, Phillips Dep. at 51:16-52:4.

**Response:** Mr. Rowe disputes that he was speeding in the parking lot. Pl.'s Ex. 23, Phillips Dep. at 51:22-52:1 (testifying that Mr. Rowe's driving was "not that fast"); Pl.'s Ex. 27, M. Rowe Dep. at 80:1-81:1 (testifying that he was not speeding and was "driving under whatever the speed limit was"); Pl.'s Ex. 28, C. Rowe Dep. at 79:6-81:5 (testifying that there was not enough space in the garage from where Mr. Rowe dropped her off to speed). The PChange SPOs were not equipped with speed detection devices, nor did they have training in assessing vehicle speed by sight or the sound of RPMs. Pl.'s Ex. 24, Williams Dep. at 144:2-11; Pl.'s Ex. 21, Hunter Dep. at 96:3-22 (testifying that he had "no clue" how fast Mr. Rowe was driving because he cannot measure speed and did not have a tachometer). Mr. Rowe disputes Phillips' testimony that the speed at which he was driving drew the attention of the SPOs. Mr. Rowe stopped and honked his horn at the SPOs twice, which caused them to turn and look at him. Pl.'s Ex. 27, M. Rowe Dep. at 83:1-22; Pl.'s Ex. 3, ROWE-TP-0626 at 1:00. He then tapped the gas pedal to get the car moving, then kept his foot on the brake so that he could slow down the car as SPOs were getting out of the way. Pl.'s Ex. 3, ROWE-TP-0626 at 1:17; Pl.'s Ex. 24, Williams Dep. at 151:6-152:20; 154:5-7 (testifying that Mr. Rowe slowed down as he drove toward them); Pl.'s Ex. 5, ROWE-TP-0645 at 7:15-7:32 (Williams telling MPD Mr. Rowe slowed down as he approached). No one had to jump out of the way to avoid being hit by Mr. Rowe's car. Pl.'s Ex 3, ROWE-TP-0626 at 1:18-1:30.

43. SPO Phillips observed Rowe speed towards the garage exit where he was standing. **Exhibit 9**, Phillips Dep. at 118:13-19.

**Response:** Mr. Rowe disputes that he was speeding in the parking lot for the reasons described in his response to ¶ 42 of Vesta's Statement of Material Facts.

44. SPO Phillips was concerned for his safety and the safety of others due to Rowe's speeding.

Exhibit 9, Phillips Dep. at 118:13-119:10.

**<u>Response:</u>**  Mr. Rowe disputes that Phillips was in fact concerned for his own safety of that or others at the time, or that any reasonable person would have been under the facts and circumstances.  Mr. Rowe was not speeding, stopped and honked at the SPOs, then slowly drove by them when they moved out of the way.  *See, supra*, Response to ¶ 42; Statement of Additional Material Facts at ¶¶ 188–195.  Phillips testified that when Mr. Rowe drove by, he was approximately "five feet" from him.  Pl.'s Ex. 23, Phillips Dep. at 56:5-17.

45. SPO Phillips explained he was concerned for his safety because the SUV's driver "might hit me. I don't know him. I don't know his driving, I don't know him from a can of paint."

    **Exhibit 9**, Phillips Dep. at 119:6-10.

    **<u>Response:</u>**  Mr. Rowe disputes that Phillips was in fact concerned for his own safety of that or others at the time, or that any reasonable person would have been under the facts and circumstances.  Mr. Rowe was not speeding, stopped and honked at the SPOs, then slowly drove by them when they moved out of the way.  *See, supra*, Response to ¶ 42; Statement of Additional Material Facts at ¶¶ 188–195.  Phillips testified that when Mr. Rowe drove by, he was approximately "five feet" from him.  Pl.'s Ex. 23, Phillips Dep. at 56:5-17.

46. Rowe went by SPO Phillips at approximately "30 to 40" miles per hour.

    **Exhibit 9**, Phillips Dep at 119:15-17.

    **<u>Response:</u>**  Disputed.  Mr. Rowe was not speeding, stopped and honked at the SPOs, then slowly drove by them when they moved out of the way.  *See, supra*, Response to ¶ 42; Statement of Additional Material Facts at ¶¶ 188–195.

47. SPO Phillips backed up against the exit post "a little bit" as Rowe passed him.

    **Exhibit 9**, Phillips Dep. At 119:11-17;

**Response:** Disputed to the extent that the testimony is being used to suggest Mr. Rowe got dangerously close to Phillips. Mr. Rowe passed no closer than five feet by Phillips, who was not standing in the roadway. Pl.'s Ex. 23, Phillips Dep. at 56:5-17; Pl.'s Ex. 27, M. Rowe Dep. at 85:7-14.

48. SPO Phillips testified that "when [Rowe] flew his car – I was close enough where the windows – the wind went against me so I was pretty close." **Exhibit 9**, Phillips Dep. at 56:9- 17.

    **Response:** Disputed to the extent that the testimony is being used to suggest Mr. Rowe got dangerously close to Phillips. Mr. Rowe passed no closer than five feet by Phillips, who was not standing in the roadway or near the other SPOs. Pl.'s Ex. 23, Phillips Dep. at 56:5-17, 119:18-120:9; Pl.'s Ex. 27, M. Rowe Dep. at 85:7-14.

49. As Rowe left the parking garage, he saw "[a] group of SPOs and two of their vehicles" blocking the garage exit. **Exhibit 6**, Michael Rowe Dep. at 81:5-17.

    **Response:** Undisputed.

50. Rowe "was frustrated" by the SPOs' blocking the exit. **Exhibit 6**, Michael Rowe Dep. at 86:6-10.

    **Response:** Undisputed.

51. Rowe testified that he stopped his vehicle approximately twenty feet from the SPOs and "double tapped [his] horn twice." **Exhibit 6**, Michael Rowe Dep. at 81:13-82:17; 121:10-18.

    **Response:** Undisputed that Mr. Rowe honked his horn at the PChange SPOs multiple times. Mr. Rowe disputes Vesta's characterization of the distance and timing at which Mr. Rowe honked his horn at the SPOs, which was approximately 50 to 75 feet from where the SPOs

were standing. Pl.'s Ex. 27, M. Rowe Dep. at 81:13-82:17; Pl.'s Ex. 3, ROWE-TP-0626 at 1:00.

52. When the SPOs did not move, Rowe testified that he "[p]ulled forward a little bit, and stopped again, and double tapped the horn again." **Exhibit 6**, Michael Rowe Dep. at 82:3-9.

**Response:** Undisputed.

53. When the SPOs again did not move, Rowe testified that he "press[ed] the gas to get the car moving," and the SPOs "started moving out of the way" except for one officer. **Exhibit 6**, M. Rowe Dep. at 83:1-8; **Exhibit 10**, ROWE-TP-0588.mp4 at 0:25.

**Response:** Undisputed as to the content of the testimony; disputed to the extent that the testimony is being used to suggest Mr. Rowe got dangerously close to the SPOs. Mr. Rowe was not speeding, stopped his car and honked multiple times at the SPOs, then slowly moved forward and maneuvered around the SPOs as they got out of the way. Pl.'s Ex. 27, M. Rowe Dep. at 81:6-83:17; Pl.'s Ex. 3, ROWE-TP-0626 at 1:00. Mr. Rowe kept his foot on the brake so that he could slow down the car as SPOs were getting out of the way. Pl.'s Ex. 27, M. Rowe Dep. at 83:1-17; Pl.'s Ex. 3, ROWE-TP-0626 at 1:24, No one had to jump out of the way to avoid being hit by Mr. Rowe's car. Pl.'s Ex. 3, ROWE-TP-0626 at 1:18.

54. Rowe testified that he saw another SPO "grabbed [the officer who had not moved] and moved her out of the way so [Rowe] could go past." **Exhibit 6,** Michael Rowe Dep. at 83:9- 17.

**Response:** Undisputed.

55. Rowe testified that, had he been speeding and the officer hadn't been moved out of the way by her fellow-SPO, "[he - Rowe] would have hit her." **Exhibit 6**, Michael Rowe Dep. at 84:19-85:1.

**Response:** Mr. Rowe disputes the characterization of the testimony elicited by Vesta to the extent it implies that Mr. Rowe had any intention of hitting any of the SPOs with his vehicle. Mr. Rowe's testimony was speculative and hypothetical. Counsel for Vesta asked Mr. Rowe, "If you had gone in a straight line, and she didn't move, would the SUV have hit her?" Mr. Rowe responded that, yes, he would have hit her. Pl.'s Ex. 27, M. Rowe Dep. at 84:19-85:1. This hypothetical does not mean that Mr. Rowe would have kept driving at the SPO if she had not moved.

56. Rowe then "cut the corner towards [the SPOs]" as he drove by. **Exhibit 8**, Williams Dep. at 153:5-12

**Response:** Mr. Rowe disputes that he "cut the corner towards [the SPOs]." Pl.'s Ex. 27, M. Rowe Dep. at 81:2-5 (testifying that he stopped 50 to 75 feet away from the SPOs and honked his horn twice at them).

57. Rowe testified that his vehicle "came close to [the SPOs] once they finally got out of [his] way…because [he] had to ride through where all the SPOs were standing [] to get out of the garage." **Exhibit 6**, Michael Rowe Dep. at 85:2-6.

**Response:** Undisputed as to the content of the testimony. Mr. Rowe disputes Vesta's characterization of his testimony to the extent it implies that he narrowly missed the SPOs while driving at a high rate of speed through the parking lot. Mr. Rowe was not speeding, stopped and honked at the SPOs, then slowly drove by them when they moved out of the way. *See, supra*, Response to ¶ 42; Statement of Additional Material Facts at ¶¶ 188–195.

58. Rowe testified that his vehicle came within "a step and a half, maybe two steps" of the SPOs. **Exhibit 6**, Michael Rowe Dep. at 85:7-11.

**Response:** Undisputed.

59. As Rowe drove by the SPOs, he yelled "I see y'all moved when I sped up." **Exhibit 11**, Alma Dep., Ex 6 at p. 23.

**Response:** Disputed to the extent that this testimony is being used to suggest that Mr. Rowe was threatening the SPOs. Williams testified that Mr. Rowe said he was "glad" that the SPOs moved out of the way since they would have been run over otherwise. Pl.'s Ex. 24, Williams Dep. at 133:16-134:13. Mr. Rowe testified that he shouted out of frustration, and that he was not hoping for anything to happen as a result of his shouting. Pl.'s Ex. 27, M. Rowe Dep. at 86:6-21.

60. Rowe also yelled something to the effect of "I would have ranned over or . . . sped up and run you over" or "if you didn't move out of the way you would have got ran over." **Exhibit 8**, Williams Dep. at 133:16-134:13.

**Response:** Disputed. Williams testified that Mr. Rowe said he was "glad" that the SPOs moved out of the way since they would have been run over otherwise. Pl.'s Ex. 24, Williams Dep. at 133:16-134:13. Mr. Rowe testified that he shouted out of frustration, and that he was not hoping for anything to happen as a result of his shouting. Pl.'s Ex. 27, M. Rowe Dep. at 86:6-21.

61. Rowe admitted that he yelled at the SPOs, "y'all blocking the way like some ignorant motherf***ers." **Exhibit 10**, ROWE-TP-0588 at 0:25; **Exhibit 6**, Michael Rowe Dep. at 85:5-19.

**Response:** Undisputed.

62. After driving past the SPOs and yelling at them, Rowe "stopped the vehicle right there and [] repeated [himself]." **Exhibit 6**, Michael Rowe Dep. at 86:22-87:10.

**Response:** Mr. Rowe disputes Vesta's characterization of his testimony, as Mr. Rowe stopped after the SPOs yelled back at him. The full context is that Mr. Rowe stopped the vehicle as he was trying to drive past a marked SPO vehicle blocking the exit, "Mr. Williams basically yelled saying what did you say? And he said something else," so Mr. Rowe stopped the vehicle right there and repeated himself. Pl.'s Ex. 27, M. Rowe Dep. at 86:22-87:10.

63. SPOs did not have the ability to conduct traffic stops as they "don't have lights and sirens to pull someone over." **Exhibit 7**, Philson Dep. at 24.

    **Response:** Mr. Rowe disputes Vesta's characterization to the extent it implies the SPOs would not exceed their authority and initiate a traffic stop. *See* Pl.'s Ex. 23, Phillips Dep. at 59:5-8, 105:13-105:20, 106:2-106:14. (characterizing SPO Williams as conducting a traffic stop).

64. Rowe testified that SPO Williams "asked me, do I live in the building and he asked for my driver's license." **Exhibit 6**, Michael Rowe Dep. at 87:11-14.

    **Response:** Undisputed.

65. Rowe did not provide his license or answer the question. **Exhibit 6**, Michael Rowe Dep. at 87:15-19.

    **Response:** Mr. Rowe disputes Vesta's characterization to the extent it implies that Mr. Rowe had any obligation to provide his license to or answer Williams' questions. Mr. Rowe would have given his ID if Williams had called 911 as Mr. Rowe requested. Pl.'s Ex. 27, M. Rowe Dep. at 88:7-11.

66. Rowe believed that he "was going to get barred from the building because [the SPOs] felt as though they could do that." **Exhibit 6**, Michael Rowe Dep. at 88:17-21.

**Response:** Undisputed.

67. A month prior to Rowe's arrest, Rowe claims that his uncle was "barred from the building" for failing to provide ID by an SPO at 800 Southern Avenue. **Exhibit 6**, Michael Rowe Dep. at 26:1-28:19.

    **Response:** Undisputed. Mr. Rowe's uncle was also assaulted during this incident. Pl.'s Ex. 27, M. Rowe Dep. at 25:16-28:19.

68. Rowe did not report the incident to with his uncle to Vesta, and does not know if uncle or mother reported it to Vesta, either. **Exhibit 6**, Michael Rowe Dep. at 28:12-19.

    **Response:** Undisputed. Mr. Rowe disputes that this suggests that Vesta was unaware that his uncle was barred, as PChange is required to provide reports, including of barring notices, to Park Southern and was required to do so in October 2021. Pl.'s Ex. 25, Polistin Dep. at 95:6-20.

69. Charlene Rowe confirmed that she did not report the incident with Rowe's uncle to Vesta, and that she did not know if the uncle reported it to Vesta either. **Exhibit 12**, Charlene Rowe Dep. at 56:9-16; **Exhibit 1**, Declaration of Nichole Kindred at ¶ 14-17.

    **Response:** Undisputed. Mr. Rowe's uncle did report the incident to MPD. Pl.'s Ex. 28, C. Rowe Dep. at 55:12-56:8.

70. The SPOs at 800 Southern Avenue are instructed to check ID "for any visitors or un-familiar occupants of the property." **Exhibit 8**, Williams Dep., Ex. 24, p. 3

    **Response:** Mr. Rowe disputes Vesta's characterization to the extent it implies that these instructions applied to Mr. Rowe, who was known at least to Hunter at the time of the incident. Pl.'s Ex. 21, Hunter Dep. at 127:8-128:15; Pl.'s Ex. 23, Phillips Dep. at 46:6-12. As Vesta admits, Mr. Rowe was a lifelong resident of Park Southern. Vesta Management DC, LLC's

Statement of Material Facts, ECF No. 144-2 at ¶ 34.  Mr. Rowe also disputes Vesta's characterization to the extent it implies that Mr. Rowe had any obligation to provide his license to or answer Williams' questions, or that Mr. Rowe's stop and arrest was required by the post orders, which state that if "a visitor fails to produce identification, the resident he/she came to visit must come down to escort Visitor to his/her residents [sic] ONLY."  Pl.'s Ex. 36, Ex. 49 to Polistin Dep. at p.3 ; Pl.'s Ex. 24, Williams Dep. at 103:18-104:8

71. Tenants' leases require them and their visitors to comply with law enforcement's "questioning, apprehension [and] investigation of any kind."  **Exhibit 13**, Lease and Addendums, Vesta 247 at ¶¶ 2-3.

**Response:**  Mr. Rowe disputes Vesta's characterization of the lease, to the extent it implies that Mr. Rowe is bound by this addendum, that this addendum applies to SPOs, that this addendum applies to unlicensed safety ambassadors, or that this addendum required Mr. Rowe to comply with Williams' request for his ID.  Mr. Rowe is not a signatory to the referenced lease addendum.  Lease Addendum at VESTA 249, ECF No. 144-15 at 14.  The paragraphs in the lease addendum refer to "law enforcement agencies," "police investigation," and "police activity," and do not refer to SPOs, licensed or unlicensed.  Lease Addendum at VESTA 247 at ¶¶ 2-3, ECF No. 144-15 at 12.  A safety ambassador in the District of Columbia is "[n]ot really [a] public safety," role and is someone who can perform concierge services, can be used for fire watches, can be used as a porter, etc."  Pl.'s Ex. 25, Polistin Dep. at 25:12-26:22.  On October 26, 2021, Arrington, who was waiting for his SPO license to be approved and cleared, was a safety ambassador.  Pl.'s Ex. 25, Polistin Dep. at 130:17-131:22.  At the time of the incident,

SPOs Hunter, Philson, and Phillips were all unlicensed SPOs. Statement of Additional Material Facts at ¶¶ 154–178.

72. Tenants' leases also forbid residents and their guests from engaging in threatening behavior or harassing any contractors. **Exhibit 13**, Lease and Addendums, VESTA247 at ¶¶ 23, 25.

**Response:** Mr. Rowe disputes Vesta's characterization of the lease, to the extent it implies that Mr. Rowe is bound by this addendum, that this addendum applies to SPOs, that this addendum applies to unlicensed safety ambassadors, or that this addendum required Mr. Rowe to comply with Williams' request for his ID. Mr. Rowe is not a signatory to the referenced lease addendum. Lease Addendum at VESTA 249, ECF No. 144-15 at 14. The paragraphs in the lease addendum refer to "law enforcement agencies," "police investigation," and "police activity," and do not refer to SPOs, licensed or unlicensed. Lease Addendum at VESTA 247 at ¶¶ 2-3, ECF No. 144-15 at 12. Mr. Rowe did not threaten the SPOs, nor did yelling at them to stop obstructing the roadway rise to the level of harassment. *See, supra* ¶¶ [59]-[62].

73. The SPOs had authority to issue a barring notice to individuals on the property "because [they] are the agent of the property" owner. **Exhibit 3**, Polistin Dep. at 101:4-13.

**Response:** Disputed to the extent that this applies to tenants. Kindred testified that "if someone was barred but it was unknown to the SPO that the person was a tenant…[i]f they had already established tenancy before the bar was issued but it was unknown to the SPO, then the bar would have to be overturned." Pl.'s Ex. 26, Kindred Dep. at 53:2-12.

74. SPOs "are provided with the rules and regulations" of 800 Southern. **Exhibit 3**, Polistin Dep. at 101:10-21.

**Response:** Mr. Rowe disputes Vesta's characterization of this fact to the extent it implies the PChange SPOs were trained on interacting with residents of or visitors to Park Southern.

Williams and Hunter were not trained on interacting with residents of or visitors to Park Southern. Pl.'s Ex. 24, Williams Dep. at 46:7-9, 50:16-20; Pl.'s Ex. 21, Hunter Dep. at 43:14-19. Kindred acknowledged that she had received complaints from residents relating to officer training. Pl.'s Ex. 26, Kindred Dep. at 195:7-197:5.

75. After Rowe refused SPO William's request for identification, SPO Williams and SPO Hunter asked Rowe to get out of his vehicle. **Exhibit 8**, Williams Dep. at 166:10-14; **Exhibit 14**, Hunter Dep. at 102:13-18.

**Response:** Mr. Rowe disputes that he refused Williams' request for identification and disputes that Williams and Hunter asked him to get out of his vehicle. Mr. Rowe told Williams he would provide his license if Williams called 911 and MPD arrived. Pl.'s Ex. 27, M. Rowe Dep at 101:18-102:12. Williams did not order Mr. Rowe to exit his vehicle and instead started yanking on the car's doorhandle and told Mr. Rowe that he was "under arrest for failure to identify." Pl.'s Ex. 27, M. Rowe Dep. at 102:13-104:5; Pl.'s Ex. 21, Hunter Dep. at 102:13-18, 105:18-105:22.

76. SPO Williams told Rowe that he was "under arrest for failure to identify." **Exhibit 6**, Michael Rowe Dep. at 103:9-12.

**Response:** Undisputed.

77. Rowe refused to get out of the vehicle. **Exhibit 6**, Michael Rowe Dep. at 106:7-9; 108:12-16.

**Response:** Disputed. Mr. Rowe was not even given the opportunity to refuse to get out of the vehicle before Williams reached in, broke Mr. Rowe's key in the ignition, and started pulling him out of the car, while Mr. Rowe was still buckled in by his seatbelt. Pl.'s Ex. 27, M. Rowe Dep. at 105:14-106:21.

78. Rowe admitted he "wasn't being compliant." **Exhibit 10**, ROWE-TP-0588.mp4 at 0:25.

**Response:** Disputed. Vesta grossly mischaracterizes Mr. Rowe's statement to MPD officers responding to the scene, captured in a body-worn camera video. Mr. Rowe's complete statement, and his tone of voice, made clear that he was being sarcastic: Mr. Rowe described to MPD exactly how the SPO Defendants yanked him out of the car, ripped his shirt, pulled his hair, choked him multiple times, and slammed him against the wall before sarcastically remarking that they slammed him against the ground and arrested him "because [he] wasn't being compliant" with that assault, in reference to the SPO Defendants' pretextual basis for arresting him. Pl.'s Ex. 1, ROWE-TP-0623 at 0:25. Immediately after, Mr. Rowe tells MPD he did not do "anything at all." Pl.'s Ex. 1, ROWE-TP-0623 at 0:57.

79. Rowe was "yelling, cussing, using foul language toward [the SPOs]," and "just being disorderly…irate." **Exhibit 8**, Williams Dep. at 160:5-11.

   **Response:** Disputed. The cited testimony references the time before Williams decided to arrest Mr. Rowe as he was approaching his vehicle. Pl.'s Ex. 24, Williams Dep. at 160:5-11.

80. After Rowe was told he was under arrest, his key was still in the ignition and his car was still in drive. **Exhibit 6**, Michael Rowe Dep. at 103:9-15, 104:9-17.

   **Response:** Undisputed.

81. Rowe testified that he "reached over, put the car in park, and turned the car off." **Exhibit 6**, Michael Rowe Dep. at 104:9-105:10.

   **Response:** Undisputed.

82. The gear shifter is located in the console and you have to reach down to grab it. **Exhibit 12**, Charlene Rowe Dep. at 94:10-17.

**Response:** Disputed. Mr. Rowe testified that the console is in front of the radio interface, where it can be seen. Pl.'s Ex. 27, M. Rowe Dep. at 104:18-105:7.

83. Rowe testified that he reached with his right hand to "turn the car off." **Exhibit 6**, Michael Rowe Dep. at 105:8-10.

    **Response:** Undisputed.

84. Rowe testified that he "realized [his] seatbelt was still on," and "reached down and hit the button…" **Exhibit 6**, Michael Rowe Dep. at 107:4-14.

    **Response:** Disputed to the extent it implies that Mr. Rowe unbuckled his seatbelt prior to Williams attempting to pull him out of the car. Mr. Rowe realized his seatbelt was still buckled and unbuckled it after Williams attempted to drag him out of the car, not before. Pl.'s Ex. 27, M. Rowe Dep. at 107:4-18.

85. SPO Williams witnessed Rowe "reach off to the right side with his right hand, like underneath his seat," and "due to that being a high crime area, felt as though it would be safer to detain him at that moment just in case he had a weapon in his vehicle." **Exhibit 8**, Williams Dep. at 160:12-19.

    **Response:** Disputed. Rowe reached for his seatbelt button, not under the seat. *See* Response to Paragraph 86.

86. SPO Williams then "started the detaining process," and handcuffed Rowe's left arm. **Exhibit 8**, Williams Dep. at 164:3-10.

    **Response:** Mr. Rowe disputes that the detention process began only upon handcuffing Mr. Rowe. *See* Statement of Additional Material Facts at ¶¶ 199–202. Mr. Rowe disputes Paragraphs 85 and 86 to the extent Vesta implies that Williams initiated his arrest only after he saw Mr. Rowe reaching underneath his seat. As discussed in the response to Paragraph 84, Mr.

Rowe reached with his right hand to unbuckle his seatbelt only after Williams had begun his assault on him.

87. SPO Williams could not see Rowe's right arm.  **Exhibit 8**, Williams Dep. at 164:11-14.

**Response:**  Disputed.  Mr. Rowe's arm would have been visible to Williams and at times was even physically being held by Williams.  Mr. Rowe reached with his right hand to turn his car off, and Williams reached over as he turned the car off and snatched the key out of his right hand.  Pl.'s Ex. 27, M. Rowe Dep. at 105:8-16.  Mr. Rowe's seatbelt was still on after that and was tight enough to prevent Williams from being able to pull Mr. Rowe out of his seat.  Pl.'s Ex. 27, M. Rowe Dep. at 107:4-14.  Then Mr. Rowe put his hand on the seatbelt button.  Pl.'s Ex. 27, M. Rowe Dep. at 107:4-14.  Williams was leaning into the vehicle, grappling with Mr. Rowe, , and it was daylight.  Pl.'s Ex. 27, M. Rowe Dep. at 104:9-17; Pl.'s Ex. 22, Philson Dep. at 104:12-16; Pl.'s Ex. 1, ROWE-TP-0623 (body worn camera footage showing it was still daylight when MPD arrived).

88. SPO Williams and SPO Hunter "used hand techniques to get [Rowe] out the vehicle."  **Exhibit 8**, Williams Dep. at 167:3-5.

**Response:**  Undisputed as to the content of the testimony.  The "hand techniques" consisted of yanking on Mr. Rowe, pulling his hair out, ripping his clothes, and choking him by the neck.  Pl.'s Ex. 27, M. Rowe Dep. at 106:10-107:14.

89. "That's when Rowe's hand went from underneath [the seat] to the steering wheel."  **Exhibit 8**, Williams Dep. at 167:5-7.

**Response:**  Disputed.  Mr. Rowe's hand was never underneath the seat, as it went from being on the seatbelt button, to one hand being handcuffed by Williams, to the other hand being placed on the steering wheel.  Pl.'s Ex. 27, M. Rowe Dep. at 107:8-108:11.  Undisputed that

when Williams began trying to pull Mr. Rowe out of the car, Mr. Rowe's hands could be plainly seen because a handcuff was placed on Mr. Rowe's left hand and Mr. Rowe held onto the steering wheel with his right hand. Pl.'s Ex. 27, M. Rowe Dep. at 107:22-108:11.

90. Rowe testified:

> Q: Why are you holding onto the steering wheel?
>
> A: I'm scared for my life.
>
> Q: So you're trying not to be pulled out of the car?
>
> A: Yeah.

**Exhibit 6**, Michael Rowe Dep. at 108:12-16.

<u>Response:</u> Undisputed as to the content of the testimony.

91. Only Rowe's Left hand was handcuffed at this time. **Exhibit 8**, Williams Dep. at 169:19-170:3.

<u>Response:</u> Undisputed as to the content of the testimony. Soon after, both of Mr. Rowe's hands were secured in handcuffs. Pl.'s Ex. 27, M. Rowe Dep. at 109:6-110:10; Pl.'s Ex. 12, Incident Report Provided to Vesta, VESTA 045 at 046; Vesta's Ex. 11, ECF No. 144-13 at 6.

92. SPO Philson saw Rowe's children in the back seat. **Exhibit 8**, Philson Dep. at 93:22-94:1.

<u>Response:</u> Undisputed as to the content of the testimony.

93. The SPOs "gave more verbal commands [to] let the steering wheel go. He [Rowe] refused to. [SPO Williams] ordered Hunter to – to deploy OC [spray]. And once OC was deployed, [Rowe] complied and [the SPOs] detained him and put [Rowe] in handcuffs." **Exhibit 8**, Williams Dep. at 169:12-18.

<u>Response:</u> Disputed. Mr. Rowe was pepper sprayed only after he had unbuckled his own seatbelt, opened his own car door, stepped out of his vehicle, and had both hands handcuffed behind his back. Pl.'s Ex. 27, M. Rowe Dep. at 109:11-111:19; Pl.'s Ex. 12, Incident Report

Provided to Vesta, VESTA 045 at 046; Vesta's Ex. 11, ECF No. 144-13 at 6; Statement of Additional Material Facts ¶¶ 218–224.

94. Rowe testified that he "did not consent to a search and moved his legs to prevent the search." **Exhibit 6**, Michael Rowe Dep. at 110:11-21; 119:21-121:9.

   **Response:** Disputed to the extent this implies that moving Mr. Rowe's legs was tantamount to resisting arrest. *See Lin v. District of Columbia*, 47 F.4th 828, 843 (D.C. Cir. 2022) (holding that simply reacting to force exercised by police officers is not resisting arrest). The search occurred after the SPOs slammed him against the fence and the ground, and after he said he did not consent to any searches. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19. Mr. Rowe was tensing his legs because he was "tense from everything that happened of having so many hands on [him]." Pl.'s Ex. 27, M. Rowe Dep. at 112:20-113:3.

95. "[The SPOs] were trying to ask [Rowe] to sit down on the ground. He wasn't, so after that he was resisting to a point where [SPO Phillips] had to step in," and SPO Phillips "picked [Rowe's] legs up," and "softly sat him down. There was no slamming involved." **Exhibit 9**, Phillips Dep. at 75:16-77:10.

   **Response:** Disputed. The SPOs lifted Mr. Rowe up and slammed him to the ground. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-113:19. Statement of Additional Material Facts at ¶¶ 226–229.

96. Kindred was informed that Michael Rowe had been arrested by the SPOs by Rowe's mother, Charlene Rowe. **Exhibit 12**, Charlene Rowe Dep. at 19:17-20:1.

   **Response:** Undisputed.

97. By the time Kindred arrived on the scene, Michael Rowe was handcuffed and sitting on the ground. **Exhibit 2**, Kindred Dep. at 121:10-18.

**Response:** Undisputed.

98. Michael Rowe testified that "[his] injuries came before Ms. Kindred came out." **Exhibit 6**, Michael Rowe Dep. at 18:16-10.

**Response:** Mr. Rowe disputes Vesta's characterization of this testimony to the extent it implies Mr. Rowe was not experiencing ongoing harm. Mr. Rowe's fingers were going numb because the handcuffs were too tight and he had not been treated for the OC spray the SPOs used on him. Statement of Additional Material Facts at ¶¶ 230–243.

99. Michael Rowe testified that he believed Vesta was negligent because "Ms. Kindred did nothing when she came out. Didn't even attempt to try to help [him] when she came out." **Exhibit 6**, Michael Rowe Dep. at 19:17-20:4.

**Response:** Undisputed.

100. Kindred testified that when she walked outside with Ms. Rowe, the Metropolitan Police Department's police officers were already there. **Exhibit 2**, Kindred Dep. at 121:10-122:2.

**Response:** Disputed. Kindred arrived at the scene prior to MPD's arrival. Ex. 27, M. Rowe Dep. at 15:6-10.

101. MPD's Internal Affairs Department later reviewed the SPOs actions and produced a written report with its findings. **Exhibit 11**, Alma Dep., Ex. 6 ("Report").

**Response:** Undisputed.

102. Jorge Alma testified as MPD's Fed. R. Civ. P. 30(b)(6) witness in response to Plaintiff's Rule 30(b)(6) deposition notice. **Exhibit 15**, Alma Dep. at 9:5-12.

**Response:** Undisputed.

103. Alma testified as follows regarding the "use of force:"

> Q: Based on your training and experience, what type of force would it be considered if you almost hit an officer with a car?

A:     Deadly force.

**Exhibit 15**, Alma Dep. at 137:8-12.

**Response:** Disputed to the extent this hypothetical question implies that Mr. Rowe almost hit an officer with his car. Mr. Rowe also objects to the admissibility of this evidence as improper expert testimony.

104.     Alma testified as following regarding the "use of force:"

Q:     What kind of force is an officer allowed to respond to that type of force with?

A:     Deadly force.

**Exhibit 15**, Alma Dep. at 137:14-17.

**Response:** Disputed to the extent this implies that that Michael Rowe almost hit an officer with his car. Mr. Rowe also objects to the admissibility of this evidence as improper expert testimony.

105.     Alma testified as following regarding the "use of force:"

Q: Is an SPO allowed to respond to a threat of deadly force with deadly force as well?

A:     Yes.

**Exhibit 15**, Alma Dep. at 137:19-23.

**Response:** Disputed to the extent this implies that Mr. Rowe threatened to use deadly force. Mr. Rowe also objects to the admissibility of this evidence as improper expert testimony.

106.     Alma testified as following regarding the "use of force:"

Q: Is the citizen allowed to respond to a threat of deadly force with deadly force as well?

A: Yes.

**Exhibit 15**, Alma Dep. at 137:25-138:6.

**Response:** Disputed to the extent it implies that Mr. Rowe used or threatened to use deadly force. Mr. Rowe also objects to the admissibility of this evidence as improper expert testimony.

107.    Alma testified as following regarding the Report:

> Q: I want to see if I understand correctly what's being reported in this memorandum and all of the narratives, so tell me if I have this right. At a high level, what's being described is that Mr. Rowe drove his car at SPOs and that's why they responded with force?

> A: Yes.

**Exhibit 15**, Alma Dep. at 143:5-13.

**Response:** Disputed. Mr. Rowe objects to the introduction of the internal affairs report as inadmissible hearsay evidence because it was not based on personal, firsthand knowledge. *Stehn*, 74 F.Supp. at 149–50 (finding narrative in police report not based on personal knowledge is inadmissible hearsay). Mr. Rowe objects to the introduction of the quoted testimony as inadmissible hearsay within hearsay as Sgt. Alma was not involved in drafting the internal affairs report. Mr. Rowe disputes the characterization in the question of the internal affairs report, which does not say that the SPO Defendants used force against Mr. Rowe because he drove at them with his car. *See generally*, Vesta's Ex. 11, ECF No. 144-13.

108.    Alma testified as following regarding the Report:

> Q: What can you tell me about that investigation?

> A: The investigation was concluded with no wrongdoing.

**Exhibit 15**, Alma Dep. at 76:18-77:1.

**Response:** Mr. Rowe objects to the introduction of the internal affairs report as inadmissible hearsay evidence because it was not based on personal, firsthand knowledge. *Stehn*, 74 F.Supp. at 149–50 (finding narrative in police report not based on personal knowledge is inadmissible hearsay). Mr. Rowe objects to the introduction of the quoted testimony as

inadmissible hearsay within hearsay as Sgt. Alma was not even involved in drafting the internal affairs report. Mr. Rowe disputes the characterization in the question of the internal affairs report, which does not say that the SPO Defendants used force against Mr. Rowe because he drove at them with his car. Mr. Rowe disputes the characterization that the internal affairs report concluded the investigation with no finding of wrongdoing, to the extent it implies the internal affairs report made express findings about the propriety of the stop, arrest, search, and use of force against Mr. Rowe. The conclusion of the report was that "this event was properly documented," and that "the proper notifications to the MPD were made by the PChange officers in reference to their use of force," so the "incident does not require any further investigation." Vesta's Ex. 11, ECF No. 144-13 at 4.

109.    The Report states that "Mr. Rowe did not complain of pain or injury as a result of the use of force." Exhibit 11, Alma Dep., Ex. 6 at p. 3.

**Response:** Undisputed as to the content of the Report. Mr. Rowe objects to the introduction of the internal affairs report as inadmissible hearsay evidence because it was not based on personal, firsthand knowledge. *Stehn*, 74 F.Supp. at 149–50 (finding narrative in police report not based on personal knowledge is inadmissible hearsay). In addition, Mr. Rowe did complain to the SPOs and to Kindred that his handcuffs were too tight and hurting his wrists, leading MPD to replace them. Pl.'s Ex. 28, C. Rowe Dep. at 14:19-15:12; Pl.'s Ex. 27, M. Rowe Dep. at 131:8-18. Mr. Rowe disputes this statement to the extent it implies he did not suffer physical injury as a result of the use of force against him. The Report itself notes that Mr. Rowe was treated for his exposure to OC spray. Vesta's Ex. 11, ECF No. 144-13 at 4. Mr. Rowe was unable to work following his injury, and he was treated the day after the incident for muscle strain in his neck, wrist, and shoulder, and tingling in his fingers. Pl.'s Ex. 27, M.

Rowe Dep. at 50:15-53:12; Verification of Treatment, ROWE00000070 at 0071, ECF No. 144-19 at 3.

110. MPD body worn camera footage shows Rowe holding his child after the use of force. **Exhibit 16**, ROWE-TP-0628.mp4 at 3:09.

**Response:** Disputed to the extent this implies Mr. Rowe was uninjured as a result of the SPO Defendants' use of force. Mr. Rowe was unable to work following his injury, and he was treated the day after the incident for muscle strain in his neck, wrist, and shoulder, and tingling in his fingers. Pl.'s Ex. 27, M. Rowe Dep. at 50:15-53:12; Verification of Treatment, ROWE00000070 at 0071, ECF No. 144-19 at 3. .

111. Rowe received medical care on October 27, 2021. **Exhibit 17**, ROWE00000070.

**Response:** Undisputed.

112. Rowe was diagnosed with a neck, wrist, and shoulder muscle strain. **Exhibit 17**, ROWE00000071.

**Response:** Undisputed.

113. His doctor excused him from work until November 1, 2021. **Exhibit 17**, ROWE00000070.

**Response:** Undisputed.

114. Rowe's paystub for the pay period *prior* to the incident (10/10/2021-10/16/2021) show that he worked 6.63 hours. **Exhibit 18**, VESTA287.

**Response:** Undisputed. Disputed to the extent this implies Mr. Rowe did not miss work as a result of the harm he suffered from the SPO Defendants. Statement of Additional Material Facts ¶¶ 247–252.

115.     Rowe's paystub for the pay period *after* the incident (10/31/21-11/06/21) show that he worked 32.10 hours. **Exhibit 19**, VESTA286.

**Response:** Disputed to the extent this implies Mr. Rowe did not miss work as a result of the harm he suffered from the SPO Defendants. Statement of Additional Material Facts ¶¶ 247–248.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

116.     Vesta's regular business is property management. *See, e.g.*, Pl.'s Ex. 20, VESTA 137.

117.     The contract between PChange and 800 Southern Avenue lists Vesta as the Owner's Agent. The Contract states that PChange shall provide its services "to the satisfaction of Owner's Agent." Exhibit B to Kindred Decl., VESTA 001 at 001-002.

118.     Under the PChange Contract, Vesta has discretion to require the "Contractor" (defined as PChange) to "amend this Contract for any extra work, make any substitutions in the work, or omit such work that the Owner's Agent may require." Exhibit B to Kindred Decl., VESTA 001 at 001-002.

119.     The PChange Contract requires PChange to be insured against legal liability. Ex. B to Kindred Decl., VESTA 001, at 002, Section 5.B.

120.     The PChange-800 Southern Contract provides that if PChange "fail[s] in any respect to perform work as specified in this Contract, the Owner's Agent will be at liberty upon serving 24 hour written notice to the Contractor, to terminate this Contract." Exhibit B to Kindred Decl., VESTA 001 at 003.

121.  Vesta replaced PChange as their security vendor around President's Day of 2024 with Valentis.  Pl.'s Ex. 26, Kindred Dep. at 59:11-62:18.

122.  800 Southern's "Management Plan" for Vesta contains a section titled "Hiring of Staff," which instructs Vesta to "supervise[] contract services and vendors" (which includes PChange).  Pl.'s Ex 20, VESTA 137 at 140; Pl.'s Ex. 26, Kindred Dep. at 60:15-21 (describing PChange as a "vendor")

123.  Nichole Kindred communicated with the PChange SPOs often.  Pl.'s Ex. 24, Williams Dep. at 80:16-21 (testifying that he communicated with Ms. Kindred "at least [on a] daily or weekly basis"); Pl.'s  Ex. 22, Philson Dep. at 50:1-18 ("Pretty much every day [Ms. Kindred] would let us know if – what she needed.  Could be anything from, hey, I'm doing . . . unit inspections, so we would escort her and we stayed in contact.").

124.  Ms. Kindred had the authority to, and did, direct PChange SPOs to investigate specific security issues on the Park Southern premises such as propped doors, alarms, or "anything on the property."  Pl.'s Ex. 26, Kindred Dep. at 37:13-38:14, 39:3-7; Pl.'s Ex. 22, Philson Dep. at 50:1-52:15.

125.  Ms. Kindred had the authority to, and did, direct PChange SPOs to assist her in conducting inspections of resident units.  Pl.'s Ex. 22, Philson Dep. at 50:1-10.

126.  Ms. Kindred had the authority to, and did, direct PChange SPOs to investigate potential lease infractions.  Pl.'s Ex. 26, Kindred Dep. at 40:15-41:3.

127.  Ms. Kindred had the authority to, and did, direct PChange SPOs to deliver eviction notices to tenants.  Pl.'s Ex. 25, Polistin Dep. at 108:5-14.

128.  Ms. Kindred had the authority to, and did, direct PChange SPOs to staff the concierge desk.  Pl.'s Ex. 26, Kindred Dep. at 71:11-21; Pl.'s Ex. 11, VESTA 073.

129. Ms. Kindred had the authority to direct PChange SPOs to patrol a particular area on the property. Pl.'s Ex. 25, Polistin Dep. at 106:12-14 (affirming that Ms. Kindred could "direct the SPOs at Park Southern to patrol a particular area" on the premises); Pl.'s Ex. 24, Williams Dep., at 83:6-16.

130. Ms. Kindred has directed PChange SPOs to patrol specific areas at Park Southern, including "hot zone[s]." Pl.'s Ex. 24, Williams Dep. at 83:6-16.

131. Ms. Kindred had the authority to direct PChange SPOs to avoid standing or loitering in certain locations on the property. Pl.'s Ex. 24, Williams Dep. at 83:17-84:11.

132. Ms. Kindred has directed PChange SPOs to avoid standing or loitering in certain locations on the property. Pl.'s Ex. 24, Williams Dep. at 83:17-84:11.

133. Ms. Kindred has directed PChange SPOs to issue parking tickets. Pl.'s Ex. 24, Williams Dep. at 84:12-14.

134. When Ms. Kindred made requests to Stefan Williams and Damion Philson, they would generally do what she asked. Pl.'s Ex. 24, Williams Dep. at 83:6-16, 86:16-21; Pl.'s Ex. 22, Philson Dep. at 52:16-20.

135. Other PChange officers likewise followed Ms. Kindred's directions. Pl.'s Ex. 28, C. Rowe Dep. at 19:17-20:19 (Ms. Rowe, a resident at Park Southern, testified that Ms. Kindred is "the only person that has power to do anything in the building" and that Ms. Rowe has seen Ms. Kindred "give [the SPOs] orders and they follow whatever she says"); Pl.'s Ex. 14, VESTA 064 at 065-67 (PChange supervisor told Kindred he "will be working diligently . . . to spearhead" issues raised by Ms. Kindred).

136. PChange SPOs considered Ms. Kindred and Vesta to be their "client." Pl.'s Ex. 24, Williams Dep., at 86:16-21.

137.    Ms. Kindred generally received daily activity reports from PChange, in addition to incident reports.  Pl.'s  Ex. 26, Kindred Dep. at 181:17-19; Pl.'s Ex. 25, Polistin Dep. at 95:6-20; Pl.'s Ex. 10, VESTA 047; Pl.'s Ex. 13, VESTA 047.

138.    Ms. Kindred had the authority to request that PChange SPOs be removed from their post at Park Southern for performance-based reasons, for misconduct, or "[i]f [she] fe[lt] this person [wa]s not a fit for the[] property."  Pl.'s Ex. 25, Polistin Dep. at 108:15-109:6; Pl.'s Ex. 26, Kindred Dep. at 198:16-20.

139.    Ms. Kindred has in fact used this authority multiple times to have PChange SPOs removed from Park Southern.  Pl.'s Ex. 25, Polistin Dep. at 108:15-20; Pl.'s Ex. 24, Williams Dep. at 86:7-15, 92:16-18, 93:13-94:15.  Mr. Williams estimated that during his tenure at Park Southern, between five and ten PChange SPOs were removed from Park Southern at Vesta's request.  Pl.'s Ex. 24, Williams Dep. at 94:1-15.

140.    On one occasion, a PChange SPO was removed from Park Southern "due [to] disorderly conduct to" Ms. Kindred.  Ex. 11, VESTA 073 at 074-075.

141.    On October 13, 2021, Ms. Kindred requested that a PChange SPO nicknamed "Rambo" "be removed from the post at" Park Southern "as further information and tenant complaints have come to light around" a prior incident.  Pl.'s Ex. 17, VESTA 068 at 069.  That same day, PChange responded that "Rambo will be moved effective today."  Pl.'s Ex. 17, VESTA 068 at 068.

142.    In February 2022, Ms. Kindred raised to PChange that residents had seen Rambo on the property.  Pl.'s Ex. 18, VESTA 124 at 126.  Ms. Kindred then reaffirmed to PChange that Rambo "cannot work here."  Pl.'s Ex. 18, VESTA 124 at 126.  On behalf of PChange, Mr. Polistin promptly responded that "under no circumstances is Sgt. Rambo to be used to cover

any shifts at Park Southern." Pl.'s Ex. 18, VESTA 124 at 125-126.

143. On July 27, 2021, Ms. Kindred and another Vesta employee had a meeting with Mr. Williams and PChange supervisors in which she "express[ed] all the issues and concerns with Park Southern." Pl.'s Ex. 11, VESTA073 at 074. Mr. Williams memorialized what was discussed at the meeting in an email the following day. Pl.'s Ex. 11, VESTA 073 at 074. Under a heading called "Concerns & Solutions," the email states that "[c]oncierge service . . . will be 24 hours 7 days a week starting August 1st," that SPOs were "not passing out literature," that "[p]atrolling of the floors throughout the interior of the property needs improvement," that "[t]icketing and [t]owing needs to be consistent, effective, and fair always," and further indicates that SPOs were "loitering in the roundabout on and off duty" which was "prohibited." Pl.'s Ex. 11, VESTA 073 at 074-75.

144. In the July 28, 2021 email, PChange agreed to address Ms. Kindred's concerns to "help [it] stay in compliance with . . . Vesta management." Pl.'s Ex. 11, VESTA 073 at 074. Mr. Williams agreed that this statement reflected that "PChange needed to do what Vesta was asking it to do." Pl.'s Ex. 24, Williams Dep. at 97:12-98:1.

145. In September 2022, Ms. Kindred emailed a PChange supervisor, copying Mr. Williams, conveying complaints from Park Southern residents about "not seeing [SPOs] make patrols inside the building" and instead "seeing them standing in the parking lot with coworkers." Pl.'s Ex. 14, VESTA 064 at 067. She further explained that SPOs "who are on duty don't seem to have had training or understand what they are supposed to do." Ms. Kindred requested a meeting "so we can hear how you plan to address it." Pl.'s Ex. 14, VESTA 064 at 067. The PChange supervisor responded that he would work "diligently" in order "to spearhead these issues." Pl.'s Ex. 14, VESTA 064 at 065-66.

146.	In the September 2022 email exchange, Ms. Kindred said to PChange: "Hopefully, things can get back on track or I will be forced to make a change. The Board is putting a lot of pressure on me as security is our biggest expense at the property." Pl.'s Ex. 14, VESTA 064 at 065.

147.	Vesta reviewed, commented on, and approved Park Southern "Post Orders" – a set of "post specific operational instructions" for SPOs – before they went into effect. Pl.'s Ex. 36, Ex. 49 to Polistin Dep.; Pl.'s Ex. 25, Polistin Dep., at 90:12-92:14; Pl.'s Ex. 15, VESTA 110 at 111 (PChange asking Ms. Kindred to "please review and let me know if any changes need to be made so that I may update and print out [the requested Post Orders] to have at the property for all concierge and officers").

148.	The Post Orders from 2019 specified how many SPOs will be staffed at Park Southern and what their shifts will be, what uniforms the SPOs are authorized to wear, and lists a number of "specific special police duties for Park Southern." Pl.'s Ex. 36, Ex. 49 to Polistin Dep.

149.	In July 2021, Ms. Kindred requested that new Post Orders be prepared, which Mr. Williams agreed to create. Pl.'s Ex. 11, VESTA 073 at 075 ("New post orders have been requested per Ms. Kindred (Property Manager) Mrs. Pam (Regional Manager). Major Williams will create new post orders for the two following services: Special Police Officer and Concierge. Once created will be emailed for approvals.").

150.	Vesta also requested changes to existing Post Orders. Pl.'s Ex. 25, Polistin Dep. at 92:16-18; Pl.'s Ex. 46, VESTA 084 at 084 (Ms. Kindred to PChange: "Can you please update the Pos[t] orders and make sure they are distributed"); Pl.'s Ex. 15, VESTA 110 at 110-111 (Ms. Kindred to PChange: "The Post Orders that were updated but did not include

the Concierge." PChange's response: "Taking care of that now ma'am.").

151.    Ms. Kindred has received complaints from residents at Park Southern about "officers standing around and talking to each other on the property." She did not direct the PChange SPOs not to do so. Pl.'s Ex. 26, Kindred Dep. at 137:13-138:11, 138:18-139:19.

152.    In August 2021, Ms. Kindred received a complaint from a long-time Park Southern resident about incompetent conduct by PChange SPOs, including Rambo and former Defendant Parker. Pl.'s Ex. 19, VESTA 132.

153.    An MPD investigation found that on September 3, 2020, while on duty for PChange, Defendant Tyrell Arrington negligently discharged his firearm inside the Village Chesapeake Apartment building, which is near Park Southern and managed by Vesta. The Vesta property manager was interviewed by MPD on December 29, 2020 as part of this investigation. Pl.'s Ex. 32, ROWE-TP-0218 at 218-222, 234, 248-249

154.    Defendants Williams and Hunter were present during the negligent discharge incident, and were found by MPD to have lied to MPD in connection with the incident. Pl.'s Ex. 32, ROWE-TP-0218 at 250-252.

155.    On September 29, 2021, MPD issued a notice of proposed revocation of PChange's Security Agency license as a result of the Chesapeake incident. Pl.'s Ex. 33, ROWE-TP-0260.

156.    MPD found that PChange's "failure to adequately train and supervise the employees of [PChange's] security agency created a substantial public safety risk." Pl.'s Ex. 33, ROWE-TP-0260 at 262.

157.    MPD also found that PChange and its SPOs "intentionally covered up the negligent discharge of a firearm." Pl.'s Ex. 33, ROWE-TP-0260 at 262.

158. On September 27, 2021, a different PChange SPO "engaged in a serious use of force" by striking "a handcuffed person in a community room." Additional PChange SPOs were present during this incident. Pl.'s Ex. 31, ROWE-TP-0033.

159. MPD then issued another notice of proposed revocation to PChange on May 24, 2022. MPD found again that PChange's "failure to adequately train and supervise the employees of [its] security agency created a substantial public safety risk." Pl.'s Ex. 31, ROWE-TP-0033 at 034.

160. PChange maintained a "command center" at Park Southern, where PChange SPOs (including those who were not posted at Park Southern) would store and check out their firearms. Pl.'s Ex. 22, Philson Dep. at 59:9-17. Ms. Kindred knew about the command center. Pl.'s Ex. 26, Kindred Dep. at 132:15-133:8.

161. SPOs in the District of Columbia must have and maintain a commission to act as a special police officer in the form of an SPO license. *See* Pl.'s Ex. 37, D.C. Mun. Regs. tit. 6, § 6-A1100 (2006).

162. SPO license statuses are posted publicly on a website maintained by the District of Columbia Department of Licensing and Consumer Protection ("DLCP"). Pl.'s Ex. 30 Alma Dep. at 120:1-9.

163. Williams' SPO license was in revoked status as of October 26, 2021. Pl.'s Ex. 30 Alma Dep. at 98:24-100:4; 101:4-9; 116:17-117:17; 155:25-156:8.

164. Williams' SPO license was revoked by the Security Officers Management Branch ("SOMB") of MPD in July 2021, after an MPD internal affairs investigation found that he had lied to MPD in connection with its investigation into a negligent discharge of a firearm by SPO Defendant Tyrell Arrington that occurred at the Village Chesapeake Apartment

building on September 3, 2020.  Pl.'s Ex. 32, ROWE-TP-0218 at 218, 251; Pl.'s Ex. 30, Alma Dep. at 66:11-67:3; 74:2-5; 98:24-100:4; 101:4-9; 116:17-117:17; 155:25-156:8.

165.    Because he was not effectively licensed, it was illegal for Williams to carry a firearm on October 26, 2021.  Pl.'s Ex. 30, Alma Dep. at 40:2-12.

166.    Hunter's SPO license was in revoked status as of October 26, 2021.  Pl.'s Ex. 32, ROWE-TP-0218 at 222, 255; Pl.'s Ex. 30, Alma Dep. at 74:6-8; 98:24-100:4; 101:4-9; 116:17-117:17; 155:25-156:8.

167.    Hunter's SPO license was revoked in connection with the same MPD internal affairs investigation into Arrington's negligent discharge of a firearm.  Pl.'s Ex. 32, ROWE-TP-0218 at 222, 255; Pl.'s Ex. 30, Alma Dep. at 74:6-8; 98:24-100:4.  Like Williams, that investigation found that Hunter had lied to MPD during that investigation.  Pl.'s Ex. 32, ROWE-TP-0218 at 251-252; Pl.'s Ex. 30, Alma Dep. at 74:6-8; 98:24-100:4.

168.    Because he was not effectively licensed, it was illegal for Hunter to carry a firearm on October 26, 2021.  Pl.'s Ex. 30, Alma Dep. at 40:2-12.

169.    Arrington's SPO license was revoked in connection with the same MPD internal affairs investigation into his negligent discharge of a firearm.  Pl.'s Ex. 32, ROWE-TP-0218 at 248-249, 255.

170.    SPOs must apply to renew their SPO licenses every year.  Pl.'s Ex. 38, MPD General Order 308.07 § I.D.1-8; Pl.'s Ex. 29, Broadie Dep. at 48:17-20.

171.    Ordinarily, all SPO license renewal applications must be submitted by May 31 of each year.  Pl.'s Ex. 29, Broadie Dep. at 47:19-2, 49:25-40:4.

172.    In 2021, due to the COVID pandemic, DLCP extended the deadline to submit SPO license renewal applications to September 30, 2021. Pl.'s Ex. 29, Broadie Dep. at 41:12-17.

173. The SPO licenses for SPOs who failed to submit complete SPO license renewal applications by September 30, 2021 went into expired status. Pl.'s Ex. 9, Ex. 16 to Broadie Dep. at 3; Pl.'s Ex. 29, Broadie Dep. at 97:21-24.

174. Philson's SPO license was in expired status as of October 26, 2021 because his application to renew his SPO license was incomplete as of the September 30, 2021 cutoff date for renewal. Pl.'s Ex. 9, Ex. 16 to Broadie Dep. at 3; Pl.'s Ex. 29, Broadie Dep. at 97:21-98:2.

175. Because he was not effectively licensed, it was illegal for Philson to carry a firearm on October 26, 2021. Pl.'s Ex. 30, Alma Dep. at 40:2-12.

176. As of October 26, 2021, Phillips had not yet received an effective SPO license. Pl.'s Ex. 23, Phillips Dep. at 17:10-13.

177. Hunter knew Mr. Rowe prior to October 26, 2021 because they grew up in the same neighborhood and saw each other frequently during that time. Pl.'s Ex. 24, Williams Dep. 132:18-133:8; Pl.'s Ex. 21, Hunter Dep. at 127:11-128:15.

178. Phillips testified that Williams "technically wasn't supposed to be in – out there on the field but he was out there. He was labeled as a [Safety Ambassador] at the time." Pl.'s Ex. 23, Phillips Dep. at 54:14-55:14.

179. PChange SPOs, including Williams and Hunter, were required to confirm that they had reviewed and agreed to abide by PChange's use of force policy. Pl.'s Ex. 24, Williams Dep. at 52:10-66:7; Pl.'s Ex. 21, Hunter Dep. at 46:13-59:13; Pl.'s Ex. 47, PChange Use of Force Policy.

180. On the afternoon of October 26, 2021, the exit to the parking garage was partially blocked by two PChange vehicles. Pl.'s Ex. 13, VESTA 049 at 059; Pl.'s Ex. 24, Williams

Dep. at 137:2-138:14; Pl.'s Ex. 27, M. Rowe Dep. at 86:22-87:10.

181. Between five and ten PChange SPOs in total, including the SPO Defendants, were standing next to the PChange vehicle, blocking the roadway leading into and out of the parking garage at Park Southern. Pl.'s Ex. 24, Williams Dep. 138:5-9; 142:7-143:14.

182. The SPOs "were all just standing there talking," and "pretty much lounging." Pl.'s Ex. 23, Phillips Dep. at 54:8-55:4.

183. The group of SPOs included Williams, Hunter, and Arrington, as well as Delante Albany, Tyauna Perry, Ryan "Rambo" Kratz, and Felix Nyakanga. Pl.'s Ex. 24, Williams Dep. at 135:16-136:13, 140:4-142:6; Pl.'s Ex 23, Phillips Dep. at 53:17-54:13.

184. Phillips was standing further away from the group waiting for his partner in the garage, about 10-15 feet away from the security booth inside the garage. Pl.'s Ex. 23, Phillips Dep. at 51:5-52:12.

185. Philson was not standing with the group at the initiation of the incident and only came out of the building after the detention had begun. Pl.'s Ex. 22, Philson Dep. at 81:15-20; 97:18-104:4.

186. Williams, Hunter, and Philson were armed with firearms. Pl.'s Ex. 24, Williams Dep. at 128:3-8; Pl.'s Ex. 21 Hunter Dep. at 85:4-87:3; Pl.'s Ex. 22, Philson Dep. at 60:14-18.

187. The Defendant SPOs, as well as Kratz and Nyakanga, were all wearing PChange uniforms bearing PChange insignia. Pl.'s Ex. 12, VESTA 045 at 046; Pl.'s Ex. 24, Williams Dep. at 128:9-11; Pl.'s Ex. 22, Philson Dep. at 155:17-19; Pl.'s Ex. 1, ROWE-TP-0623 at 00:31.

188. None of the SPOs were equipped with speed detection devices on October 26, 2021. Pl.'s Ex. 24, Williams Dep. at 144:7-8; Pl.'s Ex. 21, Hunter Dep. at 96:18-22.

189. Williams thought Mr. Rowe was speeding based on "the revving of the engine," but admitted that he had received no training on assessing the speed of a car based on the sound of its engine. Pl.'s Ex. 24, Williams Dep. at 144:2-11.

190. Mr. Rowe was not speeding. Pl.'s Ex. 27, M. Rowe Dep. at 80:1-3. When Mr. Rowe saw the SPOs and their vehicles blocking the exit, he stopped about 50 to 75 feet away from them and double tapped his horn gently twice. Pl.'s Ex. 27, M. Rowe Dep. at 81:13-82:20; Pl.'s Ex. 4, ROWE-TP-0634 at 16:32-17:35, 32:00-32:30; Pl.'s Ex. 1, ROWE-TP-0623 at 00:19-1:10; Pl.'s Ex. 24, Williams Dep. at 151:1-152:20, 154:2-7 (admitting Mr. Rowe slowed down as he approached).

191. The SPOs looked at Mr. Rowe, turned around, and kept going about their conversation. Pl.'s Ex. 27, M. Rowe Dep. at 81:13-82:20; Pl.'s Ex. 21, Hunter Dep. 95:25-96 2; 97:3-97:6 (testifying that he noticed Mr. Rowe's vehicle when it was one hundred yards from the group of SPOs and that he saw Mr. Rowe driving for a couple minutes); Pl.'s Ex. 4, ROWE-TP-0634 at 16:32-17:35, 32:00-32:30; Pl.'s Ex. 1, ROWE-TP-0623 at 00:19-1:10.

192. Mr Rowe then pulled forward slightly until he was about 25 to 50 feet away from them, stopped, and double tapped his horn again. Pl.'s Ex. 27, M. Rowe Dep. at 81:13-82:20; Pl.'s Ex. 4, ROWE-TP-0634 at 16:32-17:35, 32:00-32:30; Pl.'s Ex. 1, ROWE-TP-0623 at 00:19-1:10.

193. The SPOs turned to look at Mr. Rowe again because he honked his horn but did not move. Pl.'s Ex. 27, M. Rowe Dep. at 84:5-12. Mr. Rowe lifted his foot off of the brake to let the car move a little, and then lightly tapped the gas to get the car moving. Pl.'s Ex. 27, M. Rowe Dep. at 82:21-83:8; Pl.'s Ex. 4, ROWE-TP-0634 at 16:32-17:35, 32:00-32:30.

194. The SPOs only moved out of the way when Mr. Rowe started rolling forward. Pl.'s Ex.

27, M. Rowe Dep. at 83:1-84:4; Pl.'s Ex. 24, Williams Dep. at 145:21-146:23.

195. Mr. Rowe left a safe distance between his vehicle and the SPOs as he drove past them. Pl.'s Ex. 23, Phillips Dep. at 56:5-19 (testifying Mr. Rowe was five feet away from him as he drove past); Pl.'s Ex. 27, M. Rowe Dep. at 85:7-11 (testifying his vehicle was one-and-a-half to two full steps away from the SPOs as he drove by).

196. As Mr. Rowe drove past the SPOs, he yelled out the window to express frustration that the SPOs were blocking the exit, using expletives in the process. Pl.'s Ex. 27, M. Rowe Dep. at 85:15-86:22; Pl.'s Ex. 21, Hunter Dep. at 99:19-100:20; ROWE-TP-0634 at 16:32-17:35, 32:00-32:30; Pl.'s Ex. 4, ROWE-TP-0623 at 00:19-1:10.

197. In response, the SPOs yelled back at Rowe, including yelling at him to slow down. Pl.'s Ex. 24, Williams Dep. at 154:12-155:17; Pl.'s Ex. 12, VESTA 045 at 046.

198. Mr. Rowe stopped his vehicle just past where the SPOs were standing. Pl.'s Ex. 24, Williams Dep. at 154:12-155:17; Pl.'s Ex. 27, M. Rowe Dep. at 87:1-10; Pl.'s Ex. 23, Phillips Dep. at 58:19-59:4.

199. The SPOs approached Mr. Rowe's vehicle and formed a "perimeter" around it, including with Williams approaching Mr. Rowe's driver-side window and Hunter standing toward the rear passenger side of the vehicle. Pl.'s Ex. 21, Hunter Dep. 99:8-18; 104:15-105:2. Both Williams and Hunter saw Mr. Rowe's children in the backseat of the car around this time. Pl.'s Ex. 24, Williams Dep. at 183:12-17; Pl.'s Ex. 21, Hunter Dep. at 97:13-16.

200. Williams approached Mr. Rowe's window and demanded his identification. Pl.'s Ex. 24, Williams Dep. at 156:15-159:4, 163:4-22; Pl.'s Ex. 27, M. Rowe Dep. at 87:1-19. Williams later stated that he wanted to confirm whether he was a resident and issue a barring notice for violating Park Southern's rule against speeding. Pl.'s Ex. 24, Williams Dep. at 156:15-

159:4, 163:4-22; Pl.'s Ex. 27, M. Rowe Dep. at 87:1-19. Phillips believed that Williams was "basically conduct[ing] a traffic stop." Pl.'s Ex. 23, Phillips Dep. at 58:19-59:8; Pl.'s Ex. 5 ROWE-TP-0645 at 7:00-7:40.

201. At the time Williams approached Mr. Rowe's vehicle, he did not believe that Mr. Rowe had committed any crime other than "violat[ing] a rule by speeding through the parking lot." Pl.'s Ex. 24, Williams Dep. at 157:2-16.

202. Mr. Rowe's proffered expert, Dr. Theon Bowman, opined that at the point the officers formed a perimeter around Mr. Rowe's car, "[a]ny law enforcement agency, employing generally accepted police standards and practices would have determined that its officers had detained Mr. Rowe." Pl.'s Ex. 43, Report of Theon Bowman ("Bowman Report") at ¶ 60. Dr. Bowman further opined that, "[u]nder these facts and circumstances, any reasonable law enforcement agency, employing generally accepted police standards and practices would have determined that the officers' detention of Mr. Rowe was not justified." Pl.'s Ex. 43, Bowman Report at ¶ 61.

203. Williams and Hunter submitted written statements to MPD about the incident, and Williams provided an identical statement to Vesta. In these written statements to MPD, neither Hunter nor Williams mention being in fear for his safety or the safety of any of the other SPOs as a result of Mr. Rowe's driving. Pl.'s Ex. 45, ROWE-TP-0344 (Hunter); Vesta's Ex. 11, ECF No. 144-13 at 6 (Williams); Pl.'s Ex. 12, Incident Report Provided to Vesta.

204. Following the initiation of this lawsuit, Phillips sent a written statement to Mr. Rowe's counsel. Pl.'s Ex. 35. Phillips makes no mention in this letter of being in fear for his safety or the safety of any of the other SPOs. *Id.*

205.    Mr. Rowe asked Williams to call the police.  Pl.'s Ex. 27, M. Rowe Dep. at 90:19-91:7.
Williams responded, "I am the police."  Pl.'s Ex. 1,  ROWE-TP-0623 at 1:00.

206.    Mr. Rowe was willing to provide his driver's license if the SPOs called 911, and was
willing to pull over and wait for MPD to arrive.  Pl.'s Ex. 27, M. Rowe Dep. at 90:14-91:7,
102:8-12.

207.    Hunter placed his hand on his weapon.  Pl.'s Ex. 27, M. Rowe Dep. at 92:17-93:10.  Mr.
Rowe asked if Hunter was going to shoot him, and Hunter replied, "If I have to."  Pl.'s Ex.
27, M. Rowe Dep. at 92:17-93:10.

208.    Williams asked for another SPO to bring mace and then started yanking on the door
handle.  Pl.'s  Ex. 27, M. Rowe Dep. at 102:13-18.

209.    Mr. Rowe opened the door to avoid Williams causing damage to his mother's car.  Pl.'s
Ex. 27, M. Rowe Dep. at 102:19-103:8.

210.    Williams told Mr. Rowe to open the door because Mr. Rowe was under arrest for failure
to identify.  Pl.'s Ex. 27, M. Rowe Dep. at 103:9-12.

211.    Mr. Rowe placed the car into park.  Pl.'s Ex. 27, M. Rowe Dep. at 104:9-17.  The
gearshift in the car, a GMC Acadia, would have been visible because it was in front of the
radio.  Pl.'s Ex. 27, M. Rowe Dep. at 105:2-7.

212.    As Mr. Rowe reached with his right hand to turn off the ignition, Williams reached over,
snatched the key out of his hand, and bent the key into an L shape.  Pl.'s Ex. 27, M. Rowe
Dep. at 104:8-105:16; Pl.'s Ex. 8, ROWE-TP-0631.

213.    Phillips did not feel threatened by Mr. Rowe, and did not feel threatened at any point
while this was going on.  Pl.'s Ex. 23, Phillips Dep., 80:12-16.

214.    Williams reached into the car and began to attempt to drag Mr. Rowe out, grabbing him

by his neck, shirt, and hair and shaking him "like a rag doll."  Pl.'s Ex. 27, M. Rowe Dep. at 106:10-21; Pl.'s Ex. 7, ROWE-TP-0581 at 0:40-0:58; Pl.'s Ex. 42, Decl. of James Bowdling ("Bowdling Decl.") at ¶ 20.

215.    Mr. Rowe was still wearing his seatbelt when Williams began to attempt to pull him out of the car.  Pl.'s Ex. 27, M. Rowe Dep. at 107:4-14.

216.    Mr. Rowe unbuckled his own seatbelt.  Pl.'s Ex. 27, Rowe Dep. at 107:4-14.

217.    After he took his seatbelt off, Mr. Rowe grabbed the steering wheel with his right hand because he feared for his life.  Pl.'s Ex. 27, M. Rowe Dep. at 108:1-13; Pl.'s Ex. 24, Williams Dep. at 165:15-19.

218.    At the same time, Williams handcuffed Mr. Rowe's left hand.  Pl.'s Ex. 27, M. Rowe Dep. at 108:1-13; Pl.'s Ex. 24, Williams Dep. at 165:15-19.  At this point, other SPOs, including Hunter, were involved in physically handling Mr. Rowe.  Bowdling Decl. at ¶ 20.

219.    Williams ordered Hunter to get OC spray.  Pl.'s Ex. 27, M. Rowe Dep. at 109:1-5; Pl.'s Ex. 24, Williams Dep. at 169:12-18.

220.    Mr. Rowe was not combative with the SPOs and did not try to fight back out of fear for his safety and to avoid being charged with assaulting a police officer.  Pl.'s Ex. 27, M. Rowe Dep. at 106:12-21; Pl's Ex. 42, Bowdling Decl. at ¶ 18.  Williams later confirmed to MPD that Mr. Rowe did not strike anyone.  Pl.'s Ex. 4, ROWE-TP-0634 at 3:50-3:57.

221.    Mr. Rowe let go of the steering wheel and stepped out of his vehicle, where Hunter and Williams pressed him against the inside of the driver side door, put both hands behind his back and handcuffed him.  Pl.'s Ex. 27, M. Rowe Dep. at 108:22-111:19; Pl.'s Ex. 4, ROWE-TP-0634 at 41:20-43:15.  Mr. Rowe told the SPOs he did not want to hear what they had to say and asked them again to call 911.  Pl.'s Ex. 27, M. Rowe Dep. at 109:13-18.

222.    Hunter sprayed the OC spray directly into Mr. Rowe's face despite both of his hands being handcuffed. Pl.'s Ex. 27, M. Rowe Dep. at 108:22-111:10; Pl.'s Ex. 4, ROWE-TP-0634 at 41:20-43:15; Pl.'s Ex. 12, Incident Report Provided to Vesta, VESTA 045 at 046 (writing Mr. Rowe was "fully detained in handcuffs" when Williams ordered Hunter to deploy OC spray); Vesta's Ex. 11, ECF No. 144-13 at 6.

223.    No one else, including Mr. Rowe's children in the backseat of his car, was hit by the OC spray. Pl.'s Ex. 23, Phillips Dep. at 73:16-18.

224.    After spraying Mr. Rowe's face with OC spray, Williams and Hunter began trying to go through his pockets. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19.

225.    Mr. Rowe said he did not consent to any searches. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19.

226.    Williams and Hunter slammed Mr. Rowe against a nearby fence and tried to search his pockets again. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19. Mr. Rowe loudly repeated that he did not consent to any searches. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19; Pl.'s Ex. 4, ROWE-TP-0634 at 41:20-43:15.

227.    Mr. Rowe did not physically resist the search and could not have fought off the SPOs given that his handcuffs were behind his back and his wrists were numb. Pl.'s Ex. 27, M. Rowe Dep. at 112:20-114:15. He was "traumatized from everything that just happened," so his "whole body [was] tense." *Id.*

228.    One of the SPOs yelled, "ground him" and advised the other SPOs to watch Mr. Rowe's head and neck. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-111:19; Pl.'s Ex. 4, ROWE-TP-0634 at 41:20-43:15. The SPOs lifted Mr. Rowe in the air and slammed him on the ground on top of his cuffed hands, further tightening his handcuffs. Pl.'s Ex. 27, M. Rowe Dep. at 110:11-

111:19; Pl.'s Ex. 4, ROWE-TP-0634 at 41:20-43:15. At this point, a nearby witness to the incident called MPD to report the incident. Pl.'s Ex. 7, ROWE-TP-0581; Bowdling Decl. at ¶ 25.

229. Use of force expert Dr. Theron Bowman opined that the use of force against Mr. Rowe was excessive as they did not have a lawful basis to detain or use force against Mr. Rowe. Pl.'s Ex. 43, Bowman Report at ¶ 64. Dr. Bowman further opined that, even if they had reason to suspect Mr. Rowe of a traffic offense, the use of force would still be excessive considering the nature of that offense. ¶ 69.

230. Contrary to protocol, the SPOs did not rinse Mr. Rowe's eyes with water after applying the OC spray. Pl.'s Ex. 4, ROWE-TP-0634 at 43:00-43:15; Pl.'s Ex. 39, MPD General Orders GO-901.04 § II.D.6.B-C.

231. On October 26, 2021, Charlene Rowe, Mr. Rowe's mother, told Ms. Kindred about the incident between Mr. Rowe and the PChange SPOs as it was occurring. Ms. Rowe pleaded with Ms. Kindred to follow her outside where Mr. Rowe and the SPOs were located, and to request that the SPOs move away from Mr. Rowe and release him from detainment. Pl.'s Ex. 28, C. Rowe Dep. at 19:17-20:14, 24:9-25:15.

232. Ms. Kindred was in her office at Park Southern for at least part of the incident as it was unfolding. Pl.'s Ex. 26, Kindred Dep. at 111:3-112:12.

233. There were monitors in Ms. Kindred's office at Park Southern that displayed feeds from cameras in the parking garage. The cameras also covered parts of the entrance and exit to the garage. The cameras were operational on October 26, 2021. Ms. Kindred testified that her general practice was to "[p]eriodically" look at the monitors. Pl.'s Ex. 26, Kindred Dep. at 98:1-5, 100:5-12, 110:6-14, 113:12-22.

234. Ms. Kindred came out and saw Mr. Rowe prior to the arrival of MPD officers. Pl.'s Ex. 27, M. Rowe Dep. at 15:6-10; Pl.'s Ex. 28, C. Rowe Dep. at 23:11-18, 25:3-9, 27:7-13 (testifying that MPD "may have come a minute or two" after she arrived with Ms. Kindred).

235. After Ms. Kindred arrived at the scene of the incident, she saw that Mr. Rowe was in handcuffs and on the ground, and she refused Mr. Rowe's request to her to have the SPOs loosen the handcuffs. Ex. 26, Kindred Dep. at 122:3-7; Ex. 27, M. Rowe Dep. at 36:13-18, 42:15-22.

236. After Ms. Kindred arrived at the scene of the incident, she spoke briefly with the SPOs, and went back inside within minutes of her arrival. Pl.'s Ex. 26, Kindred Dep. at 122:14-18; Ex. 28, C. Rowe Dep. at 26:6-16.

237. Ms. Kindred told Ms. Rowe that there was nothing she could do to help Mr. Rowe. Pl.'s Ex. 28, C. Rowe Dep. at 26:11-19.

238. Two MPD officers arrived at the scene at approximately 4:00 PM. Pl.'s Ex. 1, ROWE-TP-0623; Pl.'s Ex. 4, ROWE-TP-0634 at 2:27.

239. One of the MPD officers asked Williams if Mr. Rowe had assaulted anybody, and Williams told him, "No, he didn't hit—nah he just kept resisting." Pl.'s Ex. 4, ROWE-TP-0634 at 3:50-57.

240. Williams told the MPD officers he planned on barring Mr. Rowe but did not know if he could "hit him for the resisting" because there needed to be "regular other charges attached to it." Pl.'s Ex. 4, ROWE-TP-0634 at 4:28-4:48.

241. Williams told MPD he wanted to lock up Mr. Rowe but did not know whether he could charge Mr. Rowe with "speeding toward us." Pl.'s Ex. 4, ROWE-TP-0634 at 5:24-5:30.

242. Mr. Rowe told MPD at the scene that the SPOs were blocking the driveway when he was

driving through the parking garage. He stopped and honked his horn at them and then slowly moved toward them in his car so they would move out of the way. Pl.'s Ex. 4, ROWE-TP-0634 at 16:32-17:35; 26:00-26:50.

243. At approximately 4:15 PM, MPD officers replaced the handcuffs the SPOs had placed on Mr. Rowe in response to his complaints that the handcuffs were on too tight. Pl.'s Ex. 4, ROWE-TP-0634 at 13:40-14:50.

244. The MPD officers who responded to the scene had a discussion about what offense to charge Mr. Rowe with and seemed confused as to what, if anything, Mr. Rowe could be charged with based on the facts the SPOs presented to them. "Failure to identify is not a locking offense." Pl.'s Ex. 4, ROWE-TP-0634 22:10-23-22:50.

245. At approximately 4:30 PM, MPD decided there was no probable cause for an arrest and released Mr. Rowe without charge and advised Mr. Rowe not to interact with the SPOs because they might "get in their feels" and take further action against him. MPD then removed Mr. Rowe's handcuffs and released him at the scene. Pl.'s Ex. 3, ROWE-TP-0626 at 0:01-0:40; Ex. 4, ROWE-TP-0634 at 26:00-31:20.

246. An MPD officer told the SPOs they had made several errors in their conduct toward Mr. Rowe, including describing the stop of Mr. Rowe as a "traffic stop" that they "legally" did not have the authority to make and explaining that failure to identify does not provide a basis for arrest and that they can issue a barring notice based on physical description and/or a photograph. Pl.'s Ex. 6, ROWE-TP-0628 at 00:55-2:20.

247. Mr. Rowe was unable to work following his injury, and he was treated the day after the incident for muscle strain in his neck, wrist, and shoulder, and a tingling sensation in his fingers. Pl.'s Ex. 27, M. Rowe Dep. at 50:15-53:12; Verification of Treatment,

ROWE00000070 at 0071, ECF No. 144-19 at 3.

248. Following the incident, Mr. Rowe sought and received mental health treatment from Project Empowerment, a program provided by the District of Columbia Department of Employment Services. Pl.'s Ex. 27, M. Rowe Dep. at 56:1-21.

249. Mr. Rowe was evaluated by his proffered expert, Edward McCurty, in connection with this matter, who opined that Mr. Rowe "presents symptoms and behaviors that are consistent with a DSM 5 diagnosis of: Posttraumatic stress disorder, chronic (F43.12)." Pl.'s Ex. 44, Expert Report of Edward McCurty ("McCurty Report") at ¶ 22.

250. Mr. Rowe continues to experience symptoms of PTSD, including irritability, depression, flashbacks, nightmares, insomnia, loss of interest in activities he once enjoyed, negative cognitions about himself and his future, hyperarousal, and avoidance. Pl.'s Ex. 44, McCurty Report at ¶¶ 18-24.

251. Mr. Rowe's PTSD is frequently triggered by the presence of SPOs. Pl.'s Ex. 44, McCurty Report at ¶¶ 18-21.

252. Mr. Rowe's PTSD significantly affects his daily life. Pl.'s Ex. 44, McCurty Report at ¶¶ 18-24.

253. Dr. Bowman opined that if Williams believed Mr. Rowe may have had a weapon and posed a danger to him as he approached the vehicle and asked for Mr. Rowe's ID, then a reasonable officer would have ordered the driver to stop moving and show their hands, and would have drawn their weapon and pointed it at the suspect to gain control and ensure compliance. Pl.'s Ex. 42, Bowman Report at ¶¶ 16-20.

Dated: August 5, 2024                    Respectfully Submitted,

/s/ *Thomas A. Bednar*
Thomas A. Bednar (D.C. Bar No. 493640)
David A. Last (D.C. Bar No. 476335)
Jessica Hollis (D.C. Bar No. 1618781)
Caleb J. Robertson (D.C. Bar No. 1720614)
Michael Schulman (D.C. Bar No. 1617228)
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Phone: (202) 974-1836 (Bednar)
Fax: (202) 974-1999
*dlast@cgsh.com*
*tbednar@cgsh.com*
*jhollis@cgsh.com*
*cjrobertson@cgsh.com*
*mschulman@cgsh.com*

/s/ *Dennis A. Corkery*
Dennis A. Corkery (D.C. Bar No. 1016991)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th St., NW
Ste. 400
Washington, D.C. 20005
(202) 319-1000
*dennis_corkery@washlaw.org*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Thomas A. Bednar, hereby certify that:

On August 5, 2024 a copy of the forgoing was served on all registered counsel by the

Court's CM/ECF system and by U.S. mail, first-class postage prepaid on the following party:

Shamar Phillips
7166 Lauren Lane, Unit 1002
Easton, MD 21601

Dated: August 5, 2024                    By:  /s/ *Thomas A. Bednar*
                                              Thomas A. Bednar